1   JEFFREY D. DINTZER (S.B. #139056)
    jeffrey.dintzer@alston.com
2   MATTHEW C. WICKERSHAM (S.B. #241733)
    matt.wickersham@alston.com
3   ALSTON & BIRD LLP
    333 South Hope Street, 16th Floor
4   Los Angeles, California 90071
    Telephone:    +1 213 576 1000
5   Facsimile:    +1 213 576 1100

6   Attorneys for Plaintiffs FIVE POINT HOLDINGS,
    LLC and CP DEVELOPMENT CO., LLC
7

8                  **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11  FIVE POINT HOLDINGS, LLC and CP          | Case No. _____
    DEVELOPMENT CO., LLC
12                                           | **COMPLAINT OF FIVE POINT
                                             | HOLDINGS, LLC AND CP
13           Plaintiffs,                     | DEVELOPMENT CO., LLC AGAINST
                                             | THE UNITED STATES OF AMERICA
14  v.                                       | FOR:**

15  UNITED STATES OF AMERICA,                | **(1) NEGLIGENCE**

16           Defendant.                      | **(2) NEGLIGENT HIRING**

17                                           | **(3) NEGLIGENT INTERFERENCE
                                             | WITH PROSPECTIVE ECONOMIC
18                                           | ADVANTAGE**

19                                           | **(4) EQUITABLE INDEMNIFICATION**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………………………………1

II.   PARTIES………………………………………………………………………...3

III.  JURISDICTION AND VENUE………………………………………………………4

IV.  FACTS………………………………………………………………………...5

      A.    The Hunters Point Naval Shipyard…………………………………………..5

      B.    Tetra Tech's "Investigation" of The Shipyard Under United States "Supervision".7

      C.    Plaintiffs' Knowledge of the United States' Negligence…....................................10

      D.    Injuries Suffered by Plaintiffs…………………………………………………13

V.   FIRST CAUSE OF ACTION (NEGLIGENCE) …………………………………………14

VI.  SECOND CAUSE OF ACTION (NEGLIGENT HIRING) …………………………………16

VII. THIRD CAUSE OF ACTION (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE) …………………………………………………………...17

VII. FOURTH CAUSE OF ACTION (EQUITABLE INDEMNIFICATION)…………………..18

IX.   PRAYER FOR RELIEF………………………………………………………..20

1

## I.   <u>INTRODUCTION</u>

2      1.      In 1991, the United States Department of the Navy, acting as part of the United

3  States of America ("United States") (herein after referred to as the "United States", "the

4  Government" or "the Navy"), announced its intention to close the Hunters Point Naval Shipyard

5  (the "Shipyard") and transfer the Shipyard to the City and County of San Francisco ("San

6  Francisco") for redevelopment. The Shipyard, which includes hundreds of acres of prime real

7  estate, offered an opportunity for the development of affordable homes and community benefits

8  in an area of San Francisco short on both.

9      2.      Plaintiff Five Point Holdings LLC ("Five Point") is an owner and developer of

10 mixed-use, master-planned communities in coastal California. Plaintiff CP Development Co.,

11 LLC ("CP Dev. Co.," and collectively with Five Point, as "Plaintiffs") is an indirect subsidiary of

12 Five Point. After the Navy transfers parcels of the Shipyard property to San Francisco, San

13 Francisco transfers those parcels to CP Dev. Co., which will develop the property. At the time

14 Plaintiffs acquired their interest in the redevelopment of the Shipyard, the United States had

15 provided to San Francisco and Plaintiffs a schedule for completion of environmental remediation

16 by the United States' remediation contractors, including Tetra Tech, Inc. and Tetra Tech EC, Inc.

17 (collectively, "Tetra Tech") and the subsequent property transfer by the United States to San

18 Francisco, which would have resulted in the transfer of the Shipyard properties to Plaintiffs for

19 redevelopment in phases beginning in 2016, with the majority of the property to be transferred by

20 2019, and the final parcel in 2021.

21     3.      Unfortunately, in May 2018, Plaintiffs learned for the first time from public

22 reports that the United States had filed a victim impact statement with this federal court

23 estimating that the remaining planned transfer of parcels of the Shipyard property, including the

24 transfer of the property which was slated to be transferred to Plaintiffs for redevelopment, would

25 be delayed for a significant period of time. Following the release of that information, the Navy

26 provided Plaintiffs with a remediation and transfer schedule that called for a phased transfer to

27 San Francisco (and then Plaintiffs) beginning in 2022 and ending in 2026 (and now another

28

LEGAL02/39533569v11

1   schedule that calls for transfers to begin in 2021 and end in 2025). The new transfer schedules

2   totally contradicted the prior transfer schedule provided by the Navy to Plaintiffs.

3        4.     Transfer of the Shipyard property and planned redevelopment of the Shipyard has

4   been delayed as a result of the fraud perpetrated by Tetra Tech that was overseen by the Navy.

5   Tetra Tech was paid hundreds of millions of dollars by the Navy to investigate and remediate, as

6   necessary, potential environmental contaminants, which might be present on the Shipyard

7   property due to prior Navy activities. Instead of properly supervising the investigation, testing,

8   and remediation of the Shipyard property by Tetra Tech, the Navy conducted grossly negligent

9   oversight of Tetra Tech despite straightforward obligations under its contract with Tetra Tech and

10  governing law.

11       5.     Fraudulent activities by Tetra Tech at the site now have been confirmed. Two

12  former Tetra Tech employees pled guilty to felonies for their roles in the fraudulent conduct

13  described herein. The U.S. Department of Justice has intervened in a *qui tam* Complaint brought

14  by whistleblowers. The United States is pursuing violations of the False Claims Act against Tetra

15  Tech on behalf of the Navy based upon the widespread fraud in the performance of Tetra Tech's

16  environmental investigation work at the Shipyard property under its contract with the Navy.

17       6.     This is too little too late by the United States; the United States failed to properly

18  supervise Tetra Tech for years pursuant to its contractual, statutory and other legal obligations to

19  do so. The United States deliberately withheld from Plaintiffs information in its possession about

20  Tetra Tech's fraudulent activities, and instead distributed schedules to the public, including San

21  Francisco and Plaintiffs, that the United States knew could not be met because of Tetra Tech's

22  fraudulent activities. The Navy and Tetra Tech deliberately and overtly downplayed information

23  about supposedly discrete anomalies in the data collection and downplayed the potential for

24  ensuing project delays. The Navy repeatedly represented to Plaintiffs that anomalies in the data

25  collection would not materially affect the transfer schedule, even when pressed by Plaintiffs about

26  concerns that the schedule may slip. Meanwhile, the Navy deliberately withheld information

27  about Tetra Tech's fraud from the public, including San Francisco and Plaintiffs, while the United

28  States conducted a full investigation into the fraud for years, without making the nature and

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

extent of the fraud it was investigating public. It was not until May 2018 that the United States revealed that there had been confirmed criminal misconduct and that guilty pleas had been secretly entered by Tetra Tech supervisors a year earlier—in May 2017.  It was also not until May 2018 that the Navy finally attested in a court filing that transfer would be delayed significantly, thereby recognizing and acting upon its duty to ensure the environmental investigation of the Shipyard property suitable for transfer and redevelopment.

7.     The fraudulent conduct by Tetra Tech that was negligently supervised by the United States has received widespread, negative media attention. That negative media attention has diminished the value of the future development of the Shipyard, including surrounding properties on which Tetra Tech did little or no work.

8.     As a result of this negligent conduct at the Shipyard by the United States, Plaintiff Five Point and its Chief Executive Officer (Emile Haddad) have been named as defendants in numerous lawsuits, even though they had absolutely nothing to do with remediation at the site and did not know the extent of the fraudulent activities of Tetra Tech (or the impact of such activities on the Shipyard transfer schedule) until they became public in May 2018. Rather, given the significant delay in the transfer of the Shipyard property to San Francisco, and in turn Plaintiffs, and the negative public perception now associated with the Shipyard, Plaintiffs are themselves victims of the United States' negligence. Because of its past negligent supervision and oversight, the United States is unable to certify the Shipyard property for transfer to Plaintiffs. As of the filing of this Complaint, the United States has not and cannot give Plaintiffs any realistic assurances as to when the property will be transferred. As such the United States is liable for the damage it has caused to Plaintiffs.

## II.     PARTIES

9.     Defendant the United States of America is named based upon the activities and liability of its Department of the Navy. The United States is responsible for transfer of the Shipyard pursuant to the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

10.     Plaintiffs Five Point and CP Dev. Co. are limited liability companies both formed in the state of Delaware and both registered as a foreign limited liability companies with the State of California. Five Point conducts its business as the operating managing member of Five Point Operating Company, LP, a Delaware limited partnership. Five Point Operating Company, LP is the sole manager of The Shipyard Communities, LLC, a Delaware limited liability company. The Shipyard Communities, LLC is the parent company of CP Dev. Co. CP Dev. Co. is the entity that will own and develop the Shipyard properties ultimately transferred to Plaintiffs. Plaintiff Five Point has an interest in redevelopment upon transfer from the United States by managing operations of CP Dev. Co. Plaintiffs have been harmed by the Navy's negligent oversight of its contractor Tetra Tech, and the United States is legally responsible for damages caused by that harm.

### III.     JURISDICTION AND VENUE

11.     This is a civil action against the United States brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. Jurisdiction is proper pursuant to 28 U.S.C. § 1346(b). Moreover, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1441(a), on the ground that the conduct giving rise to this action occurred in part on a federal enclave within the former Hunters Point Naval Shipyard.

12.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1402(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district and the property that is the subject of the action is located in this district.

13.     Plaintiff Five Point has properly exhausted its administrative remedies against the United States. On June 27, 2019, the United States received a completed written demand on Standard Form 95 from Plaintiff Five Point for damages, wherein Plaintiff Five Point gave notice of claims for negligence and equitable indemnity against the United States under the Federal Tort Claims Act ("FTCA"). The United States did not respond "within six months" to Plaintiff Five Point concerning disposition of the claims, which shall "be deemed a final denial of the claim" under 28 U.S.C. § 2675.

14.     Plaintiff CP Dev. Co. properly exhausted its administrative remedies against the United States. On June 27, 2019, the United States received a completed written demand on Standard Form 95 from Plaintiff CP Dev. Co. for damages, wherein Plaintiff CP Dev. Co. gave notice of claims for negligence and equitable indemnity against the Navy under the FTCA. The United States did not respond "within six months" to Plaintiff CP Dev. Co. concerning disposition of the claims, which shall "be deemed a final denial of the claim" under 28 U.S.C. § 2675.

## IV.     FACTS

### A.     The Hunters Point Naval Shipyard

15.     The Shipyard is located on a promontory in southeastern San Francisco, and consists of approximately 936 acres, a portion of which is submerged beneath the San Francisco Bay.

16.     The United States purchased the Shipyard property in 1939 and used the site as a center for ship repair during World War II and the Korean War. Due to Naval activities at and around the site, areas of the Shipyard risked contamination by radionuclides. The United States deactivated the Shipyard in 1974 and most of the site was leased to a commercial ship repair company from 1976 to 1986. In 1991, the Shipyard was selected for closure pursuant to the terms of the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

17.     On January 21, 1994, the United States, San Francisco, and the City and County of San Francisco Redevelopment Agency ("SFRA") executed a memorandum of understanding to establish the process for conveying the Shipyard property for redevelopment. Pursuant to a Conveyance Agreement between the United States on the one hand, and the SFRA on the other, the Shipyard was to be transferred to the SFRA in multiple phases. The United States had previously delineated the Shipyard into separate parcels. The first phase of transfer included Parcel A, while the second phase of transfer was meant to include the remaining parcels.

18.     Before the United States may transfer Shipyard property for redevelopment, the Navy must certify that the property scheduled to be transferred have been subject to

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

LEGAL02/39533569v11

1  environmental investigation and that the results of the investigation determine the property is

2  suitable for transfer. The Navy does so by issuing a Finding of Suitability to Transfer ("FOST")

3  for that specific portion of the Shipyard property that is subject to transfer. Without a FOST,

4  parcels of the Shipyard property may not be transferred.

5       19.    In 2004, the Navy issued a FOST for Parcel A, and transferred Parcel A to the

6  SFRA for redevelopment. In 2005, the SFRA conveyed the majority of Parcel A to affiliates of

7  Lennar Corporation, which affiliates broke ground on redevelopment of Parcel A in June 2013.

8  Since transferring Parcel A in 2005, the SFRA was dissolved pursuant to California state law, and

9  the City subsequently created the Office of Community Investment and Infrastructure as the

10  Successor Agency to the SFRA, which is required to complete work related to prior enforceable

11  obligations of the SFRA such as the Conveyance Agreement.

12       20.    In May 2007, affiliates of the Lennar Corporation and the SFRA executed the

13  Second Amended and Restated Exclusive Negotiations and Planning Agreement (Phase 2 of

14  Hunters Point Shipyard, with an Option to Expand Planning and Exclusive Negotiations to

15  Include Candlestick Point) ("ENA") concerning development of Phase 2 of the Shipyard for

16  parcels other than Parcel A. In August 2008, Lennar affiliates assigned their interests in the ENA

17  to CP Dev. Co. In June 2010, CP Dev. Co. and the SFRA entered into the Disposition and

18  Development Agreement (Candlestick Point and Phase 2 of the Hunters Point Shipyard)

19  ("DDA"), which provided for the development of Phase 2 of the Shipyard by CP Dev. Co. In

20  May 2013, the interests of CP Dev. Co. under the DDA in development of Phase 2 of the

21  Shipyard were assigned by affiliates of the Lennar Corporation to The Shipyard Communities,

22  LLC ("TSC"). In September 2015, CP Dev. Co. was added as a "Tenant" to the Interim Lease

23  with the SFRA, whereby CP Dev. Co. leases property at the Shipyard owned by the SFRA related

24  to Phase 2 of the Shipyard development.

25       21.    In May 2016, Five Point Operating Company, LP acquired TSC as a subsidiary,

26  with TSC retaining the development interests of CP Dev. Co. in development of Phase 2 of the

27  Shipyard. As the operating managing member of Five Point Operating Company, LP, Plaintiff

28  Five Point acquired development interests in the Shipyard as well. Consequently, in May 2016,

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

Plaintiffs acquired exclusive interests to conveyance, management, and redevelopment of the remaining parcels of the Shipyard to be conveyed by the United States (other than Parcel A) from affiliates of Lennar Corporation. The Navy has issued a FOST for Parcels D-2, UC-1, and UC-2, though those Parcels have not been transferred to Plaintiffs for redevelopment. Those parcels have been leased from the City to CP Dev. Co. under the Interim Lease, where certain horizontal improvements were started by CP Dev. Co., but later halted after revelations of Tetra Tech's fraud came to light. The Navy has not yet issued a FOST for any of the Shipyard's remaining parcels that are to be transferred.

**B.     Tetra Tech's "Investigation" of The Shipyard Under United States "Supervision"**

22.     From 2003 to 2014, the United States entered into approximately fifteen different contracts with Tetra Tech to perform services related to investigation, testing, and remediation of the property at the Shipyard. Under these contracts, as well as governing federal law such as the Defense Base Closure and Realignment Act, the United States was obligated to supervise and oversee remediation of the Shipyard to ensure proper remediation and timely transfer to entities such as Plaintiffs.

23.     Instead of conducting the remediation as agreed to, Tetra Tech engaged in a massive fraud, while under direct Navy oversight. Among other activities, Tetra Tech oversaw, directed and concealed the falsification of a large number of soil samples taken from the Shipyard. Tetra Tech put soil, taken from areas known to contain clean soil, into jars which were supposed to contain soil from areas supposedly remediated by Tetra Tech. Tetra Tech then represented to the United States that the clean soil had come from areas where remediation had taken place; thus, falsely identifying as "clean" areas where potentially contaminated soil still exists.

24.     In May 2017, following a confidential investigation by the U.S. Department of Justice ("DOJ"), Stephen Rolfe and Justin Hubbard—two of Tetra Tech's Radiation Control Technician ("RTC") Supervisors who oversaw radiological investigation, testing, and remediation at the Shipyard—secretly pled guilty to "destruction, alteration, or falsification of records in federal investigations" in violation of 18 U.S.C. Section 1519. Rolfe and Hubbard admitted that

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

they falsified portions of their investigation of the Shipyard testing and remediation by substituting clean soil in place of actual soil samples from the areas designated for testing. Rolfe specifically admitted that he had instructed his subordinates to substitute clean soil for legitimate samples on approximately twenty occasions in 2012. The indictments against Rolfe and Hubbard were filed under seal and were not made public until May 2018.

25.     Despite the ongoing investigation by the DOJ and the sealed indictments against Rolfe and Hubbard, the United States never communicated to Plaintiffs the extent of the fraud by Tetra Tech that had taken place or how long the transfer of Shipyard property would be delayed. Plaintiffs did not learn such information until May 2018 when the Rolfe and Hubbard indictments were unsealed. Through reasonable diligence, Plaintiffs could not have discovered the extent of Tetra Tech's fraud or the impact such fraud would have on the transfer schedule because the scope of the fraud had been hidden by the United States and Tetra Tech.

26.     The cases against Hubbard and Rolfe were sealed by the federal court until sentencing proceedings against Hubbard on or around May 2, 2018. Until that time, Plaintiffs were not aware of the investigation by the DOJ into the activities of Tetra Tech.

27.     Plaintiffs relied on the supervision and oversight of Tetra Tech and the clean up by the United States to ensure that Tetra Tech properly remediated the Shipyard properties. The United States is subject to contractual and statutory obligations to ensure a proper investigation and effective remediation of the Shipyard properties. The United States was obligated to prevent fraudulent conduct such as that perpetrated by Tetra Tech, and certainly the United States was under an obligation to be truthful with Plaintiffs about the fraud they uncovered and the impact it would have on the transfer schedule; instead, the United States hid the fraud from the public, including Plaintiffs, and instead continued to reassure Plaintiffs that the original transfer schedule would be implemented.

28.     As an example, each time Tetra Tech purportedly completed radiological survey or remediation of work in a building or area (such as a segment of the sanitary sewer and storm drain systems), the Unites States directed it to prepare a final radiological report for that building or area, called a final status survey report for buildings and a final survey unit project report for a

LEGAL02/39533569v11

sewer and storm drain segment.  After all of the final reports are issued for a Shipyard transfer parcel, the United States directed Tetra Tech to prepare a Radiological Removal Action Completion Report ("Rad-RACR") for that parcel. The purpose of the Rad-RACRs was to "summarize the results of the radiological work activities performed for" each portion of the Shipyard. Unbeknownst to Plaintiffs, Tetra Tech knew, and purposefully concealed the fact that it had not complied with applicable statutes and regulations concerning environmental investigation and testing of the Shipyard in preparing the final radiological reports and Rad-RACRs. The extent of this fraud is summarized in Final Fourth Five-Year Review for Hunters Point Naval Shipyard (July 2019), which was not prepared by Tetra Tech but by another environmental contractor, Innovex ERRG. That report states that "the Navy determined that a significant portion of the radiological survey and remediation work completed to date was not reliable because of manipulation and/or falsification of data by one of its radiological remediation contractors. Radiological data identified in reports associated with Parcels B-1, B-2, C, D-2, E, G, UC-1, UC-2, and UC-3 were deemed unreliable." In its September 27, 2019 concurrence letter for this review, the United States concluded that "there was no current health risks on the site, based on current site conditions and current uses," but that all of these parcels would "require further actions to remain protective in the long-term." This includes Parcels D-2, UC-1 and UC-2, which have received FOSTs and been transferred to San Francisco, after which Plaintiffs began to conduct critical preliminary development activities as San Francisco's lessee.

29.     Despite obtaining evidence of such fraud—and even conducting investigations into such fraud through the DOJ—the United States allowed Tetra Tech to continue its activities under the Shipyard remediation contracts without informing Plaintiffs of the extent of the fraud. Because the Rad-RACRs were not properly certified by Tetra Tech under supervision by the United States, the work performed by Tetra Tech will need to be redone. The significant delay caused by another round of environmental investigation is damaging Plaintiffs, as well as the negative public perception faced by Plaintiffs due to the United States' negligent oversight.

30.     Plaintiffs acquired their stake in redevelopment of the Shipyard in reliance on the schedule provided by the United States. Plaintiffs relied on the fact that Rad-RACRs and FOSTs

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

for Parcels D-2, UC-1 and UC-2—where Plaintiffs planned to conduct critical preliminary development activities as San Francisco's lessee—had been issued and the property transferred to San Francisco in September 2015, which occurred prior to Plaintiffs' acquisition of a stake in the Shipyard development in May 2016. Moreover, Plaintiffs relied on the fact that the Rad-RACRs for the first set of parcels it intended to own and develop (Parcels B and G) had already been completed and accepted by the United States prior to Plaintiffs' acquisition of their stake in the Shipyard development in May 2016. The fact that these milestones had purportedly been achieved demonstrated to Plaintiffs that Tetra Tech was properly investigating and remediating any radiological contamination in a timely manner pursuant to the requirements and schedule provided by the Navy. Even assuming that no further remediation of the Shipyard property is necessary, the United States (and Plaintiffs and all other interested entities) cannot rely on the environmental investigation previously conducted by Tetra Tech. Plaintiffs now face significant delay and negative public perception for their redevelopment of the Shipyard property.

C.     **Plaintiffs' Knowledge of the United States' Negligence**

31.     Plaintiffs' causes of action against the United States did not accrue until after the indictments against Hubbard and Rolfe were unsealed by the federal court as part of the sentencing proceedings against Hubbard on or around May 2, 2018. Until that time, Plaintiffs had no reason to believe that they had suffered any injury on account of Tetra Tech misconduct. To the contrary, Plaintiffs were in active communications with the Navy and diligently sought out real time information from the Government about the progress of the cleanup efforts, so as to plan for the timely development under the transfer schedule provided by the United States. Further, Plaintiffs were not aware until on or around May 2, 2018 that the transfer schedule previously announced by the United States would be significantly delayed for years by Tetra Tech's actions. As part of the indictment proceedings, the United States disclosed for the first time that the transfer schedule would be delayed up to a decade, based on Tetra Tech's conduct.

32.     The United States did not inform Plaintiffs of the significant delay in the transfer schedule of the Shipyard property until May 2018 despite having knowledge of Tetra Tech's

1    conduct. Prior to that time, the Navy continued to advise Plaintiffs that the existing schedule for

2    property transfer would be met.

3           33.     The United States consistently failed to disclose the extent of Tetra Tech's

4    misconduct, even when responding to specific concerns about the potential for delay.

5           34.     Prior to and through at least 2014, former Tetra Tech employees and contractors

6    had raised various allegations to the United States and the Nuclear Regulatory Commission that

7    Tetra Tech had engaged in fraudulent investigative practices. In 2014, Tetra Tech admitted that it

8    had provided false soil samples to the United States, but claimed the misconduct was limited to

9    certain former employees and a small number of samples and required remaining employees to

10   engage in "ethics training."

11         35.     At that time, the United States accepted Tetra Tech's explanation for Tetra Tech's

12   fraudulent investigative practices, and thereby allowed Tetra Tech to continue its work at the

13   Shipyard. The United States did not inform Plaintiffs that Tetra Tech had committed extensive

14   fraud during Tetra Tech's work at the Shipyard nor that that the transfer schedule would be

15   substantially delayed. Plaintiffs did not learn that the transfer schedule would be delayed until on

16   or around May 2, 2018, when the indictments against Hubbard and Rolfe were unsealed by the

17   federal court and when the new transfer schedule was subsequently announced.

18         36.     As of May 2018, the United States continued to publicly represent that the bulk of

19   the Shipyard property would be transferred to Plaintiffs for redevelopment in 2019, when it held a

20   public workshop that included a presentation depicting that schedule. But when the victim impact

21   statements from the United States in the Rolfe and Hubbard cases were also revealed in May

22   2018, the United States finally admitted under oath that Tetra Tech's fraud would cause

23   substantial schedule delays.

24   **D.**    **Injuries Suffered by Plaintiffs**

25         37.     The negligence perpetrated by the United States' oversight of the environmental

26   investigation, testing and remediation of Shipyard has injured Plaintiffs. Before Plaintiffs can

27   begin redevelopment on any of the remaining parcels of the Shipyard, the United States must

28   issue a FOST, which it cannot do until an exhaustive, time consuming re-evaluation of Tetra

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

Tech's radiological work at all of the remaining parcels to be transferred is conducted. This re-evaluation is expected to take several years. The injuries which Plaintiffs have and continue to experience were not, and could not, be known despite Plaintiffs' reasonable diligence until May 2018 when the indictments were unsealed and Plaintiffs were first advised that significant delays would occur as a result of the fraud that Tetra Tech perpetrated on Plaintiffs.

38.     When Plaintiffs acquired their interest in redevelopment of the Shipyard in May 2016, the bulk of the property was scheduled to be transferred by 2019, and the final parcel in 2021. But now, the transfer of Shipyard property to Plaintiffs cannot occur as scheduled; the investigation, testing, and remediation conducted by Tetra Tech must be reviewed and reexamined in detail by the United States because the United States failed to adequately do so the first time. According to statements from the United States made public in May 2018, Tetra Tech's fraudulent actions will delay any transfer of the Shipyard parcels for a significant period of time. The most recent schedule distributed by the United States shows the final parcel transferring in late 2025. Plaintiffs had already started to build out portions of the Shipyard property leased to Plaintiffs from the City, including a community kitchen and artist colony. In fact, Plaintiffs who had started the horizontal development of the artist colony were forced to abandon the physical development of that facility in the summer of 2018, after the wide spread nature of the fraud became public.

39.     This delay is resulting in substantial economic and reputational harm to Plaintiffs, which cannot generate any revenue from its investment in redeveloping the Shipyard until after the Shipyard property is properly investigated and remediated, and thereafter transferred to Plaintiffs. Only then can redevelopment begin. Like any development company, Plaintiffs can only realize meaningful profits from their redevelopment projects when those projects are completed on time. That is especially so when plans must be made decades in advance, such as the massive mixed-use redevelopment of the Shipyard property that is contingent upon proper environmental investigation and remediation. By negligently supervising investigation and remediation of the Shipyard property, the United States directly undermined the very transfer schedule that it communicated to Plaintiffs and upon which Plaintiffs relied. Even worse, the

12

1   United States failed to communicate the full nature and extent of Tetra Tech's fraud to Plaintiffs

2   and instead characterized the issue as involving discrete anomalies in the data (common to all

3   large-scale environmental investigations) rather than widespread fraud, despite the Government's

4   ongoing investigations into Tetra Tech's activities at the Shipyard which demonstrated otherwise.

5   Plaintiffs have also incurred substantial costs in responding to the harm caused by Tetra Tech

6   while under United States oversight, including costs associated with a host of lawsuits brought

7   against Plaintiff Five Point arising out this matter. The fraud perpetrated by Tetra Tech under

8   United States supervision has also significantly diminished the value of the Shipyard property to

9   be redeveloped by Plaintiffs, as well as surrounding properties, which are also to be developed by

10  Plaintiffs.

11                      **V.      FIRST CAUSE OF ACTION**
                                  **(NEGLIGENCE)**
12

13          40.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 39 above as

14  if fully set forth herein.

15          41.     The United States owed a duty to Plaintiffs to exercise reasonable and ordinary

16  care to avoid causing economic and other injury to Plaintiffs. That duty arises from the nature of

17  the environmental investigation, testing, and remediation work Tetra Tech was performing, which

18  was initiated pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to

19  the Defense Base Closure and Realignment Act of 1990. This duty also arises from the contracts

20  between the United States and Tetra Tech to perform the environmental investigation, testing, and

21  remediation work. Moreover, the Navy agreed to ensure effective environmental investigation of

22  the Shipyard and remediation sufficient for redevelopment by companies such as Plaintiffs when

23  it executed a memorandum of understanding with San Francisco and the SFRA to establish the

24  process for conveying the Shipyard property for redevelopment. The Navy repeatedly confirmed

25  its obligations through the FOST process, as well as communications to Plaintiffs, the public, and

26  public officials—even though those communications failed to provide notice to Plaintiffs of the

27  extent of the fraud perpetrated by Tetra Tech under United States supervision.

28

LEGAL02/39533569v11

42.     The environmental investigation, testing, and remediation of the Shipyard initiated by the United States was intended to, and did, affect Plaintiffs. The United States was aware that its decision to contract with Tetra Tech was for the express purpose of preparing the Shipyard for redevelopment. The United States was aware that Plaintiffs are master developers who would be conducting redevelopment of certain parcels of the Shipyard that have yet to be transferred.

43.     Accordingly, it was foreseeable that the United States' negligent misconduct would significantly delay and/or hinder redevelopment of the Shipyard, discourage property buyers, lessees, investors and lenders, and harm Plaintiffs.

44.     The United States negligently, carelessly, tortiously, and wrongfully breached its duty to Plaintiffs through misconduct that included, but is not limited to, negligent supervision of Tetra Tech and Tetra Tech's employees, negligent enforcement of rules instituted to curb Tetra Tech's fraudulent activities, and negligent communication of information concerning Tetra Tech's fraudulent activities to Plaintiffs.

45.     The United States (based upon the conduct of the Navy) is liable to Plaintiffs for the damages described herein pursuant to the Federal Tort Claims Act 28 U.S.C. § 2674.

46.     The United States' conduct violated its own authority to ensure proper environmental investigation and remediation and ultimate transfer of the Shipyard property under the Defense Base Closure and Realignment Act of 1990 and related regulations.

47.     Pursuant to California Evidence Code Section 669, the United States' negligence is presumed under the doctrine of negligence per se because it violated these laws and related regulations.

48.     Plaintiffs' harm resulted from conduct that the foregoing statutes and regulations were designed to prevent, and Plaintiffs are within the class of persons those statutes and regulations are intended to protect.

49.     Plaintiffs have been harmed as a direct and proximate result of the United States' negligence.

50.     Plaintiffs relied upon the United States' negligent misrepresentations and activities when Plaintiffs acquired exclusive interests to conveyance, management, and redevelopment of

14

the second phase of Shipyard properties (those portions of the Shipyard other than Parcel A) from affiliates of Lennar Corporation in May 2016 at a cost to Plaintiffs of over $1 billion.

51.     As a direct and proximate result of the United States' negligence, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## VI.     SECOND CAUSE OF ACTION
(NEGLIGENT HIRING)

52.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 51 above as if fully set forth herein.

53.     The United States through the Navy owed a duty to Plaintiffs to exercise reasonable care in hiring employees, independent contractors, and other agents.

54.     The United States breached its duty by continuing to hire and contract with employees, independent contractors, and other agents that were unfit and incompetent, including Tetra Tech, Tetra Tech's employees, and individuals associated with Tetra Tech that were investigated by the United States.

55.     The United States knew or should have known that continuing to hire Tetra Tech—even after evidence of fraud surfaced (but was not revealed to Plaintiffs or the public)—created a particular risk or hazard of continuing to misrepresent data at the Shipyard.

56.     The United States knew or should have known that Tetra Tech was willing to or had a propensity to participate in fraudulent activities, fabricating surveys, and other aspects of the improper radiological investigation.

57.     The unfitness and incompetence of Tetra Tech, who was repeatedly hired by the United States and whose contracts were renewed by the United States, was a factor in causing Plaintiffs harm.

58.     The United States (on behalf of the Navy) is liable to Plaintiffs for the damages described herein pursuant to the FTCA 28 U.S.C. § 2674.

59.     As a direct and proximate result of the United States' negligent hiring, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

## VII.   THIRD CAUSE OF ACTION
### (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

60.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 59 above as if fully set forth herein.

61.     Plaintiffs have existing and prospective economic relationships with individuals and entities that are intended to facilitate Plaintiffs' redevelopment of the Shipyard. These relationships depend upon the timely transfer of the Shipyard properties to Plaintiffs consistent with the schedule disclosed by the Navy prior to May 2018 when significant delays were revealed.

62.     These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs through profitable redevelopment of the Shipyard.

63.     The United States knew or should have known of these existing and prospective economic relationships. The United States knew that the Shipyard was being developed for residential, commercial and other purposes and that, as master developer of parcels of the Shipyard, Plaintiffs intended to develop the land for sale and/or investment.

64.     The United States owed a duty of care to Plaintiffs to avoid negligent conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs.

65.     The United States breached that duty to Plaintiffs through its misconduct in connection with the Shipyard.

66.     The United States knew or should have known that, if it failed to act with reasonable care, the existing and prospective economic relationships Plaintiffs had with individuals and entities to redevelop the Shipyard in a timely manner would be interfered with and disrupted.

67.     The United States was negligent and failed to act with reasonable care in connection with its oversight of testing and remediation work at the Shipyard.

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

68.     As a direct and proximate result of the United States' wrongful acts and/or omissions, Plaintiffs have suffered and will suffer economic harm, injury, and losses, including increased construction costs and delays in the overall development.

69.     As a direct and proximate result of the United States' negligent interference with Plaintiffs' prospective economic advantage, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## VIII.   FOURTH CAUSE OF ACTION (EQUITABLE INDEMNIFICATION)

70.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 69 above as if fully set forth herein.

71.     Due to the negligent oversight of the United States of Tetra Tech's fraudulent activities, Plaintiffs have become a party to litigation (either individually as Plaintiff Five Point or in combination with Emile Haddad, the Chairman and Chief Executive Officer of Five Point). These lawsuits generally allege that Plaintiff Five Point and Mr. Haddad are responsible to those plaintiffs for injuries resulting from Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States. Several such cases have already been filed naming as defendants Five Point Holdings, LLC and Mr. Haddad, and it is possible that more such cases will be filed in the future, given the gravity of the harm perpetrated by Tetra Tech under United States supervision.

72.     Plaintiff Five Point has been named in multiple lawsuits based on the United States' failure to ensure proper investigation, testing, and remediation of the Shipyard. To date, Five Point has been named in the following lawsuits:

- *Pennington, et al. v. Tetra Tech, Inc., et al.* (N.D. Cal., Case No. 3:18-cv-05330-JD).
- *Bayview Hunters Point Residents, et al. v. Tetra Tech EC, Inc., et al.* (N.D. Cal., Case No. 3:19-cv-01417-JD).

73.     Plaintiffs deny any liability as to any claims arising from the United States' failure to ensure proper investigation, testing, and remediation of the Shipyard. Five Point is entitled to equitable indemnification and/or contribution from the United States for the costs incurred in

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

responding to claims arising from the United States' failure to ensure proper investigation,

testing, and remediation of the Shipyard.

74.     Plaintiff Five Point has sought indemnification for defense costs described above

from the United States pursuant to Section 330 of the National Defense Authorization Act of

1993. According to correspondence from the Deputy General Counsel (Environment, Energy, and

Installation), the authority to adjudicate such requests was delegated by the Secretary of Defense

to the General Counsel of the Department of Defense ("DoD"), who in turn delegated that

authority to the Deputy General Counsel (Environment, Energy, and Installation). As of the date

of this Complaint, the United States has not agreed to indemnify Plaintiff Five Point for the

defense costs described above pursuant to Section 330.

75.     In the event liability should be established in any action described above involving

Plaintiffs or Mr. Haddad, which liability is expressly denied, such liability will arise by reason of

the conduct and negligence of the United States. The United States is therefore bound and

obligated to defend, indemnify, and hold harmless Plaintiffs and Mr. Haddad from and against

any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred

or to be incurred in response to claims arising from the United States' negligent supervision of the

investigation, testing, and remediation of the Shipyard.

76.     As a further direct and proximate result of the United States' improper conduct,

Plaintiffs have incurred, and will continue to incur, liabilities for attorneys' fees and costs in

responding to claims arising from the United States' failure to ensure proper investigation,

testing, and remediation of the Shipyard, in an amount to be determined according to proof at

trial.

77.     In order to prevent a multiplicity of actions, a determination of the comparative

fault, if any, of Plaintiffs and the United States should be made at trial of this action herein. If any

party, in an action arising from the United States' failure to ensure proper investigation, testing,

and remediation of the Shipyard, recovers a judgment against Plaintiffs or Mr. Haddad, then

Plaintiffs are entitled to be indemnified by the United States for the amount of any damages

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES

1  awarded in favor of that party and against Plaintiffs or Mr. Haddad, pursuant to and in accordance

2  with the proportion of relative fault or liability attributed to the United States.

3                    **IX.    PRAYER FOR RELIEF**

4      **WHEREFORE**, Plaintiffs Five Point Holdings, LLC and CP Development Company,

5  LLC pray for relief as follows**:**

6      A.    For compensatory and special damages pursuant to the First through Third Claims

7            alleged above, according to proof at trial;

8      B.    For equitable indemnification pursuant to the Fourth claim above, according to

9            proof at trial;

10     C.    For costs of suit and reasonable attorneys' fees incurred herein; and

11     D.    For an award holding the United States liable for all of Plaintiffs' damages, costs,

12           fees, and interests arising from the United States' tortious conduct;

13     E.    For interest thereon at the maximum legal rate; and

14     F.    For any and all other relief the Court deems just and proper.

15  Dated: February 27, 2020

16                                    RESPECTFULLY SUBMITTED,

17                                    JEFFREY D. DINTZER
                                      MATTHEW C. WICKERSHAM
18                                    ALSTON & BIRD LLP

19                                    By:    /s/ Jeffrey D. Dintzer
                                             Jeffrey D. Dintzer
20
                                      Attorneys for Plaintiffs FIVE POINT
21                                    HOLDINGS, LLC and CP DEVELOPMENT
                                      CO., LLC
22

23

24

25

26

27

28

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST UNITED STATES