1   JEFFREY D. DINTZER (SBN 139056)
    jeffrey.dintzer@alston.com
2   MATTHEW C. WICKERSHAM (SBN 241733)
    matt.wickersham@alston.com
3   ALSTON & BIRD LLP
    333 South Hope Street, 16th Floor
4   Los Angeles, California 90071
    Telephone:    +1 213 576 1000
5   Facsimile:    +1 213 576 1100

6   Attorneys for Plaintiffs FIVE POINT HOLDINGS,
    LLC and CP DEVELOPMENT CO., LLC
7

8               **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10

11  FIVE POINT HOLDINGS, LLC and CP          Case No. 3:20-cv-01480-JD
    DEVELOPMENT CO., LLC
12                                           **FIRST AMENDED COMPLAINT OF
                                             FIVE POINT HOLDINGS, LLC AND
                   Plaintiffs,               CP DEVELOPMENT CO., LLC
13                                           AGAINST THE UNITED STATES OF
    v.                                       AMERICA FOR:**
14
    UNITED STATES OF AMERICA,                **(1) NEGLIGENCE**
15
                   Defendant.                **(2) NEGLIGENT HIRING**
16
                                             **(3) NEGLIGENT INTERFERENCE
17                                           WITH PROSPECTIVE ECONOMIC
                                             ADVANTAGE**
18
                                             **(4) EQUITABLE INDEMNIFICATION**
19

20

21

22

23

24

25

26

27

28

ALSTON & BIRD                                FIRST AMENDED COMPLAINT
                                             AGAINST THE UNITED STATES
                                             CASE NO. 3:20-CV-01480-JD

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................ 1

II.    PARTIES ......................................................................... 7

III.   JURISDICTION AND VENUE ................................................ 7

IV.    FACTS ............................................................................ 8

       A.    History of Radiological Contamination at the Shipyard. ......................... 8

       B.    Navy Closure of the Shipyard and Planned Transfer of Parcels to San
             Francisco. ......................................................................... 9

       C.    The Navy Awards Contracts to Tetra Tech to Perform Work at HPNS. .............. 10

       D.    Tetra Tech Perpetrates Widespread Fraud at HPNS Under Navy
             "Supervision" and "Oversight." ................................................... 11

       E.    Tetra Tech Investigates its Own Fraud. .......................................... 14

       F.    Tetra Tech Employees Plead Guilty to Federal Crimes. ........................... 15

       G.    The Navy Continued to Award Contracts to Tetra Tech Even After
             Learning of its Fraud. ............................................................ 16

       H.    The U.S. EPA Subsequently Identified "Red Flags of Multiple Types" that
             the Navy Negligently Failed to Discover, Prevent, or Mitigate .................... 17

             1.    Parcel G Gamma Scans ................................................... 18

             2.    Failure to Follow Chain of Custody Procedures ............................. 19

             3.    Laboratory Data Quality Issues ........................................... 20

             4.    Failure to Follow and Implement Work Plans .............................. 21

             5.    Recognizing its Failures, the Navy Repeatedly Downplayed the
                   Extent of Tetra Tech's Fraud in Reports and Work Plans. ................... 21

       I.    Transfer of the Shipyard Property .............................................. 23

       J.    United States' Conduct was Subject to Numerous Mandatory Duties to
             Supervise and Ensure the Quality of Tetra Tech's Work. ......................... 25

             1.    The United States is Responsible for Remediation at the Shipyard
                   Pursuant to CERCLA and the NCP. ....................................... 27

2.    The Navy, through its Remedial Project Manager and Resident Officer in Charge of Construction, was Required to Ensure Compliance with CERCLA.............................................................. 29

3.    The Navy Violated its Duty Under CERCLA and the NCP to Verify, Ensure, and Rely on Accurate Data................................................ 31

4.    The Navy Failed to Communicate with the Public as Required under the NCP and CERCLA. .................................................. 36

5.    The Navy was Required to Comply with the Federal Facilities Agreement. ................................................................ 37

    a.    Compliance with CERCLA under the Federal Facilities Agreement. ...................................................... 38

    b.    Duties of the Quality Assurance Officer under the Federal Facilities Agreement. .......................................... 39

        i.    Navy QAO's Failure to Ensure and Document Compliance with Chain of Custody Requirements............ 40

        ii.    Navy QAO's Failure to Ensure and Document that Soil Samples were Transported to the Laboratory............. 45

        iii.    Navy QAO's Failure to Ensure and Document Proper Collection of Soil Samples. .................................. 46

        iv.    Navy QAO's Failure to Ensure and Document that Survey Units that Exceeded Release Criteria Were Investigated and Remediated. ............................................ 49

        v.    Navy QAO's Failure to Ensure and Document that Survey Units Were 100 Percent Gamma Surveyed. .......... 52

        vi.    Navy QAO's Failure to Ensure and Document that Scans were Conducted Properly. ...................................... 53

6.    Duties of the Remedial Project Manager under the Federal Facilities Agreement. .................................................................. 56

7. The Navy was Required Under the Federal Acquisition Regulations to Hire Responsible Contractors Only. ....................................................... 58

8. The Navy was Required to Ensure the Quality of Tetra Tech's Work Pursuant to the Construction Quality Control Program Manual.......................................................................................................... 64

9. Requirements Pursuant to Contract Task Orders Issued to Tetra Tech....................................................................................................... 72

10. Duties Under Radiological Work Plans, Sampling Plans, and QAPPs................................................................................................... 75

11. Navy Radiological Site Manager Duties Under Work Plans, Sampling Plans, and QAPPs .................................................................. 75

12. Navy Resident Office in Charge of Construction's Duties Under Work Plans, Sampling Plans, and QAPPs ................................................. 82

13. Navy Remedial Project Manager's Duties Under Work Plans, Sampling Plans, and QAPPs .................................................................. 84

14. Navy Quality Assurance Officer's Duties Under Work Plans, Sampling Plans, and QAPPs .................................................................. 85

15. Requirements Pursuant to the Department of Navy Environmental Readiness Program Manual........................................................................... 85

16. Conflicts of Interest.................................................................... 86

K. Plaintiffs' Reliance on the Navy's Supervision of Tetra Tech. ........................... 89

L. Plaintiffs' Knowledge of the United States' Negligence ....................................... 91

M. Injuries Suffered by Plaintiffs ............................................................................ 93

FIRST CAUSE OF ACTION ...................................................................................... 96

SECOND CAUSE OF ACTION (NEGLIGENT HIRING) ......................................... 98

THIRD CAUSE OF ACTION (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE) ........................................................................... 100

FOURTH CAUSE OF ACTION (EQUITABLE INDEMNIFICATION) ................................. 101

1

PRAYER FOR RELIEF..............................................................................................................103

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

## I.    INTRODUCTION

1.        Plaintiff Five Point Holdings, LLC ("Five Point") and Plaintiff CP Development Co., LLC ("CP Dev. Co.") (collectively "Plaintiffs") bring this action against the United States for negligence related to the botched remediation at the Hunters Point Naval Shipyard ("HPNS" or the "Shipyard") in San Francisco, actionable under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*[1]

2.        In 1989, the Shipyard was added to the National Priorities List pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") for remediation.  Subject to a Federal Facilities Agreement ("FFA"), the Navy was deemed the lead agency at the Shipyard.  As lead agency, the Navy is responsible for the investigation and cleanup of HPNS, community involvement, and communicating its work to the public.

3.        HPNS was also selected for closure under the Base Closure and Realignment Act of 1990, which provides the basic framework for the transfer and disposal of military installations closed during the base realignment and closure ("BRAC") process.

4.        In 1991, the United States Department of the Navy, acting as part of the United States of America ("United States") (hereinafter referred to as the "United States," the "Government," "EPA," "EPA Region IX," or the "Navy"), announced its intention to close the Shipyard and transfer it to the City and County of San Francisco ("San Francisco") for redevelopment.  Because there is a unity of interest within the United States, the Navy is part of the Government, and as such the United States is legally responsible, in full, for all of the activities and tortious conduct of the Navy.

5.        In 1992, the Navy signed an FFA with the EPA and the State of California outlining a framework to remediate the Shipyard.

6.        In addition to CERCLA and the BRAC program, remediation at the Shipyard is subject to a number of regulations, guidance documents, and policy manuals which outline specific,

---

[1] This Complaint does not allege or seek relief against the United States based on fraud, deceit, or misrepresentation.

A list of acronyms referenced in this Complaint is attached hereto as "Exhibit A."

technical, and procedural remediation requirements that the Navy was required to implement and follow at the Shipyard.

7.     The remediation of HPNS was conducted with the end goal of transferring the property, once clean, to San Francisco for redevelopment.

8.     HPNS, which includes hundreds of acres of prime real estate, offered an opportunity for the development of affordable homes and community benefits in an area of San Francisco short on both.

9.     Five Point is an owner and developer of mixed-use, master-planned communities in coastal California.  CP Dev. Co is an indirect subsidiary of Five Point.  After the Navy transfers parcels of the Shipyard property to San Francisco, San Francisco transfers those parcels to CP Dev. Co., which will develop the property.

10.     At the times Plaintiffs acquired their interests in the redevelopment of HPNS, the United States had provided to San Francisco and Plaintiffs a schedule for completion of environmental remediation of the remaining Navy-owned property at the Shipyard by the United States' remediation contractors, including Tetra Tech, Inc. and Tetra Tech EC, Inc. (collectively, "Tetra Tech") and the subsequent property transfer by the United States to San Francisco, and from San Francisco to Plaintiffs for redevelopment in phases beginning in 2016, with the majority of the property to be transferred by 2019, and the final parcel in 2021.

11.     However, the Navy, as lead agency, failed to fulfill its specific and mandatory obligations to oversee, supervise, and ensure the quality of Tetra Tech's work pursuant to CERCLA, the National Contingency Plan, and the FFA for HPNS, among dozens of other statutes, regulations, and documents.  These authorities outline mandatory and specific duties imposed on the Navy that Navy representatives charged with oversight at HPNS, violated repeatedly.  By way of example only, the Navy was required to:

- As lead agency, comply with CERCLA and the NCP.
- Ensure and document that all work is performed in accordance with work plans, sampling plans, and quality assurance project plans.
- Ensure that sampling and other field work is performed in accordance with the terms

of any final work plan and quality assurance project plan.

- Supervise radiological investigation and remediation during all hours of work at the Shipyard.
- Review all Contractor Production and Quality Control Reports immediately upon receipt to ensure their accuracy and completeness.
- Comment and follow-up on incorrect or erroneous information in reports submitted by Tetra Tech.
- Spot-check workmanship.
- Observe testing procedures.
- Evaluate Tetra Tech's quality control system.
- Inspect critical items and monitor specific testing.
- Inspect all work in progress and at completion.
- Note discrepancies in work conducted by Tetra Tech.
- Review and approve on-site laboratory data.
- Perform quality reviews on chains of custody to ensure samples are handled in accordance with work plans and sampling plans.
- Ensure all necessary sample results are provided and consistent with proposed radiological actions.
- Compare radiological data with the requirements of the work plan, task specific plans, and sampling plans to ensure that all proper conditions have been met.
- Verify that all work has been completed per contract and technical specifications prior to final government acceptance.
- Perform ongoing field inspections to verify that all work complies with both contract and technical specifications.
- Coordinate with the Radiological Affairs Support Office and Remedial Project Managers of other projects being performed in radiologically impacted areas to ensure proper controls are in place.
- Notify Tetra Tech of any work that is not in compliance.

- Ensure that the project scope of work requirements are fulfilled.

- Ensure the successful completion of Tetra Tech's remediation activities.

- Only hire responsible contractors with satisfactory performance records.

- Document discrepancies in work performed by Tetra Tech on Daily Activities Forms.

12.     The Navy repeatedly stated that anomalies in the data collection would not materially affect the transfer schedule, even when repeatedly pressed by Plaintiffs about concerns regarding the transfer schedule.  Thus, Plaintiffs lacked notice that the transfer schedule would be materially delayed.

13.     In May 2018, Plaintiffs learned for the first time from public reports the extent to which fraudulent activities by Tetra Tech at the site had been confirmed.  Two former Tetra Tech employees pled guilty to felonies for their roles in the fraudulent conduct described herein.  At this time, the United States filed a Victim Impact Statement with this Court conceding that the fraud perpetrated by Tetra Tech had "set back the planned transfer of the [Shipyard] to the City by an approximate decade."  (*See* Department of Navy Victim Impact Statement in the *Matter of U.S. v. Hubbard*, March 15, 2018, hereinafter, "Victim Impact Statement".)  This included parcels of Shipyard property that would ultimately be transferred from San Francisco to Plaintiffs for redevelopment.

14.     Following the release of that information, the Navy provided Plaintiffs with a remediation and transfer schedule that called for a phased transfer of the remaining Navy-owned property to San Francisco (and then Plaintiffs) beginning in 2022 and ending in 2026.  The most recent transfer schedule demonstrates an increasing delay and uncertainty in remediation, with the next parcel not able to transfer before 2024 and the last land parcel not able for transfer until 2027.  These schedules significantly contradict the prior transfer schedules provided by the Navy to Plaintiffs.

15.     The Navy paid Tetra Tech hundreds of millions of dollars to prepare planning documents, investigate radiological contamination, conduct remediation, dispose of radioactive

waste, and document their activities to support closure of radiologically impacted sites and buildings at HPNS.

16.     Instead of properly overseeing and supervising the investigation, testing, and remediation of the Shipyard property and ensuring the quality of Tetra Tech's work, the Navy neglected its responsibilities, and conducted grossly negligent oversight of Tetra Tech despite straightforward obligations under governing law, applicable policies and manuals, and its contracts with Tetra Tech.

17.     The U.S. Department of Justice has intervened in a *qui tam* Complaint brought by whistleblowers.  The United States is pursuing violations of the False Claims Act against Tetra Tech on behalf of the Navy based upon the widespread fraud in the performance of Tetra Tech's work at the Shipyard property under its contract with the Navy.  (*See United States of America, et al. v. Tetra Tech, Inc*., N.D. No. 13-3835-JD, hereinafter, "U.S. Compl.".)

18.     Transfer of the Shipyard property and planned redevelopment of the Shipyard has been delayed as a result of the Navy's failure to comply with mandatory remediation requirements, lack of oversight over its contractor Tetra Tech, and failure to ensure the quality of Tetra Tech's work, which allowed the fraud perpetrated by Tetra Tech to persist for years unchecked, despite numerous red flags that the Navy negligently failed to discover.

19.     The United States had *no* discretion to allow Tetra Tech to commit widespread fraud at the Shipyard, nor is there any policy rationale to allow contractors to commit fraud.  (*See* Deposition of Lawrence Lansdale ("Lansdale Depo") at 169:21-23 [Q: "Is there any policy consideration that you can think of that would favor allowing a government contractor to commit fraud on the United States of America? . . . A: "I don't know of any policy that would allow a contractor to commit fraud"].)

20.     The Government's failures have eroded trust in the remediation work done across the *entirety* of the Shipyard, and a massive effort will be required to verify all remediation work conducted by Tetra Tech across parcels.

21.     The Navy itself has lamented in its Victim Impact Statement filed with the Court that "the fraud and uncertainty surrounding [Tetra Tech's] work at HPNS has caused a complete

loss of trust in the Navy by the local community," and that "the fraud has also caused a loss of confidence by the regulatory community (both EPA and California State regulators) regarding the Navy's radiological remediation program and the Navy's competence to implement it." (Victim Impact Statement at 2.) "The Navy now faces an uphill struggle to rehabilitate itself from this negative connotation in the regulatory community. It will take years to rebuild this credibility." (*Id.*)

22.     At some point, the United States became aware of fraud perpetrated by Tetra Tech. According to the Government, initial evidence that Tetra Tech engaged in fraudulent sampling was raised in October 2012. However, the United States negligently failed to discover, prevent, or mitigate the fraud.

23.     The fraudulent conduct by Tetra Tech that was negligently supervised and overseen by the United States has received widespread, negative media attention. That negative media attention has diminished the value of the future development of HPNS, including surrounding properties on which Tetra Tech did little or no work.

24.     As a result of this negligent conduct at HPNS by the United States, Plaintiff Five Point and its Chief Executive Officer (Emile Haddad) have been named as defendants in numerous lawsuits, even though they had absolutely nothing to do with remediation at the site and did not know the extent of the fraudulent activities of Tetra Tech (or the impact of such activities on the Shipyard transfer schedule) until they became public in May 2018. Rather, given the significant delay in the transfer of the Shipyard property to San Francisco, and in turn Plaintiffs, and the negative public perception now associated with HPNS, Plaintiffs are themselves victims of the United States' negligence. Because of its past negligent supervision, oversight, and failure to ensure the quality of Tetra Tech's work, in addition to its negligent failure to discover the widespread fraud perpetrated by Tetra Tech, the United States is unable to certify the Shipyard property for transfer to Plaintiffs. As of the filing of this Complaint, the United States has not and cannot give Plaintiffs any realistic assurances as to when the property will be transferred.

25.     As such the United States is liable for the damage it has caused to Plaintiffs.

## II.   PARTIES

26.      Defendant the United States is named based upon the activities and liability of its Department of the Navy.  The United States is responsible for transfer of HPNS pursuant to the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

27.      The use of the name "Tetra Tech" in this Complaint, unless otherwise specified, refers collectively to Tetra Tech EM, Inc.  Tetra Tech EC, Inc., and Tetra Tech, Inc., as well as their predecessor companies, subsidiaries, subcontractors, or affiliates, including but not limited to Foster Wheeler Environmental Corporation, and Tetra Tech FW, Inc.

28.      Plaintiffs Five Point and CP Dev. Co. are limited liability companies both formed in the state of Delaware and both registered as a foreign limited liability companies with the State of California.  Five Point conducts its business as the operating managing member of Five Point Operating Company, LP, a Delaware limited partnership.  Five Point Operating Company, LP is the sole manager of The Shipyard Communities, LLC ("TSC"), a Delaware limited liability company.  TSC is the parent company of CP Dev. Co. CP Dev. Co. is the entity that will own and develop the Shipyard properties ultimately transferred to Plaintiffs.  Plaintiff Five Point has an interest in redevelopment upon transfer from the United States by managing operations of CP Dev. Co.  Plaintiffs have been harmed by the Navy's negligent oversight of its contractor Tetra Tech, and the United States is legally responsible for damages caused by that harm.

## III.   JURISDICTION AND VENUE

29.      This is a civil action against the United States brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*  Jurisdiction is proper pursuant to 28 U.S.C. § 1346(b). Moreover, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1441(a), on the ground that the conduct giving rise to this action occurred in part on a federal enclave within the former Hunters Point Naval Shipyard.

30.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1402(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district and the property that is the subject of the action is located in this

district.

31.    The United States waives its sovereign immunity, allowing the government to be sued by private parties for torts, pursuant to the Federal Tort Claims Act. 28 U.S.C. § 1346; 28 U.S.C. § 2674.

32.    Plaintiff Five Point has properly exhausted its administrative remedies against the United States.  On June 27, 2019, the United States received a completed written demand on Standard Form 95 from Plaintiff Five Point for damages, wherein Plaintiff Five Point gave notice of claims for negligence and equitable indemnity against the United States under the Federal Tort Claims Act.  The United States did not respond "within six months" to Plaintiff Five Point concerning disposition of the claims, which shall "be deemed a final denial of the claim" under 28 U.S.C. § 2675.

33.    Plaintiff CP Dev. Co. properly exhausted its administrative remedies against the United States.  On June 27, 2019, the United States received a completed written demand on Standard Form 95 from Plaintiff CP Dev. Co. for damages, wherein Plaintiff CP Dev. Co. gave notice of claims for negligence and equitable indemnity against the Navy under the Federal Tort Claims Act.  The United States did not respond "within six months" to Plaintiff CP Dev. Co. concerning disposition of the claims, which shall "be deemed a final denial of the claim" under 28 U.S.C. § 2675.

## IV.    FACTS

### A.    History of Radiological Contamination at the Shipyard.

34.    HPNS is located in the southeastern portion of the city of San Francisco on a peninsula that extends into the San Francisco Bay.  It consists of approximately 936 acres, a portion of which is submerged beneath the San Francisco Bay.

35.    HPNS was operated as a commercial dry dock facility from 1869 until December 29, 1939, when the Navy purchased the property.  Building, repair, and maintenance of ships for the U.S. Navy were primary activities during World War II.  Radioluminescent device handling, maintenance, and disposal occurred in the Shipyard.

36.    At the end of WWII through the mid-1970s, the Navy conducted ship repair and

maintenance of Naval vessels at the shipyard dry docks.  In 1946, the Navy established the Naval Radiological Defense Laboratory to study the effects of and to develop counter measures from nuclear weapons.  The Laboratory operated until 1969 and conducted studies related to ship shielding, radioactive waste for deep-sea disposal, animal research, radiation detection, instrumentation development, and other laboratory studies.  The Laboratory also decontaminated and disposed of some ships involved in nuclear weapons tests in the Marshall Islands.  The decontamination process involved scraping, stream-cleaning, and sandblasting the radioactivity off the ships and onto the Shipyard.

37.     In 1974, HPNS was deactivated.  The Shipyard was placed on industrial reserve and portions of the site were leased to Triple A Machine Shop, Inc., a private ship repair company, from 1976 to 1986.

38.     The Initial Study Assessment Report identified twelve sites at HPNS where hazardous materials were disposed of or spilled.

39.     This ultimately led to the EPA placing the Shipyard on the National Priorities List under CERCLA in 1989.  The National Priorities List is the list of sites of national priority among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States.

40.     In 1984, the Navy initiated site investigations as part of the Navy's Internal Assessment and Control of Installation Pollutants Program.  The Program was created in the mid-1980s as part of the mandatory Department of Defense compliance with CERLCA.  In October 1984, the Navy published a report presenting the findings and conclusions of its Initial Study Assessment of the Shipyard.

**B.     Navy Closure of the Shipyard and Planned Transfer of Parcels to San Francisco.**

41.     In 1991, the Navy announced plans to close HPNS and transfer it to San Francisco for redevelopment, pursuant to the Defense Base Closure and Realignment Act of 1990. That law and other federal standards mandated that the Navy "ensure that appropriate response or corrective actions related to . . . hazardous substances have been taken, or will be taken . . . ." (*See*

Department of Defense, Base Development and Realignment Manual (March 1, 2006) at § C8.5.)

42. In 1992, the Navy entered into an FFA with the EPA and state regulatory agencies pursuant to which it assumed responsibility to "undertake, seek adequate funding for, fully implement and report on . . . [r]emedial investigations," "feasibility studies," and "[a]ll response actions" required for cleanup of HPNS. (FFA at § 6.2.)

43. Under the FFA, "the Navy has ultimate responsibility for meeting its [own] respective deadlines or schedules." (FFA at § 18.3.)

44. The FFA is an enforceable agreement, containing binding and mandatory provisions, noncompliance with which is subject to penalties of up to $10,000 a week. (*See* FFA §§ 2.1 ["The terms of the Agreement shall apply to and be binding upon EPA, the State of California, and the Navy"], 14.1 [providing for penalties].)

45. On January 21, 1994, the Navy and San Francisco executed a memorandum of understanding establishing a process for the transfer of HPNS to San Francisco for redevelopment. The Navy agreed to convey HPNS on a parcel-by-parcel basis to San Francisco for local reuse as the environmental cleanup is completed.

46. In 2004, the Navy entered into a Conveyance Agreement with San Francisco, transferring remediated parcels to San Francisco to facilitate the transfer of those parcels to Plaintiffs.

**C.     The Navy Awards Contracts to Tetra Tech to Perform Work at HPNS.**

47. The Navy entered into approximately 16 contracts with Tetra Tech and/or its predecessor companies between at least 2003 and 2014, to prepare planning documents, investigate radiological contamination, conduct remediation, dispose of radioactive waste, and document their activities to support closure of radiologically-impacted sites and buildings at HPNS.

48. The Navy awarded "Task Orders" for the completion of particular tasks to govern those services. (U.S. Compl. at ¶¶ 22-23.) Work plans for conducting soil testing and radiological surveys governed each Task Order and set forth the standards applicable to the work. (*Id.* ¶ 25.) Those work plans defined the Navy's oversight role.

49. Initial contracts for work at the Shipyard were "cost-plus-award-fee" contracts.

1   Those contracts "obligated the Navy to pay Tetra Tech its allowable costs for providing the services

2   described in the scope of work, plus a discretionary award fee, up to a maximum amount."  (U.S.

3   Compl. at ¶ 26.)  "Cost-plus-award-fee contracts allow the payment of an award fee based upon a

4   judgmental evaluation of the Government, sufficient to provide motivation for excellence in

5   contract    performance."    (*Id.*,   citing   Federal   Acquisition   Regulation,   48   C.F.R.

6   § 16.305.)  "A contractor may earn an award fee if its overall cost, schedule, and technical

7   performance is satisfactory."  (*Id.*, citing 48 C.F.R. § 16.401.)

8        50.        The Navy awarded cost-plus-award-fee contracts to Tetra Tech periodically,

9   through at least 2009.  (U.S. Compl. at ¶¶ 27-32.)

10       51.        In addition, the Navy awarded Tetra Tech "fixed price" contracts from 2008

11  through at least 2014.  (*Id.* at ¶¶ 33-42.)  These contracts "obligated the Navy to pay a maximum

12  fixed amount for the services required under the contracts, regardless of Tetra Tech's costs.  Firm

13  Fixed Price contracts place upon the contractor maximum risk and full responsibility for all costs

14  and resulting profit or loss."  (*Id.* at ¶ 33, citing 48 C.F.R. § 16.202-1.)

15       52.        According to the Government, "fixed price contracts provide maximum

16  incentive for the contractor to control costs . . . ."  (U.S. Compl. at ¶ 33.)  Under fixed price

17  contracts, Tetra Tech's profit was maximized by cutting costs and finishing tasks as far ahead of

18  schedule as possible.

19       **D.      Tetra Tech Perpetrates Widespread Fraud at HPNS Under Navy**

20              **"Supervision" and "Oversight."**

21       53.        Instead of conducting the remediation as agreed to under its contracts, Tetra

22  Tech engaged in massive fraud at HPNS.

23       54.        From 1992 through 2014, while Tetra Tech was performing testing and

24  remediation at HPNS, it was under increasing pressure to reduce the time and expense of the

25  project.  Under the fixed-price contracts, there was an incentive for Tetra Tech to cut corners,

26  maximize profits by cutting costs, and complete work as far ahead of schedule as possible.

27       55.        In an effort to save time and cost, from 2003-2018,[2] Tetra Tech engaged in a

28

---

[2] The full scale of the fraud committed is still unknown.  For example, former employees

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

1   widespread pattern and practice of deliberate falsification, failure to follow Navy-approved and

2   adopted work plans, sampling plans, and quality assurance project plans, and failure to perform

3   work in a manner required to ensure CERCLA Record of Decision ("ROD") requirements were

4   met.[3]

5          56.      Tetra Tech whistleblowers identified a wide array of fraudulent conduct

6   perpetrated by Tetra Tech at HPNS.  Declarations were submitted under seal in both a False Claims

7   Act case (*United States ex rel. Jahr, Bowers, Andrews, Jackson v. Tetra Tech, EC et al.*, N.D. Cal.

8   No. CV13-3835) and in a petition to the Nuclear Regulatory Commission (*Greenaction for Health*

9   *and Environmental Justice v. Tetra Tech*, Petition to Revoke Materials License No. 29-31396-01

10  pursuant to 10 CFR § 2.206, hereinafter, "Greenaction Pet".)

11         57.      The Tetra Tech whistleblowers identified systematic fraudulent activity by Tetra

12  Tech across HPNS.  The whistleblowers' specific admissions included that Tetra Tech::

13       •   Manipulated and falsified building scan data, in lieu of providing actual radiation

14           detection results from all buildings at HPNS.  (Duplicated strings of data have been

15           confirmed in surveys later conducted in at least 14 of 28 buildings.)

16       •   Accelerated conveyor belt processing of potentially contaminated soil through a

17           radiation scanner in order to decrease the potential for identifying radiological

18           contamination in the soil.  According to the whistleblowers, Tetra Tech increased

19           the pace of conveyor belt scans by up to 6-9 times the approved speed.

20       •   Disabled the conveyor belt system's radiation detection alarm to avoid detection of

21           radiation in the soil.  These alarms functioned to provide alerts when high

22           radiological levels were detected on conveyor belts.

23

24  _____

    have stated that fraud related to falsification of chains of custody began before 2009 and
25  continued until at least September 2012.  *See Greenaction for Health and Environmental Justice
    v. Tetra Tech*, Petition to Revoke Materials License No. 29-31396-01 pursuant to 10 CFR §
26  2.206, at 9; *see also* U.S. Compl. at ¶ 6 ("During the period between at least June 2006 and
    January 2018, Tetra Tech submitted, or caused to be submitted, materially false claims to the
    Navy for fraudulent testing and reporting at Hunters Point.")
27         [3] Under CERCLA, the purpose of the ROD is to document the selected remedy.  The
    ROD provides a plan for site design and remediation and documents the extent of human health
28  or environmental risks posed by the site.  It also serves as legal certification that the remedy was
    selected in accordance with the requirements of CERCLA and the NCP.

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

- Decreased the sensitivity of scanners at portal monitors (designed to detect high levels of gamma radiation in trucks leaving HPNS), and scanned through the steel sides of the trucks rather than over the top of the soil to limit detection of radiation in soil leaving the Shipyard.

- Intentionally and fraudulently collected soil from areas known to be clean or have lower radioactivity and falsely stated that the samples were from investigation units, rather than survey units, in order to reduce or eliminate any required remediation work.

- Falsified chain-of-custody forms to support the false sample collection information.

- Destroyed samples, data, and analytical results when the results were above the established release criteria.

- Used tow array scanning devices at Radiological Screening Yards ("RSY") at speeds significantly higher than permitted in attempt to reduce the probability of radiation detection.

- Intentionally used handheld detectors improperly to reduce the probability of radiation detection.

- Blocked the shipment of samples to an offsite quality assurance lab if there was a high chance that the release criteria would be exceeded.

- Diluted soil before scanning it to reduce the probability of radiation detection.

- Hired workers who did not meet minimum qualification standards required under contracts between the Navy and Tetra Tech.

58.      In private, internal correspondence sent at the end of 2017, the EPA estimated that 97% of survey units in Parcel G and 90% of the survey units in Parcel B were suspect. (*See* Letter from John Chesnutt, U.S. EPA Region IX to George ("Pat") Brooks, Department of the Navy (Dec. 29, 2017), hereinafter, "EPA Dec. 2017 Letter to Navy.")

59.      At all relevant times Tetra Tech was engaged in this fraudulent activity, the Navy was charged with, and responsible for remediation at the Shipyard including compliance with applicable statutes, regulations, guidance documents, and policy manuals which outline specific,

technical, and procedural requirements that the Navy was required to implement and follow at the Shipyard, including the FFA, Federal Acquisition Regulations, Construction Quality Management Program Manual, Environmental Readiness Program Manual, and Base-Wide Radiological Work Plans, Sampling Plans, and Quality Assurance Project Plans.

60.     As alleged herein, the Navy failed to comply with these mandatory duties.

**E.     Tetra Tech Investigates its Own Fraud.**

61.     At some point—it is not clear *exactly* when—the United States became aware of Tetra Tech's misconduct.

62.     According to the Government, initial evidence that Tetra Tech engaged in fraudulent sampling was raised in October 2012, by the Navy's Radiological Affairs Support Office ("RASO").  "While reviewing post-remediation soil sample results, a RASO official identified discrepancies between the first two sets of systematic sample results . . . .  This difference in lab results raised the prospect that the post-remediation samples were taken from a different site than the first two sets of systematic samples, that is, a different location from that claimed on chain-of-custody ("COC") documents."  (Greenaction Pet. at 2, 7.)

63.     After identifying fraudulent sampling at the site, the Navy directed Tetra Tech to self-investigate its own fraud.  Tetra Tech documented the results of its self-investigation in a report tiled, *Investigation Conclusion Anomalous Soil Samples at Hunters Point Naval Shipyard* (April 2014) ("2014 Investigation Report").

64.     According to an EPA Criminal Division Interview, the Navy's Lead Remedial Project Manager ("RPM") at HPNS, Melanie Kito, explained that "if a contractor is doing a poor job, they can try to fix the problem and do a report about it.  Kito said that maybe RASO let Tetra Tech self-investigate so that Tetra Tech could identify the root cause of the problem."

65.     The 2014 Investigation Report "summarizes the investigation results and corrective actions taken by [Tetra Tech] in response to a Navy inquiry into discrepancies between the first two sets of systematic sample results and the third set at the Former Building 517 site located at [HPNS]."  (2014 Investigation Report at ES-1.)

66.     "During the investigation, Tetra Tech EC, Inc. (TtEC) identified additional

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

survey units at [HPNS] that exhibited anomalous soil sample results.  TtEC investigated each set of anomalous results; resampled and completed additional remediation, where necessary; and revised and resubmitted reports for these areas."  (*Id*. at 1.)

67.    The 2014 Investigation Report concluded that: "[w]ith the above hypotheses ruled out, there is one feasible explanation for [the anomalous] samples . . . .  That explanation is that the persons listed as the sample collectors on the chain-of-custody forms, either by themselves or in conjunction with others, collected soil samples in areas outside the designated survey units." (*Id*. at 18.)

68.    Later, in November 2016, the EPA Criminal Division asked Melanie Kito if "after Tetra Tech did its report, if there was discussion about double-checking Tetra Tech's work. Kito said that *the Navy relied on Tetra Tech*." (emphasis added.)

69.    Ms. Kito's statements evidence a cozy and largely unsupervised relationship between Tetra Tech and the Navy where the Navy decided to rely upon the statements of Tetra Tech, despite multiple red flags that Tetra Tech engaged in widespread fraud at HPNS.

### F.    Tetra Tech Employees Plead Guilty to Federal Crimes.

70.    In 2014, the Nuclear Regulatory Commission ("NRC") determined that Tetra Tech "deliberately falsified radiation readings."  (*See* NRC Office of Investigations Report No. 1-2014-018.)

71.    However, the Navy continued to allow Tetra Tech to work on the site, uninterrupted, for *years*.

72.    In March of 2017, unbeknownst to Plaintiffs and following a confidential investigation by the U.S. Department of Justice, Stephen Rolfe and Justin Hubbard—two of Tetra Tech's Radiation Control Technician Supervisors who oversaw radiological investigation, testing, and remediation at HPNS—secretly pled guilty to "destruction, alteration, or falsification of records in federal investigations" in violation of 18 U.S.C. Section 1519.

73.    Rolfe and Hubbard admitted that they falsified portions of their investigation of HPNS testing and remediation by substituting clean soil in place of actual soil samples from the areas designated for testing.  Rolfe specifically admitted that he had instructed his subordinates to

1    substitute clean soil for legitimate samples on approximately twenty occasions in 2012.

2        74.     The cases against Hubbard and Rolfe were sealed by the federal court until

3    sentencing proceedings against Hubbard on or around May 2, 2018.

4        75.     Until that time, Plaintiffs were not aware of the investigation by the Department

5    of Justice into the activities of Tetra Tech.

6        76.     Despite the ongoing investigation by the Department of Justice and the sealed

7    indictments against Rolfe and Hubbard, the United States never communicated to Plaintiffs the

8    extent of the fraud by Tetra Tech that had taken place or how long the transfer of Shipyard property

9    would be delayed.  Plaintiffs did not learn of the investigation until May 2018 when the Rolfe and

10   Hubbard indictments were unsealed.  Through reasonable diligence, Plaintiffs could not have

11   discovered the extent of Tetra Tech's fraud or the impact such fraud would have on the transfer

12   schedule because the scope of the fraud had been hidden by the United States and Tetra Tech.

13       **G.    The Navy Continued to Award Contracts to Tetra Tech Even After**

14              **Learning of its Fraud.**

15       77.     The Navy had a mandatory duty under the Federal Acquisition Regulations not

16   to award contracts to contractors with unsatisfactory performance records, including poor records

17   of business ethics and integrity.

18       78.     Nevertheless, the Navy continued to award contract task orders and make

19   payments to Tetra Tech for work at HPNS for several years after the Navy became aware of soil

20   sample falsification.  (*See United States of America, ex rel. Jahr, et al. v. Tetra Tech EC*, 3:13-cv-

21   03835-JD, Defendant Tetra Tech's Motion to Dismiss Complaint in Intervention, ECF No. 50

22   ("Tetra Tech MTD") at 3, citing U.S. Compl.)

23       79.     Tetra Tech itself has explained that "the Navy also continued to pay Tetra Tech's

24   invoices for work at Hunters Point *after* receiving the 2014 Investigation Report."  (Tetra Tech

25   MTD at 5, emphasis added.)

26       80.     Tetra Tech further explained that the "Navy continued to award contract task

27   orders and make payments to TtEC for work at Hunters Point for *several years after* the Navy

28   became aware of soil sample falsification and after TtEC's rework associated with its investigation

thereof."  (Tetra Tech MTD at 10 (emphasis added).)  In addition, the "Navy continued to award TtEC additional work at Hunters Point *for many years* after the investigation concluded."  (*Tetra Tech v. United States Environmental Protection Agency*, N.D. Cal. No. 4:20-cv-08100, ¶ 143 (emphasis added).)

81.     The Navy also continued to maintain Tetra Tech as a contractor on an unrestricted Environmental Multiple Award Contract.  For example, in a September 2016 interview with the EPA's Criminal Investigative Division, George Patrick "Pat" Brooks (BRAC Environmental Coordinator), stated that Tetra Tech still remained a Navy contractor at HPNS on an unrestricted Environmental Multiple Award Contract ("EMAC"), even though the "root problem" with Tetra Tech was its "lack of Quality Assurance/Quality Control (QA/QC)" and that Tetra Tech "need[ed] to demonstrate greater attention to QA/QC."  (EPA Criminal Investigation Division, Investigative Activity Report, Interview of George Patrick "Pat." Brooks (Sept. 27, 2016) ("EPA P. Brooks Interview").)  This point was further confirmed in the deposition of Defendant United States pursuant to Fed. R Civ. P. 30(b)(6):

> Q:     So at least as of the date of this document, September 27,
>
> 2016, Tetra Tech was still a contractor on an unrestricted EMAC
>
> [Environmental Multiple Award Contract] for work with the Navy;
>
> correct?
>
> A.     I believe so, yes.

(United States 30(b)(6) Deposition ("U.S. Depo.") at 191-193.)

### H.     The U.S. EPA Subsequently Identified "Red Flags of Multiple Types" that the Navy Negligently Failed to Discover, Prevent, or Mitigate

82.     As a result of the extended period of unchecked fraudulent conduct by Tetra Tech, the Navy has not complied with its obligations to remediate HPNS.  The wide-ranging fraudulent activities, across years and numerous parcels, confirm that the Navy did not fulfill its mandatory quality assurance responsibilities over Tetra Tech's remediation.  This is further confirmed by internal correspondence between the Navy and the EPA.

83.     For example, in 2017 (five years after the Navy discovered discrepancies in

Tetra Tech's work), the Navy prepared a *Draft Radiological Data Evaluation Findings Report for Parcels B and G Soil* (Sept. 2017) ("Draft Report").

84.     The purpose of the Draft Report was to "review the historical data collected by [Tetra Tech] at HPNS, assess the potential for data falsification or manipulation, and recommend follow-up data collection to validate previous decisions regarding the property condition."  (*See* Draft Report at p. ii.)

85.     The Navy provided the Draft Report to the U.S. EPA, California Department of Toxic Substances Control ("DTSC"), and the California Department of Public Health ("CDPH") for their independent review with a technical team including national experts in health, physics, geology, and statistics.

86.     On December 29, 2017, the EPA provided a letter to the Navy with its comments on the Draft Report.  (*See* EPA Dec. 2017 Letter to Navy.)

87.     The EPA's comment letter identified "red flags of multiple types" in work conducted by Tetra Tech at HPNS, which amounts to a concession by Defendant United States that the Navy negligently failed to discover the widespread fraud perpetrated by Tetra Tech.

88.     As discussed herein, the Navy had numerous mandatory duties to oversee, supervise, and ensure the quality of Tetra Tech's work, including (1) ensuring that sampling and field work was performed in accordance with work plans, sampling plans, and quality assurance project plans; (2) inspecting all work in progress and at completion; (4) conducting ongoing field inspections to verify that all work was in compliance with contract and technical specifications; and (5) comparing radiological data with the requirements of the work plan, task specific plans, and sampling plans to ensure that all proper conditions have been met.  These are only a few of the Navy's applicable duties.  Had the Navy actually implemented and performed these mandatory duties, it would have discovered the "red flags of multiple types" that it missed time and time again.

### 1.     Parcel G Gamma Scans

89.     The EPA found inconsistencies between gamma scan and static data that indicated that soil samples had not been sourced as Tetra Tech had represented.

90.     According to the EPA, the Agency's independent review of data submitted by

Tetra Tech indicated that in nearly a third of all Parcel G trench units, post remediation gamma scans indicated a need for biased samples to be collected, but they were not.  (EPA Dec. 2017 Letter to Navy at 15.)  This occurred even when gamma scan count rates exceeded investigation levels. (*Id*. at 8.)

91.     For example, in Parcel G, out of the 43 trench units that the Navy designated for "no further action" (meaning that no further evaluation of the data was necessary because it did not appear that data manipulation or falsification by Tetra Tech had occurred): (1) "over half had inconsistencies between gamma scan and static data and over one-third had other types of inconsistences (e.g., on-site and off-site results differ by more than 10x, plots showed signs that multiple populations likely in the data set, etc.);" (2) "in a third, the narrow range of gamma static data indicate[d] measurements were not collected from different locations as required;" (3) "in six, some data were missing so some evaluations could not be done;" (4) "in a few trench units, biased sample results appeared lower than other data sets, which is *the opposite of what we would expect*. And in a few more, the Navy's report described a finding of potential falsification in one aspect of the work but still did not flag for resampling;" and (5) "many other concerns were found through data evaluation, and most trench units *showed red flags of multiple types*."  (EPA Dec. 2017 Letter to Navy at 15 (emphasis added).)

92.     In addition, for Parcel B, the EPA found "of the 66 trench units that the Navy recommended for 'No Further Action,' a quarter of them had missing gamma scan and static data . . . ."  (*See* EPA Dec. 2017 Letter to Navy at 14.)

93.     As documented by the EPA's letter, the Navy negligently failed to discover every one of these "red flags."  In fact, the United States testified that had the Navy's quality assurance system detected the fraud, it likely would have alerted Navy contracting personnel, who could have terminated Tetra Tech.  (U.S. Depo. at 72:1-17.)  But the Navy's QA system failed to do so.

## 2.     Failure to Follow Chain of Custody Procedures

94.     EPA also identified instances when chains of custody or "COCs" were falsified or simply not submitted at all.

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

95.        For example, the EPA stated:

> The Navy's Data Evaluation Forms indicate that some of the Survey Unit Project Reports (SUPRs) are missing the chain-of-custody forms (COCs) for samples collected at various survey units. Further, worker allegations state that some COCs were falsified. Based on a review of these forms, <u>allegations regarding COC tampering/falsification have been confirmed by the Navy</u> . . . . Any archived samples which do not have the appropriate COC documentation, or which may have an accompanying COC but which have not been maintained in a locked room under controlled custody as evidenced by signed COC documentation, <u>cannot be used to provide defensible data regarding site conditions</u>.

(*See* EPA Dec. 2017 Letter to Navy at 3-4 (emphasis added).)

96.        Notably, the 2017 Draft Report was drafted *before* the Navy had conducted a complete review of COCs. For example, the report states, "an inventory evaluation of the available COCs is currently being done and was not complete at the time of this report." (Draft Report at 3-4, fn. 2.)  Accordingly, further review of COCs would have likely revealed even more widespread falsification of COCs and soil sample data.

97.        As documented by the EPA's letter, the Navy negligently failed to discover, prevent, or mitigate the widespread tampering and falsification of COCs committed by Tetra Tech.

### 3.        Laboratory Data Quality Issues

98.        The EPA also informed the Navy that a "re-review of the data based on former worker allegations has also brought to light data quality concerns not previously identified."  (EPA Dec. 2017 Letter to Navy at 4.)

99.        For example, "the contract off-site laboratory had data quality issues such as the identification of sets of data with an unusual number of non-detect or negative values, and there were revelations about the use of inaccurate nuclide libraries for identifying and quantifying gamma emitting radionuclides.  In some cases, the Ac-228 sample data was unusually low, or reported as '0' in Trench Units (TUs) 076, 077, 078, and 080 for all survey types." (*Id*.)

100.        "Additionally, for some survey units, significant discrepancies exist between on-site and off-site laboratories, with the concurrent identification of insufficient analysis procedures for identifying Radium-226 (Ra-226) contamination at the on-site laboratory.  For example, it has been determined that the on-site laboratory analyzed for RA-226 using RA-226 gamma energy line

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

at 186 Kilo-electron volts (KeV) in the gamma spectroscopy analysis, but with insufficient counting time to achieve the required detection limits."  (*Id*. at 4-5.)

101.    Of the 66 trench units in Parcel B that the Navy recommended for No Further Action, "9% showed differences in weight between samples sent to the onsite vs offsite lab."  (*Id*. at 14.)

102.    As documented by the EPA's letter, the Navy negligently failed to discover discrepancies with on-site and off-site laboratory data.

### 4.    Failure to Follow and Implement Work Plans

103.    The EPA further identified numerous instances when Tetra Tech failed to implement and follow Navy-approved and adopted work plans, which the Navy also negligently failed to discover, prevent or mitigate.

104.    According to the EPA, "[M]ultiple former workers have reported fraud associated with quality control and work plan requirements, such as the failure of some workers to follow work plans by scanning soil too quickly or with the detector too far from the surface to achieve the detection limit requirements for the analysis.  This newly identified information reveals a general lack of data quality and reliability, indicating the associated data are neither reliable nor defensible."  (*See* EPA Dec. 2017 Letter to Navy at 5.)

105.    The EPA further noted that "forms and data also document signs of failure to follow the work plan in multiple locations" on Parcel G.  (*Id*. at 9.)

106.    The EPA also directed the Navy to note in its revised version of the Draft Report "that all worker allegations . . . would suggest that if sampling [had] been performed according to the original work plan using the original analytical methods, more evidence of contamination could have been found than was originally presented."  (*Id*. at 14.)

107.    In addition, in a March 26, 2018 letter from the EPA to the Navy, the EPA noted a "general failure to follow work plans" by Tetra Tech. (*See* Letter from John Chesnutt, U.S. EPA Region IX to George ("Pat") Brooks, Department of the Navy (March 26, 2018), hereinafter, "EPA March 2018 Letter to Navy.")

### 5.    Recognizing its Failures, the Navy Repeatedly Downplayed the

1

**Extent of Tetra Tech's Fraud in Reports and Work Plans.**

2   108.  The EPA's December 2017 letter to the Navy also indicated that the Navy

3 severely downplayed the extent of Tetra Tech's fraud in its Draft Report.

4   109.  For example, according to the EPA, "in Parcel B, the Navy recommended

5 resampling in 15% of soil survey units and trenches, fill, and building sites.  EPA, DTSC, and

6 CDPH found signs of potential falsification, data manipulation, and/or data quality concerns that

7 call into question the reliability of soil data *in an additional 76% of survey units*, bringing to 90%

8 the total suspect soil survey units in Parcel B . . . .  In Parcel G, the Navy recommended resampling

9 49% of survey units, and *regulatory agencies recommended 49% more,* for a total of 97% of survey

10 units as suspect." (*See* EPA Dec. 2017 Letter to Navy.)

11   110.  Accordingly, the EPA found that the Navy was not characterizing or disclosing

12 the full extent of Tetra Tech's fraud to other regulatory agencies, stakeholders, and the public.  (*See*

13 *id.* at 5 ["A more detailed discussion about data quality and the resampling effort is needed to

14 provide assurance that any area not being resampled has defensible data . . . ."].)

15   111.  Given these concerns, the EPA stated, "[i]n the bigger picture, beyond the scope

16 of this specific Report, prior to resampling efforts, a thorough review of work plans, process review,

17 documentation, and data quality should be of primary concern to ensure that high quality defensible

18 data is obtained.  *Ongoing onsite oversight by the Navy and regulatory agencies should be*

19 *conducted frequently*."  (*Id.* (emphasis added).)

20   112.  But the Navy never addressed the EPA's concerns.

21   113.  For example, in the EPA's March 2018 letter to the Navy, the EPA provided

22 comments on the Navy's *Draft Work Plan, Radiological Survey and Sampling*.

23   114.  The EPA found that the "Conceptual Site Model" or "CSM" in the Draft Work

24 Plan did "not provide a sufficient identification" of certain "sources of contamination and/or site

25 conditions."  (*Id.* at 2.)  For example, the "Uncertainty" discussion in the Work Plan "claims that

26 all known sources of contamination were removed; however, there are allegations that 'hot'

27 samples were turned to trenches and evidence that some areas have buried radiological devices,

28 such as areas associated with use of dredge materials as fill to construct land in Parcel D-1.  In

addition, previous investigations have identified the presence of radiological devices with significant radioactive material at the site.  One such example includes the device detected outside a drain line near Building 205.  The CSM statement that all known sources of contamination at the site have been removed *does not accurately reflect site conditions*.  Please modify this statement to represent site conditions more accurately with respect to the listed uncertainties in the CSM." (*Id.* at 3 (emphasis added).)

115.    A few months later, on September 21, 2018, the EPA sent the Navy a letter commenting on the Navy-approved *Draft Fourth Five-Year Review* (July 2018).  (*See* Letter from Lily Lee, Remedial Project Manager, U.S. EPA Region IX to Derek J. Robinson, BRAC Environmental Coordinator, Department of the Navy (Sept. 21, 2018).)  In the letter, EPA Region IX criticized the Navy's management of re-sampling and cleanup work, stating it failed in its review of the high-profile cleanup to be upfront about the falsified soil sampling that Tetra Tech committed throughout HPNS.

116.    In the comments, EPA Region IX complained that the Navy's review failed to "adequately discuss the Tetra Tech EC Inc. potential contractor manipulation and/or falsification of radiological data at Hunters Point, and its effect on the protectiveness of the radiological remedies.  Some of the fraudulent activity has been confirmed through enforcement actions . . . . *[T]his issue has significantly undermined trust in the Navy, and stakeholders are frustrated by the Navy delays and want more communication and transparency*." (*Id.* at 2 (emphasis added).)

## I.    Transfer of the Shipyard Property

117.    On March 31, 2004, the United States and the San Francisco Redevelopment Agency ("SFRA") executed a Conveyance Agreement to establish the process for conveying HPNS property for redevelopment.  Pursuant to the Conveyance Agreement, HPNS was to be transferred to the SFRA in multiple phases.  The United States had previously delineated HPNS into separate parcels.  The first parcel to transfer was to be Parcel A, while subsequent transfers were to include the remaining parcels.

118.    Before the United States may transfer Shipyard property for redevelopment, the Navy must certify that the property scheduled to be transferred has been subject to environmental

investigation and that the results of the investigation determine the property is suitable for transfer. The Navy does so by issuing a finding of suitability of transfer ("FOST") for that specific portion of HPNS property that is subject to transfer.  Without a FOST which has received regulator assurance that confirms the Navy's findings that a parcel has been sufficiently remediated, parcels of HPNS property may not be transferred.

119.    In 2004, the Navy issued a FOST for Parcel A, and transferred Parcel A to the SFRA for redevelopment.  In 2005, the SFRA conveyed the majority of Parcel A to affiliates of Lennar Corporation, which affiliates broke ground on redevelopment of Parcel A in June 2013. Since transferring Parcel A in 2005, the SFRA was dissolved pursuant to California state law, and the City subsequently created the Office of Community Investment and Infrastructure as the Successor Agency to the SFRA, which is required to complete work related to prior enforceable obligations of the SFRA such as the Conveyance Agreement.

120.    In May 2007, affiliates of the Lennar Corporation and the SFRA executed the Second Amended and Restated Exclusive Negotiations and Planning Agreement (Phase 2 of Hunters Point Shipyard, with an Option to Expand Planning and Exclusive Negotiations to Include Candlestick Point) ("ENA") concerning development of Phase 2 of HPNS for parcels other than Parcel A.  In August 2008, Lennar affiliates assigned their interests in the ENA to CP Dev. Co.  In June 2010, CP Dev. Co. and the SFRA entered into the Disposition and Development Agreement (Candlestick Point and Phase 2 of the Hunters Point Shipyard) ("DDA"), which provided for the development of Phase 2 of HPNS by CP Dev. Co.  In May 2013, the interests of CP Dev. Co. under the DDA in development of Phase 2 of HPNS were assigned by affiliates of the Lennar Corporation to TSC.  In September 2015, CP Dev. Co. was added as a "Tenant" to the Interim Lease with the SFRA, whereby CP Dev. Co. leases property at HPNS owned by the SFRA related to Phase 2 of the Shipyard development.

121.    In May 2016, Five Point Operating Company, LP acquired TSC as a subsidiary, with TSC retaining the development interests of CP Dev. Co. in development of Phase 2 of the Shipyard.  As the operating managing member of Five Point Operating Company, LP, Plaintiff Five Point acquired development interests in HPNS as well.  Consequently, in May 2016, Plaintiffs

acquired exclusive interests to conveyance, management, and redevelopment of the remaining parcels of HPNS to be conveyed by the United States (other than Parcel A) from affiliates of Lennar Corporation.  The Navy has issued a FOST for Parcels D-2, UC-1, and UC-2, though those Parcels have not been transferred to Plaintiffs for redevelopment.  Those parcels have been leased from the City to CP Dev. Co. under the Interim Lease, where certain horizontal improvements were started by CP Dev. Co., but later halted after revelations of Tetra Tech's fraud came to light.  The Navy has not yet issued a FOST for any of HPNS's remaining parcels.

J.  **United States' Conduct was Subject to Numerous Mandatory Duties to Supervise and Ensure the Quality of Tetra Tech's Work.**

122.    On November 19, 2021, the Court dismissed Plaintiffs' initial complaint against the United States based on its finding that the allegations against the United States provided insufficient information regarding the mandatory and specific duties the United States violated. Thereafter, Plaintiffs and the United States engaged in discovery regarding the jurisdictional issues the United States had raised in its initial motion to dismiss, including production of documents and the deposition of Navy witness Lawrence Lansdale, the Environmental Director of the Department of the Navy Base Realignment and Closure Program Management Office for the Naval Facilities Engineering Command ("NAVFAC").

123.    As part of the jurisdictional discovery process, Plaintiffs requested documents and deposition testimony addressing how the Navy breached its mandatory and specific duties to supervise, oversee, and ensure the quality of Tetra Tech's work.  (ECF Nos. 53 and 57.)  The Court subsequently denied these discovery requests "in toto as beyond the scope of the discovery authorized at this stage by the Court."  (ECF No. 67.)

124.    On March 2, 2021, the United States represented to the Court in a signed letter brief that "the United States has produced all known documents responsive to Plaintiffs' document requests that could be the source of a policy, plan, procedure, or guideline applicable to the Navy's oversight of its remediation contractor at Hunters Point."  (ECF No. 56.)  The United States reiterated that representation on March 5, 2021, informing Plaintiffs that it had "completed its production pursuant to the Court's November 19, 2020 Order."  Based on those representations,

1  Plaintiffs proceeded to take the fact deposition of Mr. Lansdale and the United States' Rule 30(b)(6)

2  depositions.

3        125.     On May 20, 2021, Plaintiffs deposed the United States regarding its search and

4  production of documents.   At the deposition, Diane Silva, the witness the United States presented

5  as its Rule 30(b)(6) witness for document location and production, admitted that she did not know

6  if the United States had finished searching, collecting, or producing responsive documents.

7        126.     After Ms. Silva's deposition concluded, the United States proceeded to produce

8  over 37,000 pages of responsive documents over the course of two months, with the Government's

9  most recent document production occurring a mere ten days before this Amended Complaint was

10  filed.   Again, these 37,000 pages of documents were produced *after* the United States repeatedly

11  represented that it had completed its document production.

12        127.     On June 17, 2021, the Court lifted "all stays of discovery entered in all of the

13  cases," ECF No. 87, and explained that this means the parties are now entitled to full discovery:

14  "The cases are on.  Okay.  The doors are open.  The windows are open.  The shades are up.  Go

15  nuts.  Get your work done . . . This is not initial discovery.  The bar is open.  You know place your

16  orders, okay."  (Transcript of June 17, 2021 Hearing at 25:2-10.)  And the Court emphasized that

17  ***"motions to dismiss do not hold up or stall discovery*."**  (*Id*. at 17:2 (emphasis added).)  Given the

18  Court's directive, on July 9, 2021, Plaintiffs requested that the United States start producing all

19  documents responsive to the requests for production of documents that the United States previously

20  disputed as outside the scope of jurisdictional discovery.  The United States refused because

21  "Plaintiffs do not have complaints against the United States," and "should Plaintiffs file amended

22  complaints, the United States will move to dismiss them . . ."  The Government's position does not

23  square with this Court's lifting of all discovery stays.[4]

24        128.     Nevertheless, Plaintiffs have reviewed the documents produced by the

25  Government as part of the jurisdictional discovery process, and the following allegations are in

26  large part derived from the facts Plaintiffs learned through that discovery process.

27

28  [4] On July 19, 2021, contemporaneous with the filing of this Amended Pleading Plaintiff Five Point served Request for Production of Documents on the United States under Fed. R. Civ. P. 34.

129.     As alleged herein, the United States has the primary responsibility for the closure, cleanup, and ultimate transfer of the former HPNS property.  As explained by Mr. Lansdale, the Navy's policy is to enter into contracts for the type of investigation and remediation work required for that transfer with independent environmental contractors, which in this case included Tetra Tech, among others.  (*See* Decl. of Lawrence Lansdale, ECF No. 33-1 at ¶ 8.)  The Navy's primary role is to ensure that its contactors comply with requirements necessary to the adequate performance of all investigation and remediation work.

130.     As detailed below, federal statutes, regulations, Navy policy manuals, guidance documents, work plans, and contractual requirements impose supervision and oversight duties on the Navy to ensure that its contactors appropriately performed all investigation and remediation work.  The acts and omissions detailed below were catastrophic failures by the Navy that the Navy obscured, such that Plaintiffs could not reasonably be expected to have discovered them.

**1.     The United States is Responsible for Remediation at the Shipyard Pursuant to CERCLA and the NCP.**

131.     The United States, through the Navy, is ultimately responsible for the remediation process at HPNS pursuant to the NCP, CERCLA, and related statues and regulations.

132.     CERCLA provides for federal remediation at uncontrolled or abandoned hazardous waste sites.  (42 U.S.C.S. § 9604.)

133.     CERCLA and the subsequent Superfund Amendments and Reauthorization Act of 1986 ("SARA") establish a series of programs for the cleanup of hazardous waste disposal and spill sites nationwide.  One such program applicable to the Navy is the Defense Environmental Restoration Program ("DERP"), which is codified in SARA Section 211 (10 U.S.C. § 270I).  DERP is subject to and must be consistent with CERCLA.  (*See* Navy/Marine Corps Installation Restoration Manual 1992, 16.)  Through the DERP, the Department of Defense conducts environmental restoration activities.  The Department of Defense (which includes the Navy) must follow the same cleanup regulations that apply to private entities.

134.     The NCP defines the organizational structure and procedures for preparing for and responding to releases of hazardous substances.  (40 C.F.R. § 300.1)

135.     When EPA determines that clean up action can be done properly and promptly by another responsible party, the EPA may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with CERCLA.  (42 U.S.C. § 9604.)

136.     The Navy is the lead agency responsible for the investigation and cleanup of HPNS and holds the Administrative Record for the site.  (Lansdale Depo. at 188:11-12.)  EPA and its state regulatory agency partners oversee and enforce Navy compliance with Superfund requirements to ensure the cleanup at HPNS protects human health and the environment.

137.     The Navy is subject to the requirements of the FFA.  Pursuant to the terms of the FFA, the Navy must comply with CERCLA, and must do so properly and promptly.  "Remedial actions at facilities subject to interagency agreements under this section shall be completed as expeditiously as practicable."  (42 U.S.C. § 9620.)

138.     As lead agency under CERCLA, the Navy was required to follow the provisions of CERCLA and the NCP.  Lawrence Lansdale testified that "under CERCLA it is required to perform an [remedial investigation], an [feasibility study] and follow the CERCLA process."  (Lansdale Depo. at 210:15-21.)

139.     Pursuant to CERCLA and the FFA, the Navy was required to comply with all applicable regulations that would otherwise apply to EPA.

140.     Furthermore, "[n]o department, agency, or instrumentality of the United States may adopt or utilize any such guidelines, rules, regulations, or criteria which are inconsistent with the guidelines, rules, regulations, and criteria established by the Administrator under this chapter."  (42 U.S.C. § 9620.)

141.     In addition, applicable agency guidance is also binding on the Navy.  "[I]t is Navy/Marine Corps policy that [Installation Restoration] response actions follow EPA guidance in determining the reasonable interpretation and application of the regulations.  In addition, CERCLA § 120(a)(2) prohibits the Navy/Marine Corps from adopting any guidelines, rules, etc., that are inconsistent with EPA's guidelines and rules." (Navy/Marine Corps Installation Restoration Manual 1992 at 1-9.)

142.     The Navy's Installation Restoration Program follows the environmental cleanup process established by CERCLA.  The manual was designed to identify and clean-up contamination from hazardous substances, pollutants, and contaminants resulting from past Navy activities to protect human health and the environment at present and former Navy installations.

143.     The Navy's role as the lead agency of the CERCLA remediation is subject to a number of overarching mandatory duties.

144.     The Navy failed to comply with the statutory and regulatory requirements pursuant CERCLA and the NCP.  The Navy had no discretion to abandon these duties under the applicable statutes and regulations including CERCLA and the NCP.

**2.     The Navy, through its Remedial Project Manager and Resident Officer in Charge of Construction, was Required to Ensure Compliance with CERCLA.**

145.     CERCLA requires the appointment of a Remedial Project Manager ("RPM").

146.     At HPNS, the RPMs are Navy employees.[5] (Lansdale Depo. at 263:5.)

147.     "The RPM is the prime contact for remedial or other response actions being taken (or needed) at sites on the proposed or promulgated NPL, and for sites not on the NPL but under the jurisdiction, custody, or control of a federal agency."  (40 C.F.R. § 300.120(f).)

148.     The NCP regulations further dictate that the RPM is required to "coordinate[], direct[], and review[] the work of other agencies, responsible parties, and contractors to assure compliance with the NCP, Record of Decision (ROD), consent decree, administrative order, and lead agency-approved plans applicable to the response . . . The RPM's period of responsibility begins prior to initiation of the RI/FS, described in § 300.430, and continues through design and remedial action and the CERCLA cost recovery activity."  (*Id.*; *see also* FFA § 18.1 ["The RPM shall be responsible on a daily basis for assuring proper implementation of the RI/FS and the RD/RA in accordance with the terms of the agreement"].)

---

[5] Some of the Navy RPMs at HPNS included Melanie Kito (Lead RPM), Jim Whitcomb, Chris Yantos, Laura Urizar, Brooks Pauly, and Rebecca Cardoso.

149.     In addition, the RPM "shall participate in all decision-making processes necessary to ensure compliance with the NCP, including, as appropriate, agreements between EPA or other federal agencies and the state." (*Id.*)

150.     The RPM is responsible for ensuring "that all appropriate public and private interests are kept informed and that their concerns are considered throughout a response, to the extent practicable, consistent with the requirements of § 300.155 of this part." (40 C.F.R. § 300.135.)

151.     In addition, a Navy Resident Officer in Charge of Construction ("ROICC") must ensure that work at a CERCLA site is conducted as outlined:

> The Navy ROICC is the construction manager for the remedial action. He/she is responsible for ensuring that the work is accomplished per plans and specifications and in a fashion which protects human health, welfare, and the environment. Because the RA has been agreed upon in consultation with regulatory agencies, the ROICC cannot make field changes without having first coordinated them through the RPM. The ROICC should monitor the contractor's site Health and Safety Plan (HSP) and other procedures for compliance with the Occupational Safety and Health Act (OSHA) regulations (29 CFR 1910). The ROICC ensures that the approved QA/QC plan is followed, both for implementing the selected alternative and for accomplishing field sampling to verify that clean up levels are attained.

(Navy/Marine Corps Installation Restoration Manual 1992, 6-3.)

152.     The RPMs were *required* to ensure compliance at the site with applicable guidance and regulations and supervise the actions of the Navy's contractor, Tetra Tech.

153.     Hiring a contractor did not excuse the RPMs, ROICCs, or the Navy from its own obligations to ensure compliance with all applicable remediation requirements.

154.     The RPMs, ROICCs, and the Navy as a whole have not complied with their obligations at HPNS as evidenced by the extensive fraud that was allowed to continue over a span of years.

155.     As a result of the RPMs and ROICC's neglect to their responsibility to ensure that HPNS was remediated in compliance with CERCLA, the EPA is ordering additional sampling and requiring additional verification and work to be undertaken at HPNS which is expected to cause

a decade-long delay in the completion and transfer of the property.  (*See* Victim Impact Statement at 2.)

156.     This delay is a violation of the Navy's obligation to remediate a site promptly, properly, and efficiently.

### 3.     The Navy Violated its Duty Under CERCLA and the NCP to Verify, Ensure, and Rely on Accurate Data.

157.     The NCP requires the lead agency to assemble and evaluate existing data from a site, including the results of any site inspections, preliminary assessments, removal actions, and the NPL listing process (40 C.F.R. § 300.430(b)), and then to use that information to develop a remedial investigation plan to characterize the nature of, and threat posed by, hazardous materials at a site.  (40 C.F.R. § 300.430(b)–(d).)

158.     The Navy must meet the standards established pursuant to CERCLA when it effectuates a selected remedy at a site:

> Remedial actions selected under this section or otherwise required or agreed to by the President under this Act shall attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release at a minimum which assures protection of human health and the environment.  Such remedial actions shall be relevant and appropriate under the circumstances presented by the release or threatened release of such substance, pollutant, or contaminant.

(42 U.S.C.S. § 9621.)

159.     Navy installations in compliance with CERCLA have the responsibility to carry out a Preliminary Assessment ("PA") at a hazardous waste site as part of the remedial process.  In addition, a Health Assessment ("HA") must be performed for all Navy NPL sites.  (Navy/Marine Corps Installation Restoration Manual 1992 at 12-13.)

160.     The Navy is required to commence RI/FS on NPL sites.  (Navy/Marine Corps Installation Restoration Manual 1992, 5-43.)

161.     "The purpose of the remedial investigation/feasibility study (RI/FS) is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy.  Developing and conducting an RI/FS generally includes the following activities: project scoping, data collection,

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

risk assessment, treatability studies, and analysis of alternatives. The scope and timing of these activities should be tailored to the nature and complexity of the problem and the response alternatives being considered." (40 C.F.R. § 300.430; Navy/Marine Corps Installation Restoration Manual 1992 at 5-2.)

162.     As part of this process, "the lead agency shall characterize the nature of and threat posed by the hazardous substances and hazardous materials and gather data necessary to assess the extent to which the release poses a threat to human health or the environment or to support the analysis and design of potential response actions by conducting, as appropriate, field investigations." (40 C.F.R. § 300.430(d).)

163.     The end product of a RI/FS is the selection of a remedial action that is supported by valid site data and a Baseline Risk Assessment. "Using the data developed [pursuant to] this section," the lead agency is also required to "conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment that may be posed by contaminants migrating to ground water or surface water, releasing to air, leaching through soil, remaining in the soil, and bioaccumulating in the food chain. The results of the baseline risk assessment will help establish acceptable exposure levels for use in developing remedial alternatives in the FS, as described in paragraph (e) of this section."  (40 C.F.R. § 300.430(d)(4).)

164.     The RD/RA process builds upon the RI/FS once complete.

165.     The purpose of remedial design ("RD") is to convert the conceptual design for the selected remedy into a final design that is biddable and implementable.  All RD/RA activities shall be in conformance with the remedy selected and set forth in the ROD or other decision document for that site.  (40 C.F.R. § 300.435(b).)  "All RD/RA activities shall be in conformance with the remedy selected and set forth in the ROD or other decision document for that site. Those portions of RD/RA sampling and analysis plans describing the QA/QC requirements for chemical and analytical testing and sampling procedures of samples taken for the purpose of determining whether cleanup action levels specified in the ROD are achieved, generally will be consistent with the requirements of § 300.430(b)(8)."  (40 C.F.R. § 300.435.)

166.    "During the course of the RD/RA, the lead agency shall be responsible for ensuring that all federal and state requirements that are identified in the ROD as applicable or relevant and appropriate requirements for the action are met."  During the RD/RA, the Navy must ensure that all federal and state requirements that are identified in the ROD as applicable or relevant and appropriate requirements for the action are met.  (40 C.F.R. § 300.435(b)).

167.    The ROD is a comprehensive document which carefully shows that the decision being reached is consistent with the NCP.  (Navy/Marine Corps Installation Restoration Manual 1992, 5-35.)

168.    Components of the remedy not described in the ROD must attain (or waive) requirements that are identified as applicable or relevant and appropriate at the time the amendment to the ROD or the explanation of significant difference describing the component is signed:

> After publication of the proposed plan and prior to adoption of the selected remedy in the record of decision, if new information is made available that significantly changes the basic features of the remedy with respect to scope, performance, or cost, such that the remedy significantly differs from the original proposal in the proposed plan and the supporting analysis and information, the lead agency shall . . . [i]nclude a discussion in the record of decision of the significant changes and reasons for such changes . . . Seek additional public comment on a revised proposed plan . . . The lead agency shall, prior to adoption of the selected remedy in the ROD, issue a revised proposed plan, which shall include a discussion of the significant changes and the reasons for such changes, in accordance with the public participation requirements described in paragraph (f)(3)(i) of this section.

(40 C.F.R. § 300.430.)

169.    The CERCLA and NCP process is one that is incredibly technical.  "*Technical expertise is absolutely critical* in making [a] determination" regarding risk assessments, health and safety plan components.  (U.S. Depo., at 102:12 (emphasis added).)  These decisions require "primarily technical" analysis.  (*Id.* at 104:16.)  The NCP on the whole is an incredibly technical regulation.

170.    As the lead agency, under CERCLA it was the Navy's, and not Tetra Tech's, responsibility to comply with these statutory and regulatory requirements.

171.     The data gathered by the Navy pursuant to the requirements of CERCLA builds on itself, thus it is imperative that accurate data is used throughout the process.

172.     By failing to ensure accurate data collection, and to verify Tetra Tech's sampling practices as required, the Navy has allowed the faulty data to pervade each step of the CERCLA process.  The Navy has admitted in the Attachments to its Complaint in Intervention that 236 reports accepted by the Navy contain false or fraudulent data.

173.     As a consequence, the RI/FS process relied upon data created by Tetra Tech that was not legally defensible, and that data has been used by the Navy to support the remedy selected, and all subsequent elements of the remedy including the ROD at HPNS.

174.     Allowing fraudulent data throughout the entirety of the remediation process has created a significant delay that otherwise would have been avoided if the Navy had ensured and verified that all data relied upon was valid and in compliance with CERCLA as it was required.

175.     Furthermore, when establishing the scope of the work completed at the Shipyard, the lead agency is required "to identify the optimal set and sequence of actions necessary to address site problems."  Specifically, the lead agency shall "[d]evelop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs."  (40 C.F.R. § 300.430 (b).)

176.     The Sampling and Analysis Plan ("SAP") contains the Field Sampling Plan ("FSP") and the Quality Assurance Project Plan ("QAPP").  Proper planning and QA/QC are essential for field sampling associated with all phases of the CERCLA process.  "Even in the very early phases of the program the highest level of QA/QC should be demanded.  Thus, data obtained early in the process can be considered valid throughout and decisions to design programs and expend money based on information this data provides will be justifiable."  (Navy/Marine Corps Installation Restoration Manual 1992, 4-18.)

177.     A QAPP "presents the policies, organization, objectives, functional activities, and specific quality assurance (QA) and quality control (QC) activities to ensure the validity of analytical data generated during project execution.  The purpose of the plan is to ensure that all

technical data generated are accurate, representative, and will ultimately withstand judicial scrutiny, should such a need arise."  (Navy/Marine Corps Installation Restoration Manual 1992, 4-19.)

178.      "All QA/QC procedures should be in accordance with applicable professional technical standards, EPA and state requirements, government regulations and guidelines, and specific project goals and requirements."  (Navy/Marine Corps Installation Restoration Manual 1992, 4-19.)

179.      Pursuant to the Navy's guidelines for implementing CERCLA and as part of its QA/QC requirements the Navy was responsible for ensuring that all analytical and technical data requirements were met.  This responsibility to validate data and ensure it was of "sufficient quality" is a technical requirement utilizing the Navy's professional and scientific judgment and expertise.

180.      The Navy failed to effectuate these requirements and failed to exercise appropriate technical and professional expertise throughout the CERCLA process at HPNS.

181.      As a result, the Navy must conduct further radiological investigation and remediation at HPNS because the data collected by Tetra Tech is neither reliable nor legally defensible.  (*See, e.g.*, EPA Dec. 2017 Letter to Navy at 5; *see also* Victim Impact Statement at 2 ["The EPA has expressed to the Navy that they no longer have confidence in the work performed by TtEC at HPNS, as well as at other Navy radiological sites . . ."].)

182.      The Navy has failed to comply with its duties under CERCLA and has not exercised appropriate technical and professional judgment throughout this process.

183.      Remediation efforts at HPNS *were not* consistent with EPA requirements.  The remediation that occurred did not comply with CERCLA.  As noted above, remediation "*shall* attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release at a minimum which *assures* protection of human health and the environment."

184.      This standard has not been met.  According to the Government, "Tetra Tech falsified or caused the falsification of soil surveys, as described above, and falsified or caused the falsification of building surveys, as described below, in connection with its work in Parcels B, C,

1   D-2, E and G, and Utility Corridors 1, 2, and 3 at dozens of survey units . . . ."  (U.S. Compl. at ¶

2   61.)

3          185.     The EPA is requiring significant additional work at HPNS, and all property

4   transfers have been halted until this process is complete.  Parcels that have already been transferred

5   will need to be re-tested, because the Navy cannot *assure* the EPA or the public that already

6   transferred parcels meet the requirements established under CERCLA.

7          186.     Thus, the Navy did not comply with the requirements outlined by CERCLA and

8   the NCP, and as a result, the final CERCLA approvals needed to transfer the property are

9   significantly delayed.

10             **4.     The Navy Failed to Communicate with the Public as Required**

11                       **under the NCP and CERCLA.**

12          187.     As noted previously, RPMs are responsible for ensuring "that all appropriate

13   public and private interests are kept informed and that their concerns are considered throughout a

14   response, to the extent practicable, consistent with the requirements of § 300.155 of this part." (40

15   C.F.R. § 300.135.)

16          188.     In turn, 40 C.F.R. § 300.155 requires:

17             When an incident occurs, it is imperative to give the public prompt,
               accurate information on the nature of the incident and the actions
18             underway to mitigate the damage.  OSCs/RPMs and community
               relations personnel should ensure that all appropriate public and
19             private interests are kept informed and that their concerns are
               considered throughout a response.  They should coordinate with
20             available public affairs/community relations resources to carry out
               this responsibility by establishing, as appropriate, a Joint
21             Information Center bringing together resources from federal and
               state agencies and the responsible party.
22

23          189.     In addition, prior to the initiation of RD, the lead agency is required to develop

24   a community relations plan ("CRP").   "The community relations requirements specified in §§

25   300.415, 300.430, and 300.435 apply to removal, remedial, and enforcement actions and are

26   intended to promote active communication between communities affected by discharges or releases

27   and the lead agency responsible for response actions."  (40 C.F.R. § 300.155.) A CRP may also be

28   referred to as a "Community Involvement Plan" or "CIP."

190.     "The Navy is the lead agency for [HPNS] Superfund site and, therefore, is the lead for community outreach and involvement activities."  (Letter from Enrique Manzanilla, EPA, Director Superfund Division, to Laura Duchnak, Director BRAC Program Management Office (Aug. 27, 2020) at 1.)

191.     The EPA has determined that the Navy's Community Involvement Plan at Hunters Point posed serious concerns.  The Navy's CIP commits to survey the community every two years and evaluate its community outreach and involvement program to "…ensure that the actions that are implemented continue to meet the needs of the HPNS community."  (*Id.* at 2.) However, in August 2020 the EPA noted that: "we are unsure if the Navy's current community outreach and involvement program is meeting the needs of the Bayview Hunters Point community, especially in light of the surveying and evaluation process by which you decided to continue dissolution of the Restoration Advisory Board."  (*Id.* at 1.)  EPA further determined that the Navy did "not appear to have evaluated the outcomes or impacts of its community outreach and involvement program in a sufficiently robust manner.  (*Id.* at 2.)

192.     The EPA has "*strongly recommend[ed] that the Navy complete a more comprehensive evaluation of its community outreach and involvement program . . .*" (*Id.* at 3 (emphasis in original).)

193.     The Navy has not complied with its mandatory duties under CERCLA and the NCP.  The Navy did not keep public and private interests informed of incidents that occurred at HPNS as a result of Tetra Tech's fraud until after the indictments against Rolfe and Hubbard were unsealed.  The Navy did not consider the interests or the concerns of the public in this regard, nor did the Navy provide prompt and accurate information regarding Tetra Tech's fraud. Had the Navy communicated with the public and kept public and private interests informed, as required under CERCLA and the NCP, Plaintiffs could not have discovered the extent of Tetra Tech's fraud earlier or the impact such fraud would have on the transfer schedule.

194.     The Navy has violated its mandatory duties under CERCLA and the NCP and has failed to appropriately exercise its professional and technical expertise in doing so.

**5.     The Navy was Required to Comply with the Federal Facilities**

1                         **Agreement.**

2                         **a.**         **Compliance with CERCLA under the Federal Facilities**

3                         **Agreement.**

4       195.       The 1992 FFA is "binding upon EPA, the State of California, and the Navy."

5 (FFA §§ 2.1.) The general purpose of the FFA is to "*ensure* that the environmental impacts

6 associated with past and present activities at the Site are thoroughly investigated and appropriate

7 remedial action taken as necessary to protect the public health, welfare and the environment." (FFA

8 § 1.1(a).)

9       196.       In addition, the FFA is intended to "*[a]ssure compliance*, through this

10 Agreement, with RCRA and other federal and State hazardous waste laws and regulations for

11 matters covered herein." (*Id.* at § 1.2(e) (emphasis added).) To that end, the FFA fully integrates

12 the "Navy's CERCLA response obligations and RCRA corrective action obligations which related

13 to the release(s) of hazardous substances, hazardous wastes, pollutants, or contaminants covered by

14 [the FFA]." (FFA § 17.1.)

15       197.       The Navy was required to "notify its agents, members, employees, response

16 action contractors for the Site, and all subsequent owners, operators, and lessees of the Site of the

17 existence of this Agreement." (FFA § 2.2.) Thus, the Navy was required to notify Tetra Tech of

18 the FFA.

19       198.       Under the FFA, "[e]ach Party *shall be responsible* for ensuring that its

20 contractors comply with the terms and conditions of this Agreement." (FFA § 2.5 (emphasis

21 added).) Thus, the Navy had a mandatory duty to ensure that its contractors complied with the

22 terms of the FFA. Lawrence Lansdale agrees:

23                 Q: Is it true that under Federal Facilities Agreement, section 2.3 . . .

24                 that the Navy was responsible for ensuring that all of its

25                 contractors, including Tetra Tech in this case, comply with the

26                 terms and conditions of the agreement?

27                 . . .

28                 A: Agreed.

1   (Lansdale Depo. at 238:11-20.)

2         199.      Furthermore, the FFA notes that "[f]ailure of a Party to provide proper direction

3   to its contractors *and any resultant noncompliance with this Agreement by a contractor* shall not

4   be considered a Force Majeure event . . . ."   (FFA § 2.3 (emphasis added).)   This further

5   demonstrates that the Parties to the FFA were *required* to give proper direction to contractors, and

6   failure of a contractor to comply with federal and State hazardous waste laws and regulations would

7   be considered noncompliance on behalf of the Party.

8         200.      As discussed in herein, Tetra Tech's remediation at HPNS did not comply with

9   CERCLA and the NCP, among other appliable hazardous waste statutes and regulations, as

10  evidenced by EPA's halt of all property transfers, and requirements for resampling and retesting.

11  Because of this noncompliance, Tetra Tech was likewise not compliant with the FFA.

12        201.      The Navy violated its obligations under the FFA by failing to ensure that Tetra

13  Tech remediated HPNS as required by the FFA, CERCLA, and the NCP.

14                        **b.      Duties of the Quality Assurance Officer under the**

15                              **Federal Facilities Agreement.**

16        202.      The FFA requires that the Navy, as the lead agency responsible for the cleanup

17  of HPNS, to designate a Quality Assurance Officer ("QAO")[6] as follows:

18

19            In order to provide quality assurance and maintain quality control
              regarding all field work and sample collection pursuant to this
20            Agreement, the Navy agrees to designate a Quality Assurance
              Officer (QAO) who ***will ensure*** and document that all work is
21            performed in accordance with approved work plans, sampling plans,
              and [Quality Assurance Project Plans ("QAPPs")].  The QAO ***shall***
22            ***maintain*** for inspection a log of quality assurance field activities and
              provide a copy to the Parties upon request.[7]

23  (FFA § 20.1 (emphasis added).)

24  _____

25        [6]  The Navy QAO at HPNS was Narciso Ancog.

26        [7]  The Ninth Circuit Court of Appeals in *Myers v. United States*, 652 F.3d 1201 (9th Cir.
    2011) held that a nearly identical provision in the FFA for Camp Pendleton overcame the
27  discretionary function exception.  Notably, the Navy's QAO in *Myers* was also the Navy's QAO
    for HPNS – Narciso Ancog.  In *Myers*, the evidence showed that Mr. Ancog acted negligently
28  by failing to ensure that the Navy contractor performed work in compliance with an air dust
    monitoring plan in contravention of the FFA.

203.     Here, in contravention of Section 20.1 of the FFA, the Navy QAO failed to ensure and document that all work at the Shipyard was performed in accordance with approved work plans, sampling plans, and QAPPs.  For example, as discussed below, the Navy QAO failed to ensure and document that (1) Tetra Tech complied with chain of custody requirements; (2) all soil samples were transported to the laboratory; (3) soil samples were collected properly; (4) survey units that exceeded release criteria were investigated and remediated; (5) survey units were 100 percent gamma surveyed; and (6) survey scans were conducted properly.

204.     In fact, the EPA and former workers at HPNS have confirmed that field work and sampling collection was *not* conducted in conformance with approved work plans, sampling plans, and QAPPs.  (*See, e.g.,* EPA Dec. 2017 Letter to Navy at pp. 3 ["former workers have alleged that samples were collected purposefully from areas where gamma scans showed the lowest readings, rather than the highest readings . . .  A recent [NRC] enforcement action confirmed that samples were purposefully not collected from the appropriate locations in violation of the Work Plan requirements"], 5 ["former workers have reported fraud associated with quality control and work plan requirements, such as the failure of some workers to follow work plans by scanning soil too quickly or with the detector too far from the surface to achieve the detection limit requirements for analysis"], 14 ["formers workers alleged that Tetra Tech EC, Inc. generally tried to under-represent the true extent of exceedances of cleanup levels in its falsification activities . . . the Navy, EPA, DTSC, and CDPH reviews of this report have found examples of data patterns that would be consistent with these allegations"].)

205.     As detailed further below, the Navy QAO's failure to ensure and document that all work at the Shipyard was performed in accordance with approved work plans, sampling plans, and QAPPs means that the work conducted by Tetra Tech is not reliable or defensible, which has delayed the transfer of Shipyard parcels to Plaintiffs due to the substantial amount of re-work that must be conducted.

**i.      Navy QAO's Failure to Ensure and Document Compliance with Chain of Custody Requirements.**

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

206.     Chains of custody ("COCs") are used to document the proper collection and transportation of material samples.  According to the EPA, "COCs provide documentary evidence to authenticate who, where, and when samples were collected, transported, and analyzed.  Signed and dated COC documentation is also required to verify that custody of the samples was maintained by the appropriate personnel from the time of collection through analysis and storage, in order to prove that the samples were not tampered with or altered."  (EPA Dec. 2017 Letter at 4.)

207.     The work plans, sampling plans, and QAPPs applicable to HPNS contained several requirements governing the procedure for completing and transmitting COCs.  Just by way of example, some of these requirements included the following:

- "An overriding consideration for data sampling from laboratory analyses is the ability to demonstrate that the data are legally defensible, i.e., that the samples were obtained from the locations stated and that they reached the laboratory without alteration. To accomplish this, evidence of collection, shipment, laboratory receipt, and laboratory custody until disposal **will be documented** through the COC record." (*Final Sampling Plan and Quality Assurance Project Plan* (Oct. 2007) at § 4.1.4 (emphasis added);[8] *see also Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at p. 165 [containing the same language];[9] *Final Sampling Plan and Quality Assurance Project Plan: Basewide Radiological Support* (Jan. 2011) at p. 169 [containing the same language].)[10]

- For chains of custody, "[a]t a minimum, each sample container *will be* labeled with the following . . . sample collection date (month/day/year), time of collection (24-hour clock) from the start of sampling." (*Final Sampling Plan and Quality Assurance Project Plan*, Oct. 2007 at § 4.1.3.)

---

[8] Navy QAO Narcisco Ancog reviewed, signed, and approved the 2007 *Final Sampling Plan and Quality Assurance Project Plan* on October 4, 2007.  This document is attached as Appendix B to the *Base-Wide Radiological Work Plan*, Rev. 1 (Oct. 5, 2007).

[9] Navy QAO Narcisco Ancog reviewed, signed, and approved the 2010 *Final Sampling Plan and Quality Assurance Project Plan* on July 20, 2010.  This document is attached as Appendix A to the *Final Project Work Plan*, Rev. 4 (July 30, 2010).

[10] Navy QAO Narcisco Ancog reviewed, signed, and approved the 2011 *Final Sampling Plan and Quality Assurance Project Plan* on January 14, 2011.  This document is attached to a January 21, 2011 *Final Execution Plan*.

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

1    • "To establish the documentation necessary to trace sample possession from

2    the time of collection through analysis, the COC record *will be* completed and *will*

3    *accompany* every sample." (*Id*. (emphasis added).)

4    • "Sample collection records *will include* field logbooks and COCs." (*Final*

5    *Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary*

6    *Removal*, Rev. 4, July 2010 at Attachment 2, p. 9 (emphasis added).)

7    • "Field data from the COCs (date and time collected, sample identification,

8    etc.) *will be* entered into the TtEC database by the Project Chemist." (*Id*. at p. 74; see also

9    *Final Field Sampling Plan and Quality Assurance Project Plan* (Oct. 5, 2007) at B.8-2.)

10    • "A copy of the COCs *will be* faxed/emailed to the Project Chemist on a daily

11    basis for review and communication with the laboratory." (*Final Sampling Plan and*

12    *Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4,

13    July 2010 at 73; *see also Final Sampling Plan and Quality Assurance Project Plan*, Jan.

14    2011 at p 81 [same].)

15    • "Samples *will be* recorded on COC documentation." (*Final Sampling Plan*

16    *and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev.

17    4 (July 2010) at Attachment 2 (*Hunters Point Shipyard Standard Operation Procedures*),

18    p. 6.)

19    • "Field forms for this project *will include* COC forms." (*Final Field*

20    *Sampling Plan and Quality Assurance Project Plan* (Oct. 5, 2007) at B.4-2.)

21    • "Field documents and COC records *will be* reviewed to ensure that all entries

22    are printed or written in indelible black or blue ink, dated, and signed.  Sampling operations

23    will be reviewed and compared to this SAP and other applicable SOPs.  Use of proper

24    sample containers, proper handling of samples, and *adequate documentation of the*

25    *sampling operation will be verified*." (*Id*. at B.9-1.)

26    208.    In addition, several of the QAPPs for the Shipyard contain "sample" COC

27    records, which require Tetra Tech, among other things, to identify the sample ID, the date the

28    sample was collected, the time the sample was collected, the location where the sample was

collected, who collected the sample, and to whom it was relinquished.  (*See, e.g.*, *Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at Attachment 1 [sample COC record].)

209.     In contravention of FFA § 20.1, the Navy's QAO failed to ensure and document that all work at the Shipyard was performed in accordance with the COC requirements set forth in the above work plans, sampling plans, and QAPPs.

210.     For example, COCs were not completed for various survey units at HPNS, which demonstrates that the Navy QAO failed to ensure and document that COC records were completed for and accompanied "every sample" in accordance with the above work plans, sampling plans, and QAPPs.  (*See* EPA Dec. 2017 Letter to Navy at 3-4.)

211.     The Navy QAO also did not ensure and document that samples were obtained from the locations stated in the COC form in accordance with the above work plans, sampling plans, and QAPPs.  Instead, post-remediation samples were collected in a location different from that claimed on the COC documents.

212.     For example, in his plea agreement, Stephen Rolfe conceded that "soil locations reported in the chain of custody forms and survey unit tracking sheets" for certain samples "were false, that is, that the locations reported on the forms regarding where the soil came from were untrue."  (*United States of America v. Stephen C. Rolfe*, N.D. Cal. No. CR-17-0123-JD, Plea Agreement of Stephen C. Rolfe ("Rolfe Plea Agreement") at 3; *see also* U.S. Compl. at ¶ [Rolfe "admitted . . . he knew that the soil locations reported on the Chain-of-Custody Record forms were false"]; *see id.* at ¶ 57 ["Tetra Tech submitted these falsified soil samples to the lab accompanied by a Tetra Tech Chain-of-Custody Record falsely identifying the Survey Unit (*and therefore the location from which the soil was collected*) of each sample"] (emphasis added).)

213.     The Navy QAO's failure to ensure and document that samples were obtained from the locations stated in the COC is further confirmed by Tetra Tech's 2014 Investigation Report, which concluded that "persons listed as the sample collectors on the [COC] forms, either by themselves or in conjunction with others, collected soil samples in areas outside the designated survey units."  (2014 Investigation Report at 18; *see also* Greenaction Pet. at 1 ["Tetra Tech

1    employees and the radiological subcontractors it directly supervises were involved in . . . fake

2    sampling, in which soil samples – *potentially thousands of them* – were reported to have been taken

3    at one location when they were actually taken from another"] (emphasis added).)

4          214.    In addition, the NRC concluded that "between November 18, 2011, and June 4,

5    2012, when tasked with obtaining soil samples to ascertain the amount of residual radioactivity in

6    specific locations within Parcel C, Tetra Tech employees instead obtained soil samples *from other*

7    *areas* that were suspected to be less contaminated.  The Tetra Tech employees then represented (on

8    related chain-of-custody records*)* that the samples had been obtained from the specified locations.

9    (NRC Office of Investigations Report No. 1-2014-018 (Feb. 11, 2016) at 1.)

10         215.    The Navy QAO also failed to ensure and document that COCs identified the

11   actual time that samples were taken in accordance with the above work plans, sampling plans, and

12   QAPPs.  This is evidenced through sworn declarations submitted by Bert Bowers, the Radiation

13   Safety Officer at HPNS, and Anthony Smith, a Senior Health Physics Specialist at HPNS, as well

14   as the Greenaction Petition to Revoke the Materials License of Tetra Tech.

15         216.    For example, according to the Greenaction Petition, "COCs for anomalous

16   samples purport they were collected in exact five-minute intervals, precisely on the five-minute

17   mark."  (*See* Greenaction Pet., at 8.)  COCs which identify Rolfe as the sampler claim he took

18   almost 50 samples over a span of a couple days in "*exact* five-minute intervals." (*Id.* (emphasis

19   added).)  Other COCs claim samples were taken *precisely* every three minutes without deviation.

20   (*Id.*)  However, "according to experienced [Health Physics Specialists] . . . soil samples cannot be

21   taken with such rigid regularity.  The need to prevent cross-contamination of samples and sampling

22   equipment from one sample location to another precludes it; [Health Physics Specialists] need to

23   follow exacting practices to decontaminate all sampling equipment between samples, making five-

24   minute intervals ***impossible***."  (Greenaction Pet. at 9 (emphasis added).)  An interview of Justin

25   Hubbard indicated that "[o]ne sample could take 40 minutes." (*Id.* at 8 [citing interview by Tetra

26   Tech in connection with Anomalous Samples Report].)

27         217.    Experienced Health Physics Specialists have explained the sampling interval

28   "would have raised immediate red flags that either the COCs were filled out in error, which would

violate proper COC procedures, or that sampling was done fraudulently."  (Declaration of Bert Bowers in Support of Petition to Revoke the License of Tetra Tech EC, Inc. ("E. Bowers Declaration") at 38 (emphasis added); *see also* Declaration of Anthony Smith in Support of Petition to Revoke the License of Tetra Tech EC, Inc. ("A. Smith Declaration") at 10 ["Looking at the COC forms from Hunters Point displays that the forms are falsified . . . .  In my experience, it is impossible to take soil samples every five minutes if you follow proper procedures"].)

218.     Moreover, some COCs reported that samplers were collecting soil in two places at one time in a given day.  Others stated that samplers took more collections than would have been physically possible in a single day.  (*See* A. Smith Declaration, p. 10.)

219.     All of these facts, including statements from the United States in its own pleadings, clearly demonstrate that the Navy QAO failed to ensure and document that COCs were completed in accordance with work plans, sampling plans, and QAPPs.

                    **ii.      Navy QAO's Failure to Ensure and Document
                              that Soil Samples were Transported to the
                              Laboratory.**

220.     The work plans, sampling plans, and QAPPs applicable to HPNS contained several requirements governing the procedure for transporting soil samples to the laboratory for analysis.

221.     For example, various QAPPs provide that "samples *will be* delivered for analysis to an on-site laboratory via a box, cooler, or similar container (ice is not required if only radiological analysis will be performed) along with the completed COC."  (*Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010), Attachment 2 at 9 (emphasis added); *see also Final Field Sampling Plan and Quality Assurance Project Plan* (Oct. 5, 2007), Attachment 2 at 9.)

222.     For samples shipped to an off-site laboratory, "samples *will be* transported to the laboratory via courier or FedEx.  The courier who receives samples will sign the COC and accept the samples.  For samples shipped via FedEx, the COC will be packaged within the cooler, and the sender's copy of the airbill will serve as custody documentation and will be maintained on-site in

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

the project files." (*Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 217 (emphasis added); *see also Final Field Sampling Plan and Quality Assurance Project Plan* (Oct. 5, 2007) at B.4-4 ["Samples *will be* transported to the laboratory via hand delivery, laboratory-provided courier, FedEx, UPS, or DHL (which may be referred to generically as a commercial carrier)"] (emphasis added).)

223. The Navy's QAO failed to ensure and document that all work at the Shipyard was performed in accordance with the requirements set forth in the above work plans, sampling plans, and QAPPs with respect to transporting soil samples for analysis to on-site and off-site laboratories.

224. For example, samples that were known or suspected to be too "hot" (i.e., above the cleanup standard) were discarded along with their COCs, instead of being transported to the laboratory in conformance with the above requirements under the work plans, sampling plans, and QAPPs. (Greenaction Pet. at 1, 34.) Notably, discarding samples or results when they do not meet a certain criteria (whether above or below the criteria) is referred to as censoring or "cherry picking" of analytical results and is considered manipulation and falsification of analytical data.

225. Tetra Tech's onsite executive, the Project Manager, directed the sample destruction. (Greenaction Pet. at 35; *see also* Draft Report at 2 ["Onsite soil sample results were reviewed and shipment of samples to the offsite lab was blocked if there was a high chance that the release criteria would be exceeded"]; U.S. Compl., ¶ 56 ["Tetra Tech managers instructed RCTs to discard soil samples collected from certain Survey Units at Hunters Point"].)

226. These facts demonstrate the Navy QAO clearly failed to ensure and document that soil samples were transported to the on-site and off-site laboratories in accordance with the above work plans, sampling plans, and QAPPs.

### iii. Navy QAO's Failure to Ensure and Document Proper Collection of Soil Samples.

227. Tetra Tech prepared Task Specific Plans ("TSPs") for survey and remediation work performed under the Base-Wide Work Plans.

228. TSPs are a form of work plan. They are intended to supplement the information

performed under the Base-Wide Plans.  (*See, e.g.*, 2005 Work Plan at 1-3.)  Each TSP provides relevant location-specific data and identifies variances and/or additions to the Base-Wide Plan. (*Id.*; *see also* U.S. Compl. at ¶ 25 [TSPs "detail the specific work plan for conducting soil samples and radiological surveys of building surfaces, as well as the standards applicable to the work"].)

229.     Each TSP for HPNS was "prepared by Tetra Tech, and approved by the Navy, with concurrence by the EPA, DTSC, and CDPH."  (U.S. Compl. at ¶ 25.)

230.     TSPs also provide the details for the Final Status Survey for each survey unit at HPNS.  Final Status Surveys are used to demonstrate that identified residual radioactivity levels in survey units meet release criteria and to remediate any soil that contains radionuclides at levels that exceed release criteria.  Final Status Surveys are conducted in conformance with the Base-Wide Work Plans.

231.     At HPNS, the TSPs "identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations."  (*United States of America v. Justin E. Hubbard*, N.D. Cal. No. CR-17-0278-JD, Plea Agreement of Justin E. Hubbard ("Hubbard Plea Agreement") at 3.)  TSPs also identified the number of samples to be collected at specific locations.

232.     "A survey unit is a physical area consisting of structures or land areas of specified size and shape for which a separate decision will be made as to whether or not that area exceeds the release criteria.  This decision is made as a result of the [Final Status Survey].  As a result, *the survey unit is the primary entity for demonstrating compliance with the release criteria*." (*Base-Wide Radiological Work Plan*, Rev. 1 (Oct. 5, 2007) at 4-4 (emphasis added).)

233.     The Navy QAO failed to ensure and document that all work at the Shipyard was performed in accordance with the TSPs for HPNS.  Specifically, the Navy QAO failed to ensure and document that all samples were taken from the survey unit locations identified in the TSPs.

234.     The Navy QAO's failure to ensure and document that all samples were taken from the survey unit locations identified in the TSPs is demonstrated in numerous documents, including guilty pleas of Stephen Rolfe and Justin Hubbard.  For example, in his plea agreement, Stephen Rolfe stated:

During 2012, I told the RCTs on my team to get "clean dirt" from areas known to be clean and taken *from outside the marked survey unit areas* to use as substitute samples for the dirt from the marked survey unit.  I did this so that the survey unit would pass the laboratory analysis and not require further remediation . . . I directed the RCTs to switch soil for samples 81-100 for Survey Unit 22, taken on August 23, 2012.  On that occasion, I falsified data on the survey unit tracking sheet in that I stated on the form the soil came from within that Survey Unit when I knew it did not.  I also know that the sampling data from Survey Unit 22 incorporated into the map and analyses sent by Tetra Tech to the U.S. Navy on August 29, 2012 *was false*.  I did not receive extra compensation for substituting "clean" soil for potentially contaminated soil in a survey unit.  My motivation came from pressure applied by the Tetra Tech supervisors.  One told me on multiple occasions to "get the hell out of that area," in reference to a particular survey unit that was not testing clean.  Another told me on more than one occasion that we were "not remediating the whole goddam site."  An Assistant HPNS Project Manager told me on numerous occasions to "get clean dirt."  *I understood these statements as a direction to go outside the appropriate survey unit and get dirt from other areas that was known to be clean, that is not containing excessive levels of radiation*.

(Rolfe Plea Agreement at 3-4 (emphasis added).)

235.    In addition, Justin Hubbard stated in his plea agreement:

During 2012, in direct contravention of the relevant U.S. Navy testing protocols, I obtained "clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS.  To effect this illegal switching, I drove my company truck to the area north of Buildings 253 and 211 and filled a five-gallon bucket with "clean" serpentinite soil from an area *I knew to be outside the relevant marked survey unit*.  I then drove the clean dirt back to a "conex box"-style trailer.  Once I was inside the conex, I emptied the "legitimate" soil samples previously collected by RCTs from their sampling bags into an empty bucket, and substituted the clean serpentinite soil into each sampling bag . . . On or about May 31, 2012*, I fraudulently switched soil* for four survey units on the North Pier of HPNS: Survey Units l, 8, 10, and 11.  For Survey Unit 1, I specifically recall replacing the soil samples 28-47 with soil I had collected from a clean area.

(Hubbard Plea Agreement at 3-4, emphasis added.)

236.    Furthermore, the NRC enforcement action against Tetra Tech confirmed that soil samples were sometimes purposefully not collected from the appropriate locations in violation of the Work Plan and QAPP chain of custody requirements.  (NRC Office of Investigations Report No. 1-2014-018, Feb 11, 2016 at 1; EPA Dec. 2017 Letter to Navy at 3.)

237.    The United States has informed the Court that in Navy Final Status Survey

Reports, Final Survey Unit Project Reports, final Removal Action Completion Reports, and/or Characterization Survey Result Reports, "Tetra Tech falsely stated that soil samples were properly collected from designated survey units, when, in fact, samples of soil that Tetra Tech knew to be 'clean' were collected from locations outside of the designated survey units and submitted to the laboratory for analysis.  In the Reports, Tetra Tech stated the soil sample analytical results as if the soil was properly collected."  (U.S. Compl. at ¶ 70; *see also id*. at ¶ 59 [Tetra Tech "switched real samples with fake clean dirt ***between 800 and 1000 times***"] (emphasis added); *see also* Greenaction Pet. at 12 ["HPs were directed by their supervisors to obtain false samples *nowhere near the area intended to be sampled*, but rather in at least three remote locations known from prior sampling to contain 'clean' soil.  Tetra Tech management pressured its supervisors to have the HPs engage in fraudulent sampling that would guarantee lab results under the free release levels so it could get fully paid without incurring the full costs of the cleanup"], (emphasis added).)

238.    Finally, Tetra Tech's 2014 Investigation Report concluded that "persons listed as the sample collectors on the [COC] forms, either by themselves or in conjunction with others, collected soil samples in areas outside the designated survey units."  (2014 Investigation Report at 18.)

239.    The Rolfe and Hubbard plea agreements, the NRC enforcement action, Tetra Tech's 2014 Investigation Report, and the Government's statements in submissions to this Court demonstrate that the Navy QAO clearly failed to ensure and document that all work was performed in accordance with the TSPs because Tetra Tech employees had repeatedly taken clean soil samples from outside designated survey units and represented them as having come from the survey units in contravention of the TSPs.

240.    Soil samples were taken outside designated survey units potentially thousands of times, which amounts to a catastrophic failure of the Government to comply with its mandatory and specific duties to oversee the sampling program and ensure and document that it complies in all respects with the TSPs.

iv.    **Navy QAO's Failure to Ensure and Document that Survey Units that Exceeded Release Criteria**

**Were Investigated and Remediated.**

241.     Under the Base-Wide Work Plans, QAPPs, and sampling plans Tetra Tech was required to collect soil samples for laboratory analyses to characterize the survey unit.  When survey units were found to exceed release criteria, Tetra Tech was required to remove and remediate the radioactive contamination and bring contaminant levels below release levels.

242.     For example, a sampling plan and QAPP from 2010 state that the Navy "has applied a conservative remediation decision criteria (any one sample result exceeding the action level or [radiological remedial objective] will require remediation), and this conservative approach effectively overrides the large uncertainty in single sample results." (*Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 121.)  Any indicated activity above release criteria required remediation prior to issuance of a Final Status Survey.  (*Id*. at 121-22.)

243.     In addition, under the 2007 Work Plan, "the survey progression is reassessed typically when a survey unit fails to meet the release criteria during a [Final Status Survey] effort. If a Class 2 or 3 survey unit fails to meet the criteria for release, it would undergo decontamination or remedial actions, where necessary, and be reclassified as a Class 1 unit for the follow-up survey actions.  If a Class 1 survey unit fails to meet the release criteria, decontamination and remedial action support surveys will be performed.  A Class 1 survey will follow decontamination or remedial activities."[11]  (2007 Work Plan at 4-6.)  For Final Status Surveys, "if the survey results do not demonstrate compliance with the release criteria, then additional assessment and/or remediation are necessary."  (*Id*. at 5-4.)

244.     Furthermore, under the 2010 *Final Project Work Plan*, "readings greater than 3 sigma that of background or sample results that exceed the release limits will be further investigated to identify the extent of the contamination."  (*Final Project Work Plan*, Rev. 4, July 30, 2010 at 5-4; *see also Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and*

---

[11] Class 1 survey units are defined as having reasonable potential for contamination above release criteria, are divided into areas of less than 100 square meters.  Class 2 survey units are defined as having reasonable potential for contamination but below release criteria and are divided into areas less than 1,000 square meters.  Class 3 survey units are impacts areas that have a low probability of contaminating areas with residual radioactivity.

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

*Sanitary Removal*, Rev. 4 (July 2010) at 60 [containing same language].)

245.     The Navy QAO failed to ensure and document that survey units that did not meet release criteria were further investigated, remediated, and decontaminated to support their release and ultimate transfer.

246.     For example, on numerous occasions Tetra Tech refused to treat survey units as radioactively contaminated despite lab results and sensor readings indicating that samples were "screaming hot." (*See, e.g.*, Greenaction Pet. at 18.)

247.     As explained in the Greenaction Petition, "Tetra Tech management directed the destruction of samples and records showing excessive radioactive contamination because it chose not to spend the time and money to do a proper cleanup . . . Tetra Tech's management pressured its supervisors to have HPs engage in fraud to guarantee free release of radiologically contaminated soil and buildings so Tetra Tech could get fully paid and profit without incurring the full costs of the cleanup. The fraudulent conduct went on for years because of corporate greed and employees' fear that to object meant termination." (*Id*. at 37.)

248.     For example, "HPs Anthony Smith and Josh Hooper took post-remediation soil samples from the crawl space in an attempt to demonstrate that there was no longer any residual radiological contamination above established free-release levels.  However, a post-remediation sample came back too 'hot,' demonstrating the radioactive cleanup had not been successfully completed.  *Proper procedure mandated another round of soil removal*.  This additional round of remediation would once again involve laborers and a vacuum truck, followed by another round of post-remediation sampling.  However, *Tetra Tech's management directed that proper procedures be ignored*."  (*Id*. at 15 (emphasis added); *see also* U.S. Compl. at ¶ 61 ["Rolfe admitted that Tetra Tech management at Hunters Point directed him to get his crew 'the hell out' of a survey unit that was testing above the release criteria, told him that they were 'not remediating the whole goddam site,' and directed him on numerous occasions 'to get clean dirt"].)

249.     These documents demonstrate that the Navy QAO clearly failed to ensure and document that all work was performed in accordance with work plans, sampling plans, and QAPPs because Tetra Tech employees had intentionally refused to further investigate and remediate survey

units that tested above release criteria.  Instead, the Navy stood by and did nothing to obtain compliance with work plans, sampling plans, and QAPPs that Tetra Tech had obviously violated, which amounts to a total failure by the United States to comply with its mandatory duties under FFA § 20.1.

> v.  **Navy QAO's Failure to Ensure and Document that Survey Units Were 100 Percent Gamma Surveyed.**

250.   Gamma spectroscopy or "gamma scans" are used to detect the presence of radionuclides.  Under the Base-Wide Work Plans, QAPPs, and sampling plans Tetra Tech was required to conduct 100 percent gamma scans for each survey unit:

- "Each survey unit will be 100 percent, gamma scan surveyed."  (*Final Project Work Plan*, Rev. 4, July 30, 2010 at 5-3; *see id*. at 5-2 ["Each excavated trench survey unit will undergo a 100 percent scan survey for gamma radiation . . . Each [excavation soil] survey unit will undergo a 100 percent scan survey for gamma radiation"]; *see also Final Project Work Plan*, Rev. 3, Nov. 30, 2008 at 5-2, 5-3 [containing the same language]; *Final Execution Plan*, *Basewide Radiological Support*, January 21, 2011 at 2-3 [containing the same language].)

- "[Final Status Surveys] for every excavated trench section and excavated soil will include 100 percent scan measurements."  (*Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 41; *see also Final Project Work Plan*, Rev. 3, Nov. 30, 2008 at ES-3 [containing the same language]; *Final Addendum 1 to the Final Sampling Plan and Quality Assurance Project Plan*, July 11, 2006 at A.3-3 [containing the same language].)

- "Radiological surveys required to support the unrestricted release of trenches and excavated soil are to include 1) 100 percent gamma scan surveys . . ."  (*Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 59.)

- "The work plan requires that in addition to systematic soil samples using a

1    grid, 100% scans are also necessary to identify potential hot spots missed between

2    systematic samples." (EPA. Dec. 2017 letter at p. 9.)

3    251.    The Navy QAO failed to ensure and document that survey units were 100

4    percent gamma surveyed.  For example, the EPA found that a quarter of trench units in Parcel B

5    alone did not have gamma scan data.  (*See* EPA Dec. 2017 Letter.)  In Parcel G, EPA found that in

6    a third of the 43 trench units that the Navy had designated for "no further action," the narrow range

7    of gamma static data indicated measurements were not collected from different locations as

8    required.  (*Id.*)

9    252.    EPA further noted that "if scan results are missing or if they do not appear to

10   represent a wide range of readings that would be typical, then a determination cannot be made about

11   whether or not potential hotspots were identified and remediations.  In these situations, and others,

12   further action is necessary before the EPA can concur on a FOST." (*Id.* at p. 9.)

13   253.    These statements from the EPA confirm that the Navy QAO clearly failed to

14   ensure and document that all work was performed in accordance with work plans, sampling plans,

15   and QAPPs because Tetra Tech did not 100 percent gamma scan survey every survey unit.

16                    **vi.      Navy QAO's Failure to Ensure and Document**

17                              **that Scans were Conducted Properly.**

18   254.    Both the 2005 and 2007 Work Plans provide, "[s]can surveys are an integral part

19   of the survey program conducted to determine radiological contamination levels.  The surveys are

20   an evaluation technique performed by moving a detection device over a surface at a *specified speed*

21   and *distance above the surface* to detect radiation.  It will be used to identify areas that may require

22   additional survey measurements." (*See* 2005 Work Pan at 7-1; 2007 Work Plan at 8-1.)

23   255.    The ability of the scanning device to accurately detect radiological

24   contamination at the desired concentration is a result of many factors, among which, is the amount

25   of time the sample is exposed to the scanning device and the distance the device is held from the

26   sample.

27   256.    The scanning speed is a critical component in effectively providing reliable

28   results.  Therefore, the scan speed is predetermined and listed in Project Work Plans and TSPs and

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

must be followed.  (*See, e.g.*, 2005 Work Plan at §§ 8.2.1 [scan surveys for alpha/beta radiation], 8.2.2 [scan surveys for gamma radiation]; § 2007 Work Plan at §§ 8.2.1, 8.2.2 [same].)

257.     Changing something as critical as the scan speed is a major modification to sampling plans and requires prior approval by the Navy.  Increasing the scan speed, thereby reducing the amount of time the sample is exposed to the device, would have a negative bias on radiological detections.

258.     The Navy QAO failed to ensure and document that scanning devices were used at the speeds approved in Base-Wide Work Plans and TSPs.

259.     For example, Tetra Tech accelerated a conveyor belt system that was used to run potentially contaminated soil through a radiation scanner, in order to decrease identification of radiological contamination of the soil.  The conveyor belt system was accelerated up to 6-9 times the approved speed.  Tetra Tech also took actions to cripple the conveyor belt system's ability to detect radiation by intentionally disabling its radiation detection alarm.

260.     In addition, Tetra Tech pulled scanning devices (tow array) at RSYs at speeds much faster than allowed under proper procedure in order to intentionally reduce the probability of radiation detection.

261.     Former workers at HPNS "have reported fraud associated with quality control and work plan requirements, such as the failure of some workers to follow work plans by scanning soil too quickly . . . ."  (EPA Dec. 2017 letter at 5.)

262.     According to Archie R. Jackson, a Health Physics Specialist that worked for New World Environmental and Aleut World Solutions at the Shipyard and was supervised by Tetra Tech, Tetra Tech manipulated the scan speed of these devices "***hundreds*** of times."[12]

263.     These facts demonstrate that the Navy QAO clearly failed to ensure and

---

[12] *See* Declaration of Archie R. Jackson in Support of Petition to Revoke the License of Tetra Tech EC, Inc. at 5 ("There were other unprofessional practices taking place.  One such practice was taking soil scans too quickly.  Soil was surveyed for gamma radiation on the RSY screening pads by spreading soil over a pad to a thickness of about 6 inches.  A 'towed array,' containing radiation detection equipment was pulled over this pad by a small tractor.  This had to be performed at a slow speed; if it was too fast, valid results could not be obtained.  But I saw HPs performing soil surveys operating the towed array too fast.  I saw this happen at RSY-2, RSY-3 and RSY-4.  My best estimate from my own observations is that scanning too fast happened hundreds of times," emphasis added.)

document that all work was performed in accordance with work plans because Tetra Tech manipulated scan speeds in contravention of the approved speeds set forth in Base-Wide Work Plans and TSPs.

264.    Accordingly, the Navy QAO acted negligently by failing to ensure and document that Tetra Tech performed work in compliance with applicable work plans, sampling plans, and QAPPs in contravention of FFA § 20.1.  The Navy QAO also negligently failed to discover the widespread fraud perpetrated by Tetra Tech because he failed to perform mandatory duties under the FFA, as set forth above.  There is no policy that justifies the Navy QAO's failure to discover these widespread deficiencies, which were obvious from actions taken by Tetra Tech across HPNS and from the records provided to the Navy.

265.    Likewise, no social, economic, or political policy is implicated in the Navy QAO's decision whether to ensure and document that work is performed in accordance with approved work plans, sampling plans, and QAPPs.  Work plans, sampling plans, and QAPPs are highly technical documents.

266.    For example, the Uniform Federal Policy for Quality Assurance Project Plans ("Uniform Policy"), which is applicable to the Navy and mandates the creation of QAPPs for environmental cleanups,  explains that QAPPs are comprehensive documents that identify technical steps that must be taken to ensure the quality of environmental data:

> A "Quality Assurance Project Plan" or "QAPP" is "a formal document describing in comprehensive detail the necessary quality assurance (QA), quality control (QC), and other ***technical*** activities that must be implemented to ensure that the results of the work performed will satisfy the stated performance criteria.  A QAPP presents the steps that should be taken ***to ensure that*** ***environmental data*** *** collected are of the correct type and quality*** ***required for a specific decision or use***.  It presents an organized and systematic description of the ways in which QA and QC should be applied to the collection and use of ***environmental data***.  A QAPP ***integrates*** ***technical*** *** and quality control aspects*** of a project throughout its life cycle, including planning, implementation, assessment, and corrective actions."

(Uniform Policy, Part 1: UFP-QAPP Manual, Final Version 1 (March 2005) at vii (emphasis added).)

267.    The Uniform Policy establishes the Navy's ultimate responsibility for proper

data collection and characterizes the underlying considerations as technical in nature.  Section 1.3.1 of the Uniform Policy explains that the "lead organization," here, the Navy, "is responsible for all phases of environmental data collection as well as for ensuring that the organization, personnel, contractors, and subcontractors perform work as prescribed" in the QAPP.  The Uniform Policy also requires QAPP approval by a QAO, who must be a technical expert and must employ their technical knowledge in assessing whether QAPPs satisfy the requirements of the Uniform Policy.  As the Uniform Policy makes clear, the Navy's quality assurance role, as delineated in QAPPs, has already been decided as a matter of policy and exclusively involves matters of professional and scientific judgment, rather than any policy judgments by QA Officers or other employees overseeing the QAPP's implementation.

268.     Likewise, TSPs, a form of work plan, are highly technical documents that provide details for surveys of buildings and areas at HPNS in accordance with scientific approaches and methodologies in Base-Wide Wok Plans, Standard Operating Procedures, Accident Prevention Plans, and Site Safety and Health Plans to determine if residual radioactivity is present at the Shipyard above established release criteria.

269.     The conduct of ensuring and documenting that radiological investigation and remediation work is performed in conformance with these highly technical documents involve matters of scientific and professional judgment.

270.     The Navy QAO must use his scientific and professional judgment in applying his technical training and expertise in determining how to ensure that all work is performed in accordance with approved work plans, sampling plans, and QAPPs, including that (1) proper chain of custody requirements are followed; (2) all soil samples are transported to the laboratory for analysis; (3) soil samples are collected in conformance with applicable QAPPs and work plans; (4) survey units that exceeded release criteria are investigated and remediated; (5) survey units are 100 percent gamma surveyed; and (6) survey scans are conducted properly.  (FFA § 20.1.)

### 6.     Duties of the Remedial Project Manager under the Federal Facilities Agreement.

271.     Under the FFA, the Navy's Remedial Project Manager ("RPM") "***shall be***

1   *responsible on a daily basis* for *assuring* proper implementation of the RI/FS and the RD/RA in

2   accordance with the terms of the Agreement."  (FFA § 18.4 (emphasis added).)  To accomplish

3   this, Section 18.4 of the FFA states that: "[t]he authority of the RPMs shall include, but is not

4   limited to (a) Taking samples and ensuring that sampling and other field work is performed in

5   accordance with the terms of any final work plan and QAPP."

6        272.        In addition, Section 18.6 states that: "[t]he RPM for the Navy *shall be*

7   *responsible for day-to-day field activities at the Site.*  The Navy RPM or other designated employee

8   of Hunter Point Annex Environmental Program *shall* be present at the Site or reasonably available

9   to *supervise work during all hours of work* performed at the Site pursuant to this Agreement."

10  (emphasis added.)

11       273.        Thus, the Navy RPMs had a responsibility independent of any obligation of

12  Tetra Tech to ensure that sampling, field work, and other day-to-day activities were performed in

13  accordance with final work plans and QAPPs.  This responsibility was specific and mandatory.

14       274.        As discussed in above, the final work plans and QAPPs contained several

15  requirements related to sampling and field work.  For example, (1) COC records must contain the

16  date, time, and location the sample was collected and accompany every sample; (2) soil samples

17  must be transported to on-site or off-site laboratories in conformance with specified procedures; (3)

18  soils samples must be taken from designated survey units; (4) survey units must be further

19  investigated and remediated if samples exceed release criteria; (5) survey units must be 100 percent

20  gamma surveyed; and (6) survey scans must be conducted at approved speeds.

21       275.        In addition, various documents, including the Government's Complaint in

22  Intervention, the Greenaction Petition, declarations from whistleblowers, the 2014 Investigation

23  Report, correspondence from the EPA, and the Navy's Draft Report have detailed how Tetra

24  Tech falsified COC records, blocked the transport of "hot" samples to on-site and off-site

25  laboratories, took soil samples from outside designated survey units potentially *thousands of*

26  *times*, failed to further investigate and remediate survey units that exceeded release criteria, failed

27  to 100 percent gamma survey all survey units, and failed to use approved scan speeds *hundreds of*

28  *times*.  These are only a few examples of how the Navy RPM failed to ensure that sampling and

57

other field were performed in accordance with the terms of final work plans and QAPPs.

276.     This wealth of information demonstrates that the Navy RPMs negligently failed to ensure that sampling and field work was performed in accordance with the terms of final work plans and QAPPs in contravention of the FFA.

277.     In fact, EPA criminal investigators asked the Navy's Lead RPM, Melanie Kito, "if there was any monitoring of the sample collection at Hunters Point."  According to EPA investigators, Ms. Kito responded that the "California Department of Public Health might come out to observe sampling techniques."   In other words, the Navy's Lead RPM abdicated her responsibility under the FFA to "ensure that sampling . . . is performed in accordance with the terms of any final work plan and QAPP" to the California Department of Public Health—a state agency.

278.     Likewise, this information demonstrates that the Navy RPMs or other designated employees were not "present" at HPNS or "reasonably available to supervise work during all hours of work," otherwise they would have identified these widespread deficiencies in the performance of work by Tetra Tech, many of which occurred hundreds of thousands of times.

279.     Thus, the Navy, through its RPMs, breached its duty under the FFA to ensure that sampling and other field work was performed in accordance with the terms of final work plans and QAPPs, and to be present at HPNS or reasonably available to supervise work during all hours of work pursuant to the FFA.

280.     The Navy RPMs negligently failed to discover the widespread fraud perpetrated by Tetra Tech because they failed to perform mandatory duties under the FFA, as set forth above.

281.     The Navy RPMs did not have discretion to deviate from their self-imposed duties pursuant to the FFA.  Nor were their respective failures susceptible to social, economic, or political policy considerations.

### 7.     The Navy was Required Under the Federal Acquisition Regulations to Hire Responsible Contractors Only.

282.     The Federal Acquisition Regulations ("FAR") were established in 1983 for the purpose of codifying and publishing practices and procedures for federal executive agencies to follow in making acquisitions.  (*See* 48 C.F.R. §1.101.)

283.     The FAR apply to all acquisitions, except where expressly excluded.  (*See* 48 C.F.R. § 1.104.)  An "acquisition" means "the acquiring by contract . . . of supplies or services (including construction) by and for the use of the Federal Government . . . ."

284.     The FAR applies to all contracts that the Navy entered into with Tetra Tech for the performance of environmental investigation and remediation at HPNS.

285.     As codified in FAR Section 9.103, the government's mandatory policy is to award contracts to "responsible prospective contractors only."  (48 C.F.R. § 9.103(a) ["Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors *only*"] (emphasis added).)   The Navy does not retain any degree of discretion to award contracts to contractors who are not "responsible prospective contractors."

286.     Under the FAR, contracting officers must make an "affirmative determination of responsibility" before making a purchase or award to a contractor.  (*See* 48 C.F.R. § 9.103(b) ["No purchase or award shall be made unless the contracting officer makes an affirmative determination of the responsibility.  In the absence of information clearly indicating that the prospective contractor is responsible, the contractor shall make a determination of non-responsibility"], emphasis added.)

287.     For the Navy to affirmatively determine whether a contractor is "responsible," and therefore eligible for a Navy contract, the contracting officer must find that the contractor satisfies seven elements set forth in the FAR.  (*See* 48 C.F.R. § 9.104-1.)

288.     For example, the contractor "*must*" "have a satisfactory performance record."  (48 C.F.R. § 9.104-1(b), (emphasis added).)

289.     The FAR specifically defines what it means to have a "satisfactory performance record."   Under 48 C.F.R. § 9.103-3(b): "A prospective contractor that is or recently has been seriously deficient in contract performance *shall be presumed to be nonresponsible*, unless the contracting officer determines that the circumstances were properly beyond the contractor's control, or that the contractor has taken appropriate corrective action.  *Past failure to apply sufficient tenacity and perseverance to perform acceptably is strong evidence of nonresponsibility*. *Failure to meet the quality requirements of the contract is a significant factor to consider in*

*determining satisfactory performance.*   The contracting officer shall consider the number of contracts involved and the extent of deficient performance in each contract when making this determination."  (emphasis added.)

290.     The contractor must also "[h]ave a satisfactory record of integrity and business ethics." (48 C.F.R. § 9.104-1(d).)

291.     The Navy failed to adhere to the duties established under the Federal Acquisition Regulations.

292.     Since around 2012, the Navy knew that there was compelling information indicating that Tetra Tech was not a "responsible" contractor because it did not have a "satisfactory record of integrity of business ethics" and did not have a "satisfactory performance record."

293.     For example, no later than November 2012, the Navy was on notice that Tetra Tech's employees had taken soil samples from areas outside of designated survey units but had represented those samples as having come from the appropriate locations, based on a draft report submitted to the Navy by Tetra Tech in response to data discrepancies identified in October 2012. Moreover, in August 2013, the Navy received further notice that Tetra Tech's employees, at the direction of Tetra Tech management, routinely engaged in intentional fraudulent conduct by switching soil samples taken from the designated survey units with soil that had been identified as "clean." (*See, e.g.*, U.S. Compl., ¶¶ 54-64.)

294.     Nevertheless, the Navy never made a determination of non-responsibility and continued to award Tetra Tech contracts.  As Tetra Tech itself has explained, "the Navy continued to award contract task orders and make payments to TtEC for work at Hunters Point for *several years after the Navy became aware of soil sample falsification* and after TtEC's rework associated with its investigation thereof."  (Tetra Tech MTD at 10 (emphasis added).)

295.     Despite the Navy's knowledge of Tetra Tech's fraud in 2012, seriously deficient contract performance, and obvious absence of information clearly indicating that Tetra Tech was a "responsible" contractor, the Navy continued to issue contract task orders to Tetra Tech for investigation and remediation of radiological contamination at Hunters Point. For example:

    •     On July 10, 2012, the Navy awarded contract number N62473-10-D-0809,

task order 0012 to Tetra Tech in support of Phase II of Parcel C remediation, focusing on sanitary sewer and storm drain lines and radiologically-impacted ship berths and sites.  Task Order 0809-0012 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $9,846,298 for providing the services required under the contract, regardless of Tetra Tech's costs.  After five contract modifications, the total contract value awarded was **$10,487,802**.

- On September 19, 2012, the Navy awarded contract number N62473-12-D-2006, task order 0004 to Tetra Tech, which required Tetra Tech to perform and report on surveys to analyze the radiological contamination in Buildings 253 and 211 in Parcel C and to identify and bound the areas of contamination.  Task Order 2006-0004 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $5,892,247 for the services required under the contract, regardless of Tetra Tech's costs.  After two contract modifications, the total contract value awarded was **$7,255,881**.

- On August 13, 2013, the Navy awarded contract number N62473-10-D-0809, task order 0015, which addressed recommendations in a Health Risk Assessment for radiologically-impacted sanitary sewer and storm drain lines in Parcel E.  Task Order 0809-0015 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $4,894,307 for the services required under the contract, regardless of Tetra Tech's costs.  After two contract modifications, the total contract value awarded was **$5,061,910**.

- On September 23, 2014, the Navy awarded contract number N62473-10-D-0809, task order 0016 to Tetra Tech, which was in support of Phase III of Radiological Remediation and Support of Parcel C.  Task Order 0809-0016 was a firm fixed price contract that, as modified, obligated the Navy to pay Tetra Tech a maximum fixed amount of **$669,812** for the services required under the contract, regardless of Tetra Tech's costs.

296.     In fact, the Navy admitted that Tetra Tech was still a contractor in 2016 on an unrestricted EMAC, even though at that time Pat Brooks (BRAC Environmental Coordinator) had identified that the "root cause" of the remediation issues as of 2016 was Tetra Tech's lack of quality

assurance and quality control. (*See* EPA P. Brooks Interview.)

297.    In addition to its own claims of fraud against Tetra Tech, the United States has admitted that "if someone committed a massive fraud, that would not be satisfactory." (*See* U.S. Depo. at 57-65, 67 ["if a contracting officers knows of a massive fraud . . . their contractor would not be deemed responsible for the section we are talking about [Section 9.103 of the FAR] which they're not, they would not get a contract"], 70 ["I think that there is portions of the work [Tetra Tech] did that's seriously deficient and that was documented in the two gentlemen pleading guilty."].)

298.    Thus, the Navy violated the FAR by continuing to make purchases from and award contracts to Tetra Tech even though it knew, as early as 2012, that Tetra Tech was not a responsible contractor and that there was no legitimate basis to make an affirmative determination that Tetra Tech was a responsible contractor.[13]

299.    The Navy's contracting personnel did not have discretion under the FAR to retain a contractor with unsatisfactory performance. Nor did the FAR afford discretion not to evaluate Tetra Tech's performance according to required and specific criteria. The Navy's failure to adequately implement the FAR's mandatory protocols, intended to prevent the hiring of unsatisfactory contractors (like Tetra Tech), is not susceptible to social, economic, or political

---

[13] Interestingly, in a press release, the Department of Justice remarked that its Complaint in Intervention against Tetra Tech "will ensure that the Navy's contractors retained to work in the Northern District of California are held accountable for any failures to comply with the contract that was intended to make certain critical testing was completed. We will ensure compliance with all contractual obligations for which the government has paid." (United States Attorney's Office, Northern District of California, *United States Joins Lawsuits Against Tetra Tech EC Inc. Alleging False Claims in Connection with Shipyard Cleanup*, Oct. 26, 2018.) Yet despite the Department of Justice's promise to "ensure compliance with all contractual obligations," Tetra Tech is *still* an active government contractor. Obviously unpleased with this fact, the Speaker of the House of Representatives, Nancy Pelosi, has remarked that Tetra Tech should not receive any more federal contracts: "***Why would you trust them after they let this happen?***" (Jason Fagone and Cynthia Dizikes, *SF Shipyard Scandal: Pelosi Calls for Federal Probes*, S.F. Chronicle (Aug. 2, 2018, 8:30 AM), emphasis added.)

A spokeswoman for Speaker Pelosi has further remarked, "***We are concerned that Tetra Tech continues to receive contracts*** amidst ongoing Department of Justice whistle-blower lawsuits into their fraudulent work at Hunters Point Naval Shipyard." (Jason Fagone, *Parent of Shipyard Contractor Gets Huge Deal for Camp Fire Cleanup*, S.F. Chronicle (Jan. 9, 2019), emphasis added.)

1    policy considerations.

2         300.        Moreover, there are no competing policy considerations underlying the Navy's

3    decisions to continue to award contracts to a contractor who was defrauding the Government and

4    American taxpayers, which has resulted in financial loss, reputational damage to the Navy, loss of

5    confidence in the Navy, loss of trust in the Navy, and loss of credibility – all of which are articulated

6    at length in the Navy's Victim Impact Statement.  This was confirmed by the United States:

7              Q: Is there any policy consideration in favor of the Navy or Navy

8                 personnel that is accomplished by the financial losses articulated in

9                 this Victim Impact Statement, Exhibit 20 to your deposition?

10             . . .

11             A: Yeah, the -- there is no benefit to the financial loss and there is no

12                policy that would state there is a benefit of a financial loss such as

13                you are talking about.

14             Q: Is there any policy consideration in favor of the Navy or Navy

15                personnel that is accomplished by the staining of the Navy's

16                reputation that's articulated in the Victim Impact Statement?

17             . . .

18             A: I am not aware of any -- I am not aware of any policy that is a

19                benefit for us for our relationship being tarnished.

20             Q:   Is there any policy consideration in favor of the Navy or Navy

21                personnel that is accomplished by the loss of trust that is articulated

22                in the Victim Impact Statement?

23             . . .

24             A: I am not aware of any policy.

25             Q: Is there any policy consideration in favor of the Navy or Navy

26                personnel that is accomplished by the loss of confidence in the

27                regulatory community, including the EPA and the California state

28                regulators?

1          . . .

2          A: I am not aware of any policy.

3          Q: Is there any policy consideration in favor of the Navy or Navy

4          personnel that is accomplished by the years that will be necessary to

5          rebuild the Navy's credibility?

6          A: No.  I am not aware of any policy that would be favorable to loss

7          of our credibility or the years that it would take to rebuild it.

8          Q: Is there any policy consideration in favor of the Navy or Navy

9          personnel that is accomplished by displacing funds for training

10         sailors, building ships, purchasing aircraft, that the Navy needs for

11         its core mission of fighting the country's wars and deterring

12         aggression?

13         A: I am not aware of any policy that would be of benefit there.

14    (U.S. Depo at 88-90.)

15              **8.      The Navy was Required to Ensure the Quality of Tetra Tech's**

16                       **Work Pursuant to the Construction Quality Control Program**

17                       **Manual.**

18         301.    The NAVFAC serves as the Navy's facilities, installation, and contingency

19    engineers.  NAVFAC's duties include oversight of contractors hired to accomplish Navy facilities

20    construction and redevelopment goals, including the investigation and remediation of former Navy

21    installations.   The requirements for carrying out those duties are established by NAVFAC's

22    Construction Quality Management Program Manual ("NAVFAC Construction Manual"),

23    NAVFAC 0525-LP-037-7202.  The Navy's operations at HPNS are required to comply with the

24    duties set forth in NAVFAC's Construction Manual.

25         302.    As the NAVFAC Construction Manual explains, its purpose is to "define[]

26    NAVFAC's policy for construction quality management" and "outline[] the concepts,

27    requirements, and procedures used to execute NAVFAC's Construction Quality Management

28    (CQM) Program,"    which "implements the Contractor's Quality Control (QC) and the

1  Government's Quality Assurance (QA) Systems, tools designed to support the management of

2  NAVFAC's construction and environmental restoration work."  "All NAVFAC construction type

3  contracts, for work to be performed in the United States and its territories, will comply with the

4  requirements and procedures outlined in [the Construction Manual]."  (Construction Manual at I;

5  *see also id.* at 1-2 (stating that the NAVFAC uses the Construction Manual to establish the

6  procedures that "*shall* be used for all construction contracts above the Simplified Acquisition

7  threshold").)

8      303.    The United States does not contest that the Construction Manual "applies to the

9  work that Tetra Tech did at Hunters Point."  (U.S. Depo at 253:14-16.)

10     304.    Under the Construction Manual, "the Government *must assure* that construction

11 work conforms to contract requirements by ensuring that the Contractor's Quality Control (QC)

12 System is properly functioning."   (Construction Manual at xiii (emphasis added).)   "[T]he

13 requirement for NAVFAC quality assurance is independent of any quality control effort of the

14 Contractor." (*Id.* at 1-7).   The United States assures work conforms to contract requirements

15 through "reviews, tests, and surveillance."  (*Id.*)  The United States has testified that the

16 Navy had a mandatory duty under the Construction Manual to assure the quality of Tetra Tech's

17 Work:

18          Q: You agree that the Navy was required to apply quality assurance

19          processes to Tetra Tech's work at Hunters Point?

20          A: Yes, I believe – I agree that we had to apply quality assurance

21          processes, yes.

22 (U.S. Depo. at 259:24-25 – 260:1-3.)

23     305.    Accordingly, under the Construction Manual, "NAVFAC is responsible for

24 evaluating all construction prior to final acceptance and payment to determine compliance with

25 contract documents." (Construction Manual at § 1.6.2.)

26 The Construction Manual imposes mandatory quality assurance obligations on specific Navy

27 personnel.

28     306.    The quality assurance obligations are critical to ensuring that contractors, like

Tetra Tech, provide quality work.  (*See* Construction Manual at xiv ["When the Contractor fails to meet quality requirements or carry out their contractual [Quality Control] responsibilities, the [Quality Assurance] System is designed to establish that fact"].)

307.     However, there were numerous deficiencies in the Navy's Quality Assurance System that allowed Tetra Tech's fraud to persist unchecked for years, despite multiple red flags that the Navy would have identified had it performed its duties under the Construction Manual. Chapter 3 of the Construction Manual sets out the procedures for implementing the Navy's QA system for government contracts.  Section 3.3 sets out the role of NAVFAC quality assurance personnel in overseeing contractor work.

308.     For instance, Section 3.3.1 "places responsibility on the [Quality Assurance Representative ("QA Rep")] to be cognizant of the Contractor's activities in order to monitor the critical work elements."  (Construction Manual at § 3.3.1.)   Carrying out this responsibility "requires the QA Rep to accomplish" certain tasks "on a routine basis, both pre-and post-award." (*Id*. at § 3.3.1.1.)  For example, "the Contractor must submit daily reports to the Government.  The Contractor is required to submit their Contract Production Report and a Contractor Quality Control Report to the Government on a daily basis.  These reports are to be delivered to the Quality Assurance Representative no later than 1000 the following workday." (*Id*. at § 2.15.1.)

309.     The "Contractor Production Report" is "documentation of the efforts expended and progresses made on a daily basis." (*Id*. at § 2.15.1.1.)  The Contractor Production Report (1) describes the work performed; (2) the location of the work performed; (3) identifies safety actions taken and safety inspections conducted; (4) describes construction equipment used; and (5) identifies the total hours on the job site. (*See id.* at Appendix E.)

310.     The "Contractor Quality Control Report" addresses "the Quality Control System as it occurs on the project site . . . It is primarily intended to document 'follow-up' phase controls of the ongoing work and be clearly tied to the activities on the Contractor's schedule." (*Id*. at § 2.15.1.2.)  The Contractor Quality Control Report describes: (1) preparatory phase work performed; (2) initial phase work performed; and (3) follow-up phase work performed, including a description of the work and testing performed, by whom, the location the work was performed, and a list of

personnel present.  (*Id*. at Appendix F.)  The Contractor Quality Control Report also includes space to identify "rework items" that were not corrected by close of business and "rework items" that were corrected.  (*Id*.)  Finally, there is space for the Navy QA Rep to insert remarks and/or exceptions to the Contractor Quality Control Report.  (*Id*.)

311.    The Construction Manual imposes a mandatory and specific duty on the Navy QA Reps to review and ensure the accuracy and completeness of the Contract Production and Contract Quality Control Reports:

> [T]he QA Rep has the *prime responsibility* to ascertain the completeness and accuracy of the Contractors' Production and Quality Control Reports . . . . The QA Rep *must* review all reports immediately *upon receipt* to ensure their accuracy and completeness . . . . The QA Rep should use the space provided on the form to comment on, or take exception to, information indicated in those reports.

(*Id*. at § 3.4.2 (emphasis added).)

312.    Section 3.3.1 of the Construction Manual further states that "the QA Rep *must* daily review all Contractor reports *and* inform his supervisors of any errors or omissions." (emphasis added.)

313.    The Construction Manual also describes *how* the Navy QA Reps should "review" all Contractor Production and Quality Control Reports:

> The QA Rep should check the following when reviewing reports: phases of construction (preparatory, initial, and follow-up) under way on the day of the report, and the specific location of the work performed.  Results of quality control procedures and inspections, including the nature of deficiencies observed and the corrective action proposed by the Contractor.  This should include dimensional checks and validation of work elements along with safety violations and the location of such inspections . . . Test results, including failures and remedial action to be taken.  When test results cannot be completed by the time the report is submitted, a notation should be made that the test was performed, and the approximate date results will be available.  Delayed test results should be submitted with the report on the date received.

(*Id*. at § 3.4.2.)

314.    Furthermore, in reviewing the Quality Control Reports, the QA Reps are required to "note any disagreement or question regarding the accuracy and completeness of the

report," which "must be returned to the Contractor for resolution and appropriate reporting in subsequent Contractor reports or by another acceptable method." (Construction Manual 3.4.1.1.) And to the extent the QA Reps identify "[i]ncorrect or erroneous information," they are required to comment on that information and take appropriate follow-up action. (*Id*. at § 3.4.2.) "Failure to take exception to incorrect information contained in the report constitutes constructive acceptance of the Contractor's version of events." (*Id*.)

315.    Accordingly, the Navy QA Reps had a mandatory and specific duty to review all Contractor Production and Quality Control Reports immediately upon receipt to ensure their accuracy and completeness, comment and follow-up on incorrect or erroneous information, and inform supervisors of errors or omissions.

316.    On information and belief, the Navy's QA Reps did not "immediately upon receipt" review all of Tetra Tech's Production and Quality Control Reports to ensure their accuracy and completeness, did not comment and follow-up on incorrect and erroneous information, did not take exception to incorrect information contained in the Reports, and did not inform their supervisors of any errors or omissions.

317.    There were several inaccuracies in Tetra Tech's Production and Quality Control Reports that the QA Reps would have identified had they (1) properly reviewed the reports and (2) did so "immediately upon receipt."

318.    For example, Tetra Tech's daily Production and Quality Control Reports did not completely or accurately describe the work being performed, the location of work performed (such as soil collection locations), and results of quality control procedures and inspections. Many building scans were manipulated and falsified, and the actual radiation detection activities reported did not occur. This is evident from the duplicative data in the survey results. The data indicates that Tetra Tech's daily reports for at least half of all buildings surveyed would have been inaccurately reporting that these buildings were being scanned and completed, when they were not. Similarly, daily reports on the location and completion of soil sampling activities likewise were not accurate. Daily reports on soil sampling and testing activities also could not have been complete without including the unapproved collection of soils outside designated survey units.

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

319.     Furthermore, based on information and belief, the Navy QA Reps did not comment upon (nonetheless correct) numerous forms of incorrect and erroneous information contained in Tetra Tech's Production and Quality Control Reports related to the hundreds – and potentially thousands – of instances of data falsification and manipulation.

320.     In addition to these duties, the Construction Manual also imposed certain "specific duties" on the QAP Reps to accomplish the following tasks on a routine basis, both pre- and post-award. Those "specific duties" include:

- Observing enforcement of safety provisions during normal site visits;
- Making or arranging for inspections to be performed by the Government;
- Inspecting critical items and monitoring specific testing;
- Making sufficient site visits to determine adequacy of QC System performance, which includes spot-checking workmanship and observing testing procedures;
- Obtaining and reviewing the daily QC and Production reports in a timely manner and taking necessary action;
- Preparing Construction Contract Non-compliance Notices; and
- Witnessing final tests and making final inspections for acceptance.

(Construction Manual at § 3.3.1.1.)

321.     The Construction Manual further states that "on most contracts, the QA Rep should visit the work site each day.  *As a minimum*, he *must* visit the work site *once a week* to maintain awareness of the project status."  (Construction Manual at § 3.3.1.1 (emphasis added).)

322.     Furthermore, where deficiencies in a contractor's work are identified, the QA Rep is required to "assure the deficiency is corrected."  (*Id*. at § 3.3.1.2.)  If a deficiency "is not corrected within 24 hours, the [contractor] is required to track the deficiency on the Rework Items List," and if they fail to do so, "the QA Rep shall issue a Construction Contract Non-Compliance Notice."  (*Id*.)

323.    The Construction Manual, which binds the Navy, also makes clear that (i) Tetra Tech "must not be allowed to build upon defective work" and (ii) "no payment shall be made for nonconforming work." (*Id*. at § 3.5.2.)

324.    The Navy failed to adhere to the duties established under the Construction Manual, as established by the testimony of multiple former workers at HPNS, including the criminal plea agreements of Justin Hubbard and Stephen Rolfe, as well as independent investigations of Tetra Tech's work conducted by other federal agencies.

325.    Navy QAs did not prepare Construction Contract Non-compliance Notices for the hundreds and potentially thousands of times that Tetra Tech failed to comply with the provisions of its contracts.

326.    In addition, if the Navy's QA Reps had visited the site at least once a week to maintain awareness of project status;   conducted pre-final and final inspections; conducted sufficient site visits to determine the adequacy of the Quality Control System; witnessed final tests and made final inspections for acceptance; spot checked workmanship on a routine basis; observed testing procedures on a routine basis; and inspected critical items and monitored specific testing as required under Construction Manual § 3.3.1.1,  then the widespread and years-long deficiencies of Tetra Tech's quality control efforts would have been easily detected and eliminated.

327.    Had the Navy fulfilled these "specific duties" under the Construction Manual, it would have been apparent that Tetra Tech was (1) changing the scan speed on the radiation detection scanner's conveyor belt system to a level that was "well above established standards;"[14] (2) locking the conveyor belt so that the belt speed could not be changed;[15] (3) using hand sensors shielded by thick steel scoops that were ineffective at detecting hazardous radioactive contamination;[16] (4) using unqualified laborers instead of Health Physics Specialists to perform soil

---

[14] *See, e.g.*, E. Bowers Declaration at p. 12 ("It is common knowledge that the detectors become much less effective when the scan speeds are increased . . . .  The radiation detectors at these speeds would not be able to detect and alarm for radioactive contamination at the health and radiation safety criteria that the Navy and regulators had set for Hunters Point").

[15] *See* Declaration of Robert McLean in Support of Petition to Revoke the License of Tetra Tech EC, Inc. at p. 4 ("[T]he belt speed was locked at far too fast a speed well above the established standards.").

[16] *Id*. at p. 5.

sample collection "*hundreds of times*;"[17] (5) taking soil scans on the Radiological Screening Yard screening pad too fast "*hundreds of times*;" (6) falsifying COCs and blocking the shipment of "hot" samples to laboratories;[18] (7) collecting soil from different areas known to be clean or have lower radioactivity and falsely representing over a period of years that "potentially *thousands*" of samples had come from areas being investigated in order to reduce or eliminate the remediation work required;[19] (8) failing to conduct further investigation and remediation when samples from survey units exceeded release criteria; and (9) failing to take 100 percent gamma surveys of all survey units.

328.    Had the Navy QA Reps followed these "specific duties," those and other obvious violations of site safety protocols would have been easily detected and eliminated.

329.    The Navy's QA Reps further failed to assure that identified deficiencies in Tetra Tech's work were corrected, as required under Construction Manual § 3.3.1.2. Tetra Tech's 2014 Investigation Report acknowledged a limited number of soil samples had been switched with soil taken from outside the areas under investigation but describing those as isolated incidents which had been fully resolved. Although the Navy was aware of allegations from other Tetra Tech workers that Tetra Tech's soil sampling issues were more widespread, it nevertheless accepted Tetra Tech's account of events, failed to conduct its own investigation of Tetra Tech's data quality, and continued to award Tetra Tech contracts for remediation work at HPNS. Later, independent investigations carried out on behalf of the EPA determined that up to 97% of Tetra Tech's soil

---

[17] *See, e.g.*, Declaration of Archie Jackson in Support of Petition to Revoke the License of Tetra Tech EC, Inc. at p. 4 ("The above incident at RSY-2 was not the only time I observed laborers performing soil samples, it occurred hundreds of times. Laborers were not supposed to collect samples- HPs were supposed to collect samples. This was one of the work issues at Hunters Point I objected to and brought to the attention of my supervisors, to no avail.")

[18] *See, e.g.*, Plea Agreement of Stephen Rolfe at p. 3; Plea Agreement of Justin Hubbard at p. 4.

[19] *See, e.g.*, Greenaction Pet. at 2 ("The soil sampling fraud involved multiple Health Physics Specialists and supervisors. It began at the direction of top Tetra Tech onsite management and took place over a period of years rather than weeks or months. Thousands of samples may be involved, not just the few dozen originally identified by the Navy. Furthermore, the fraud involved a host of activities, not just the soil sampling addressed in the Anomalous Samples Report. Rather, the fraud spanned virtually all radiological remediation functions for which Tetra Tech was responsible"); *see also* Plea Agreement of Stephen Rolfe at p. 3 (testifying that he directed RCTs to substitute hot samples for clean samples); Plea Agreement of Justin Hubbard at p. 3 (stating that he substituted hot samples for clean samples).

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

1    remediation data in Parcel G alone was fraudulent or failed to comply with applicable remediation

2    standards.   (See EPA Dec. 2017 Letter to Navy.)   By failing to uphold its duty to assure that

3    identified deficiencies in Tetra Tech's work were corrected, the Navy permitted Tetra Tech's

4    misconduct to persist and harm Plaintiffs' interests.

5        330.    Had the Navy QA Reps complied with their QA duties and obligations under the

6    Construction Manual, the Navy's QA system would have detected these deficiencies in the

7    performance of Tetra Tech's work, many of which occurred "hundreds" or potentially "thousands"

8    of times, and alerted Navy contracting personnel accordingly.  But the Navy's negligent application

9    of its QA system failed to do so, to Plaintiffs' and the public's detriment.

10       331.    The Navy QA Reps' failures in this regard allowed Tetra Tech to "build upon"

11   its defective work and obtain compensation from American taxpayers for "nonconforming work,"

12   in contravention of the Construction Manual.

13       332.    The Construction Manual's imposition of specific and mandatory duties

14   deprived the Navy of discretion to permit the extensive falsification that Tetra Tech committed

15   under the Navy's supervision.  The Navy's failures were technical in nature, and not susceptible to

16   social, economic, and political policy consideration.

17              **9.    Requirements Pursuant to Contract Task Orders Issued to**

18                   **Tetra Tech.**

19       333.    Each specific environmental remediation task carried out by Tetra Tech at HPNS

20   was governed by Contract Task Orders ("Task Orders") between the Navy and Tetra Tech.  Each

21   of those Task Orders sets forth a Statement of Work that defined the scope of Tetra Tech and the

22   Navy's responsibilities under the contract.  While the primary focus of the Statement of Work is

23   on Tetra Tech's duties to perform appropriate environmental remediation, certain provisions

24   establish mandatory, specific requirements that the Navy must fulfill under the Task Order.

25       334.    The Navy was required to comply with the self-imposed terms of its contracts

26   with Tetra Tech.

27       335.    In a Task Order for radiological remediation work on Parcel E under Navy

28   contract number N62473-10-D-0809, dated September 22, 2010, Section 3 sets forth a number of

1    "Special Conditions" that the parties must comply with.  In particular, Section 3.10 explains that

2    "No contractor personnel are to enter any location without first obtaining clearance from the Navy."

3    Section 3.25 further explains that the "Navy shall review all pertinent records provided by the

4    contractor to authorize persons to enter and/or work at the site."  Likewise, in a Task Order for

5    radiological surveys of buildings on Parcel C under Navy contract number N62473-12-D-2006,

6    dated September 19, 2012, the Navy was required to "review all pertinent records provided by the

7    contractor to authorize persons to enter and/or work at the site" under Section 3.21.

8          336.       The Navy failed to adhere to its mandatory, specific duties under these and other

9    Task Orders.  As multiple former Tetra Tech workers have testified, numerous employees

10   providing environmental remediation services at HPNS lacked the requisite training or background

11   to qualify for employment in their positions.  Nevertheless, they were permitted by Tetra Tech and

12   the Navy to work at HPNS for years on end.  Had the Navy complied with its duty to "review all

13   pertinent records" in order to authorize those individuals to work at HPNS, those individuals would

14   never have been permitted to perform any environmental remediation work at HPNS.

15         337.       Pursuant to its contracts with Tetra Tech, , the Navy was also required to inspect

16   all the work in progress and at completion: "The Navy *shall* inspect all the work in progress and at

17   completion." (*See, e.g.*, Statement of Work for Radiological Multiple Award Contract N62473-09-

18   D-2614 X008 at § 3.23.)

19         The United States testified that this is a mandatory duty:

20                Q: "'The Navy shall inspect the work in progress and at completion.' Do you

21                see that?

22                A: I do.

23                Q: Did the Navy have discretion to ignore that provision?

24                A: No.  The Navy needed to inspect work, inspect all progress and at

25                completion.

26                Q: And that was a mandatory requirement of the Navy; correct?

27                       . . .

28                A: It would be a requirement, yes.  Mandatory requirement."

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

1    (U.S. Depo. at 202:1-14.)

2         338.    The Navy utterly failed to follow its mandatory duty to insect all the work in

3    progress and at completion, as evidenced by the widespread nature of Tetra Tech's fraud at the

4    Shipyard.  One of the most severe examples of Tetra Tech's fraud was collecting soil from different

5    areas know to be clean or have lower radioactivity and falsely stating the samples had come from

6    areas being investigated in order to reduce or eliminate the remediation work required.  But the

7    Navy's Lead RPM informed the EPA Criminal Division that the California Department of Public

8    Health, not the Navy, was monitoring sample collection at HPNS.

9         339.    Furthermore, Section 3.23 of the Statement of Work states that "any

10   discrepancies shall be noted on the Daily Activities Form."  The Navy does not have any discretion

11   to refuse to note discrepancies in the Daily Activities Form.  The United States testified that this is

12   a mandatory requirement:

13            Q: And the Navy was not free to ignore the requirement that any

14               discrepancies be noted on the daily activities form; correct?

15            A: Yeah, there is a re -- -- yeah, it's required in the contract that we

16               would note that, yes.

17            Q: It's a mandatory requirement, correct?

18            . . .

19            A: That – yeah, it's required in the contract that we would note that,

20               yes . . . it's a -- mandatory requirement that we would note

21               discrepancies on the daily activity form, yes.

22   (U.S. Depo. at 203-204.)

23        340.    Based on information and belief, the Navy also breached its mandatory duty to

24   note major discrepancies related to Tetra Tech's fraudulent performance of work at HPNS on the

25   Daily Activities Forms.   Notably, "decisions motivated solely by laziness or careless inattention

26   'do not reflect the kind of considered judgment grounded in social, economic, and political policy'

27   that the discretionary function exception is intended to shield."  (See Congressional Research

28   Service, The Federal Tort Claims Act (FTCA): A Legal Overview, No. R45732, Nov. 20, 2019.)

10.     **Duties Under Radiological Work Plans, Sampling Plans, and QAPPs**

341.     On February 16, 2005, Tetra Tech prepared a *Base-Wide Radiological Work Plan* ("2005 Work Plan") for the BRAC Program Management Office and approved by the Navy. The 2005 Work Plan is signed and approved by the Navy's RASO Representative, Radiological Site Manager ("RSM") Laurie Lowman.

342.     The 2005 Work Plan "describes survey and decontamination approaches that will be implemented in support of radiological release of buildings and areas at Hunters Point Shipyard (HPS), San Francisco, California." (2005 Work Plan at 1-1.) The 2005 Work Plan was intended to be used to conduct activities in support of radiological surveys, such as conducting reference background surveys, scoping surveys, characterization surveys, remedial action support surveys, final status surveys, personnel surveys, equipment and material surveys, truck surveys, air sampling, decontamination and dismantling, and radioactive materials management. (*Id*.)

343.     "The objectives of these activities [were] to evaluate impacted sites that may contain residual radioactive contamination as a result of past activities at [HPNS], cleanup radioactive contamination that is identified, and confirm that buildings and sites at [HPNS] meet the release criteria." (*Id*.)

344.     On or about October 5, 2007, Tetra Tech prepared the 2007 Work Plan for the BRAC Program Management Office and approved by the Navy. The 2007 Work Plan is also signed and approved by the Navy RSM, Laurie Lowman.

345.     Much like the 2005 Work Plan, the 2007 Work Plan described survey and decontamination approaches to support radiological release of buildings and areas at HPNS. (2007 Work Plan at 1-1.)

346.     As the Work Plans makes clear, the Navy has primary responsibility for the successful completion of Tetra Tech's remediation work at HPNS.

347.     Pursuant to the Navy-approved 2005 and 2007 Work Plans, the Navy self-imposed various mandatory duties on its employees, as discussed below.

11.     **Navy Radiological Site Manager Duties Under Work Plans,**

1      **Sampling Plans, and QAPPs**

2      348.      Pursuant to the 2005 and 2007 Base-Wide Work Plans, the Navy RSM "has

3   primary responsibility within the [Navy] for the ***technical accuracy*** and the regulatory

4   conformance of work performed under this Base-wide Plan."  (2005 Work Plan at 3-12 (emphasis

5   added); 2007 Work Plan at 3-11.)

6      349.      The Navy RSM during the time period at issue in this case was Laurie

7   Lowman.

8      350.      The Navy RSM's "*duties* and authority" include "reviewing and approving on-

9   site laboratory analytical data" and "ensuring compliance with applicable MARSSIM

10   requirements."  (2007 Work Plan at 3-12 (emphasis added); 2005 Work Plan at 3-12 (same).)

11      351.      The MARSSIM is a technical document that provides information on planning,

12   conducting, evaluating, and documenting building surface and surface soil final status radiological

13   surveys for demonstrating compliance with dose or risk-based regulations or standards.  It is a

14   multi-agency consensus document that was developed by the Department of Defense, Department

15   of Energy, EPA, and NRC.  The MARSSIM's objective is to describe a consistent approach for

16   planning, performing, and assessing building surface and surface soil final status surveys to meet

17   established dose or dose-risk based criteria.

18      352.      The Government acknowledges that radiological investigation and remediation

19   of soil and buildings at the Shipyard had to be conducted in accordance with MARSSIM.  (U.S.

20   Compl., ¶¶ 44-46, 54, 65, 69, 101.)

21      353.      As discussed in the Government's Complaint in Intervention, "For the

22   radiological investigation and remediation at HPNS, the Relevant Contracts and MARSSIM

23   required Tetra Tech to take the following steps for each survey unit: (1) determine the boundaries

24   of the survey unit; (2) collect soil samples for laboratory analysis in order to characterize the survey

25   unit; (3) if laboratory results demonstrate that the soil is above release criteria, remediate survey

26   unit by removing and disposing of soil; (4) collect soil samples for laboratory analysis from

27   locations that tested above release criteria to ensure that remediation was effective; (5) further

28   remediate if necessary; and (6) collect final status survey soil samples for laboratory analysis.  The

Relevant Contracts require Tetra Tech to 'perform remediation and additional excavation until remediation goals have been met and or appropriate risk levels have been reached.'" (U.S. Compl. at ¶ 45.)

354.     In addition, as explained by the Government, "The Relevant Contracts and MARSSIM required Tetra Tech to take the following steps: (1) scan and remove material, equipment, and building debris; (2) determine the Class, and therefore size, of survey units; (3) conduct radiation scans by moving detectors across surfaces at required speeds; (4) download data from detection instruments; (5) correct survey results for naturally occurring background radiation; (6) evaluate data to determine whether the survey unit exceeds release criteria; (7) remediate, remove and dispose of material, if necessary; and (8) repeat the above steps until release criteria are met." (*Id.* ¶ 46.)

355.     However, in contravention of the Work Plans, the Navy RSM failed to ensure that work performed at the Shipyard complied with applicable MARSSIM requirements because: (1) Tetra Tech did not remediate survey units by removing and disposing of soil when laboratory results demonstrated that the soil was above release criteria; instead, Tetra Tech refused to treat survey units as radioactively contaminated despite lab results and sensor readings indicating that samples were "screaming hot" (Greenaction Pet. at 18; U.S. Compl. at ¶ 61); (2) Tetra Tech did not take samples in order to characterize the survey unit, and instead took background soil samples from radiologically impacted areas that could not be used to characterize survey units because they were not indicative of actual background levels; (3) Tetra Tech did not collect soil samples for laboratory analysis from locations that tested above release criteria to ensure that remediation was effective, and instead collected soil samples from clean or nonimpacted areas (potentially thousands of times); and (4) Tetra Tech did not conduct radiation scans by moving detectors across surfaces at required speeds, and instead increased the scan speed on radiation scanners and pulled scanning devices, and manipulated the scan speed on hand-held radiation detection devices in one spot or just set it down in one spot for up to 30 minutes while readings were recorded (*see, e.g.,* U.S. Compl. at ¶ 69 ["The Relevant Contracts and MARSSIM required Tetra Tech to conduct building radiation scans by *moving* detectors across surfaces at required speeds"].)  These obvious failures

1  demonstrate that the Navy RSM failed to ensure that work performed at the Shipyard complied

2  with applicable MARSSIM requirements.

3  356.   The Navy RSM also failed to review all on-site laboratory data as required under

4  the Work Plans.  (2007 Work Plan at 3-12 (emphasis added); 2005 Work Plan at 3-12 (same).)  For

5  example, had the Navy RSM reviewed all on-site laboratory data, she would have discovered that

6  (1) laboratory results for various radionuclides were all low, with multiple negative results, which

7  was a *red flag* that there were data quality issues; (2) biased sample results were lower than other

8  data sets, which was a *red flag* because biased samples are supposed to be collected in locations of

9  highest scan results, so they would be expected to be higher, not lower, than other data sets collected

10  in random locations; (3) on-site and off-site lab results differed by more than 10 times, which was

11  a *red flag* indicating that samples from the on-site lab were tampered with and that the on-site lab

12  and off-site quality assurance lab were not analyzing the same sample; (4) the presence of low soil

13  K-40 concentrations (< 5 picocuries per gram) relative to the higher mean survey soil K-40

14  concentrations, which was a *red flag* indicating that clean formation soil samples were being

15  substituted for the potentially impacted surface soil survey samples;[20] and (5) there were duplicated

16  strings of data, which is unusual and would be a *red flag* to the reviewer.[21]

17  357.   The EPA has informed the Navy that there were "*extensive* data quality issues"

---

18  [20] Naturally occurring radionuclides that are not Site contaminants, are present soils at the
19  Shipyard and exhibit characteristic distributions and concentrations that are indicative of the local
    Franciscan Soil formation.  These "low K-40" samples, include atypical concentration of low K-
20  40, Ra-226, Bi-214, Pb-214, Ac-228, and cesium-137 (Cs-137) activity concentrations whereas
    Shipyard impacted survey soil samples represent a more variable and higher concentration
21  mixture of these compounds. The presence of low soil K-40 concentrations (< 5 picocuries per
    gram) relative to the higher mean survey soil K-40 concentrations indicated that clean formation
22  soil samples were being substituted for the potentially impacted surface soil survey samples.

23  [21] Duplicated strings of data from a data validation standpoint refers to a repeated
    consecutive string of analytical results for different field samples, collected at different locations,
24  and analyzed at different times.  Given the heterogeneity of soil and or solid samples, and given
    that the allowable variability in the analytical method for the analysis of the same sample
25  (laboratory duplicate) is ± 30%, a repeated string of analytical results (for different samples) is
    unusual and should be a red flag to a data reviewer/validator and warrant further investigation.
26  The causes of data duplication can include sample switching, sample mislabeling, improper
    recording of field scan data, or improper loading of data into an electronic format, all of which
27  Tetra Tech had engaged in at HPNS.

28

ALSTON & BIRD

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

at the Shipyard (EPA Dec. 2017 Letter at 10, emphasis added) – data quality issues that the Navy would have discovered had the Navy RSM reviewed all on-site laboratory data.

358.     In addition to the Navy RSM's negligent implementation of the Base-Wide Work Plans, the Navy RSM also failed to implement and comply with requirements under Navy-approved and adopted sampling plans and QAPPs.

359.     Sampling plans and QAPPs required the Navy RSM to: (1) "perform[] on-site reviews of all radiological site operations including the on-site laboratory;" (2) "perform[] quality reviews on COCs to ensure samples are collected in accordance with the Work Plan and SAP"; (3) "ensur[e] that all necessary sample results are provided and consistent with proposed radiological actions;" (4) "ensur[e] that the radiological data reported is consistent with the intent for which the data was provided;" (5) "compar[e] radiological data with the requirements of the Work Plan, Task-specific Plans, and SAP to ensure that all proper conditions have been met to implement the action requested;" and (6) "review[] radiological laboratory data on a routine basis." (*See Final Sampling Plan and Quality Assurance Project Plan* (Oct. 2007) at Table B.2-1; *Final Sampling Plan and Quality Assurance Project Plan: Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 28.)

360.     The Navy RSM failed to comply with these mandatory requirements.

361.     First, the Navy RSM did not perform on-site review of all radiological site operations including the on-site laboratory.  This is demonstrated by the numerous deficiencies associated with radiological site operations, which the Navy RSM would have readily discovered had she performed on-site review of all radiological site operations.

362.     In addition, the Navy RSM's failure to conduct on-site review of the on-site laboratory is demonstrated by the numerous deficiencies associated with the laboratory's operations, which the Navy RSM would have discovered had she performed these reviews.

363.     According to a whistleblower, Tetra Tech allowed untrained laborers to work in the on-site laboratory and process soil samples:

> In October 2011, I observed two laborers working in the lab, who obviously had not been adequately trained. Their names were Luis and Alfredo (I do not recall their last names). They were "pounding"

1
2
3
4
5
6

> dirt for radioactive sample testing using a mortar and pestle *with their bare hands* to prepare samples for analysis and were not wearing gloves or face masks. They were apparently unaware not only of the radiation exposure they were risking, but also the *danger of cross contaminating the samples*. This indicated that *they were not properly* trained to handle. When I asked them what they were doing, they replied that Robin Fluty, one of the lab managers liked them and that they were allowed to help out *all the time* . . . I *never say the laborers working the lab in a manner that would reflect proper procedures were being followed*. I was very concerned that they were risking their health and the integrity of other samples.

7
8

(*See* Declaration of Susan V. Andrews in Support of Petition to Revoke Materials License at 11 (emphasis added).)

9
10
11
12
13
14

364.    In addition, there is evidence that Tetra Tech routinely destroyed laboratory samples, which the Navy RSM would have discovered had she performed reviews of the on-site laboratory.  (*See, e.g.*, Grenaction Pet. at 18-19 ["Tetra Tech RSOR Taylor ordered Andrews to go to the laboratory and obtain the smears and their associated records and destroy them . . . Andrews did what she was told.  She went to the lab, obtained the smears and records and destroyed them"]; *id*. at 34 ["inconvenient data were manipulated or destroyed"].)

15
16
17
18
19
20
21

365.    Second, the Navy RSM did not perform quality reviews on COCs to ensure samples are handled in accordance with work plans and sampling plans.  There were widespread issues identified by the EPA associated with Tetra Tech's completion (and sometimes failure to complete) COCs in accordance with work plans and sampling plans.  Tetra Tech's falsification of COCs was so widespread and persistent that the Navy RSM would have easily discovered this fraud had she performed quality reviews on COCs to ensure that they were handled in accordance with work plans and sampling plans.

22
23
24
25
26
27
28

366.    Third, the Navy RSM did not ensure that all necessary sample results were provided and consistent with proposed radiological actions.  Tetra Tech did not provide the necessary sample results to support the free-release of radiologically impacted areas at the Shipyard because Tetra Tech, among other things, collected soil from different areas known to be clean or have lower radioactivity and falsely stated the samples had come from areas being investigated in order to reduce or eliminate the remediation work required to meet release criteria.  The Navy RSM failed to ensure that "all necessary sample results were provided" because Tetra Tech's sample

results were falsified and were not indicative of the actual level of radioactivity in designated survey units. Obviously, the Navy RSM further failed to ensure that Tetra Tech's sample results were "consistent with proposed radiological actions" because falsified sample results taken from areas that did not need to be remediated cannot support investigation and remediation of radiologically impacted areas.

367. Fourth, the Navy RSM did not ensure that the radiological data reported was consistent with the intent for which the data was provided because the radiological data was falsified, as discussed at length herein.

368. Fifth, the Navy RSM did not compare radiological data with the requirements of the work plans, TSPs, and sampling plans to ensure that all proper conditions were met. Indeed, had the Navy RSM actually compared the radiological data with the requirements of the work plans, TSPs, and sampling plans the Navy RSM would have discovered multiple red flags, including that: (1) laboratory results for various radionuclides were all low, with multiple negative results, which clearly indicated data quality issues; (2) survey unit project reports were missing gamma static and scan results; (3) biased sample results were lower than other data sets; (4) on-site and off-site lab results differed by more than 10 times; (5) the presence of low soil K-40 concentrations (< 5 picocuries per gram) relative to the higher mean survey soil K-40 concentrations indicated that clean formation soil samples were being substituted for the potentially impacted surface soil survey samples; (6) there were duplicated strings of data, which is unusual and would be a red flag to the reviewer; and (7) in nearly a third of all 63 Parcel G trench units, post-remediation gamma scans indicated a need for biased samples to be collected, but they were not. (*See* EPA Dec. 2017 Letter.)

369. Sixth, the Navy RSM did not comply with her nondiscretionary, nondelegable duty to "review radiological laboratory data on a routine basis." The Navy RSM, Laurie Lowman, would at times fail to review radiological laboratory and instead delegate that work to other Navy employees who did not work in RASO. And more fundamentally, as the United States has itself alleged, laboratory data produced by Tetra Tech showed significant amounts of "[d]uplicated strings of data," which in some instances showed that "the exact time, to the second, that the reading was taken was also duplicated." Had the Navy RSM carried out the duty to "routinely" review this

data, these discrepancies would have immediately been clear.

370.    All these actions demonstrate a widespread failure of the Navy's RSM to follow applicable requirements under work plans, sampling plans, and QAPPs.

371.    As discussed further below, the Navy's RSM, Laurie Lowman, had a conflict of interest in that her son worked for Tetra Tech, which affected her ability to objectively review or evaluate the results provided by Tetra Tech.

372.    Ms. Lowman abruptly retired shortly after information came to light regarding Tetra Tech's falsification of soil data.

373.    The Navy RSM negligently failed to discover patent deficiencies in work performed by Tetra Tech because she failed to perform her mandatory duties under the Base-Wide Work Plans, sampling plans, and QAPPs, as set forth above.  The Navy RSM's failures were technical in nature, and not susceptible to social, economic, and political policy consideration.

### 12.    Navy Resident Office in Charge of Construction's Duties Under Work Plans, Sampling Plans, and QAPPs

374.    Pursuant to the Work Plans, the Navy's Resident Officer in Charge of Construction ("ROICC") is responsible for *technical* oversight and quality control at the HPNS: The Navy ROICCs have the "primary responsibility for providing on-site quality assurance and safety oversight of contractors performing work at [HPNS]."[22]  (2005 Work Plan at § 3.2.18; 2007 Work Plan at § 3.2.18.)

375.    The Navy ROICCs have mandatory duties under the Navy-approved and adopted Work Plans, which include (1) "verifying that all work has been completed per contract and technical specifications prior to final government acceptance;" (2) "performing ongoing field inspections to verify that all work is in compliance with both contract and technical specifications;" (3) "notifying the contractor of any work that is not in compliance;" (4) and "reviewing contractor daily reports for completeness and accuracy."[23]  (2005 Work Plan at § 3.2.18; 2007 Work Plan at

---

[22] Some of the ROICCs at HPNS include Shirley Ng, Izzat Amadea, Robert Christopher, and Peter Stroganoff.

[23] Identical requirements for the ROICC appear in several Final Project Quality Control Plan's for HPNS, which are attached to various Final Execution Plans.  (*See, e.g.*, *Final Execution Plan for Crisp Road* (Jan. 25, 2010), Attach. 1 at § 2.3; *Final Execution Plan for Parcel C* (Oct.

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

§ 3.2.18.)

376.    The Navy ROICCs did not comply with these mandatory obligations.

377.    First, the Navy ROICCs did not verify that all work had been completed per contract and technical specifications prior to final government acceptance.  As discussed herein, the Government's Complaint in Intervention details numerous requirements under MARSSIM and the Navy's contracts with Tetra Tech applicable to work performed at the Shipyard.

378.    However, the Navy's ROICCs clearly failed to verify that all work had been completed per these contract specifications prior to final government acceptance.  As discussed herein, Tetra Tech failed to complete work per contract specifications hundreds and potentially thousands of times.  These obvious failures demonstrate that the Navy's ROICCs failed to verify that all work had been completed per contract specifications prior to final government acceptance.

379.    Second, the Navy's ROICCs did not perform ongoing field inspections to verify that all work was in compliance with both contract and technical specifications.  As detailed at length herein, there were numerous, widespread deficiencies in the work conducted by Tetra Tech that occurred hundreds or potentially thousands of times, which clearly did not comply with both contract and technical specifications.  The Navy's ROICCs would have discovered these deficiencies had they performed ongoing field inspections to verify that all work was in compliance with both contract and technical specifications.

380.    Third, for several years, the Navy ROICCs did not notify Tetra Tech that any of the widespread instances of data falsification and manipulation were noncompliant, as evidenced by the Navy's continued awarding of contract work to Tetra Tech at HPNS.

381.    Fourth, the Navy ROICCs did not review Tetra Tech's daily reports for completeness and accuracy.  As discussed at length herein, there were numerous deficiencies in Tetra Tech's daily reports that the Navy ROICCs would have discovered had they actually reviewed Tetra Tech's daily reports for completeness and accuracy. The Navy ROICCs would have likely alerted contracting personnel of fraud had its QA system detected any, and the contracting officers could have then determined whether retention of Tetra Tech was appropriate.

25, 2010), Attach. 1 at § 2.3; *Final Execution Plan* (Jan. 21, 2011).)

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

382.     The Navy ROICCs negligently failed to discover these deficiencies in the work performed by Tetra Tech because they failed to perform their mandatory duties under the Base-Wide Work Plans.  The Navy RSM's failures were technical in nature, and not susceptible to social, economic, and political policy consideration.

### 13.     Navy Remedial Project Manager's Duties Under Work Plans, Sampling Plans, and QAPPs

383.     Section 3.2.15 of the Work Plans sets out the Navy RPMs' oversight role, which incorporates the "primary responsibility within the DON for day-to-day management of Tetra Tech's remediation activities under this [] Plan *and for their successful completion*."

384.     Accordingly, Section 3.2.15 holds the Navy RPMs responsible for, among other things: (1) ensuring that the project scope of work requirements are fulfilled; (2) providing formal technical direction to the Tetra Tech project team; (3) coordinating with RASO and Remedial Project Managers of other projects being performed in radiologically impacted areas to ensure proper controls are in place; (4) acting as lead interface with agencies on non-radiological issues.

385.     The Navy RPMs failed to ensure the "successful completion" of Tetra Tech's work at HPNS.  As discussed at length herein, there were numerous deficiencies with Tetra Tech's performance of work at HPNS.  That work was never "successfully" completed because, just by way of example, the EPA has estimated that 90% of soil survey units in Parcel B and 97% of survey units in Parcel G are suspect.  (EPA Dec. 2017 Letter to Navy.)  Likewise, the work was never "successfully" completed because EPA has concluded that data collected by Tetra Tech at HPNS is neither reliable nor defensible."  (Id. at 5.)  Of course, the Navy RPMs' failure to ensure the "successful completion" of Tetra Tech's remediation activities has resulted in the delayed transfer of Shipyard parcels to Plaintiffs until remediation can be successfully completed so the Navy can issue FOSTs.

386.     In addition, Mr. Lansdale acknowledged that, before the Navy could certify invoices for each work item, the Navy was required to ensure that the invoiced work was complete and accurate.  However, Melanie Kito—the Navy's Lead RPM during the period when Tetra Tech employees acknowledged falsifying remediation data—admitted in an interview with the EPA

1   Criminal Division that she would "blindly approve" Tetra Tech's invoices before they were

2   submitted to the Navy's financial personnel for payment.  Had the Navy RPMs reviewed those

3   invoices as necessary to ensure "successful completion" of Tetra Tech's work before certifying

4   them for payment, Tetra Tech would not have been able to continue building on its defective work.

5   In fact, even after Tetra Tech admitted to having submitted fraudulent samples in connection with

6   invoiced work, Kito informed the EPA Criminal Division that the Navy continued to rely on Tetra

7   Tech's representations rather than independently scrutinize its work.

### 14.   Navy Quality Assurance Officer's Duties Under Work Plans, Sampling Plans, and QAPPs

10   387.    As detailed at length herein, the Navy QAO had multiple duties pursuant to the

11   Work Plans, Sampling Plans, and QAPPS, which the Navy QAO breached.

### 15.   Requirements Pursuant to the Department of Navy Environmental Readiness Program Manual

14   388.    The activities of all divisions of the Navy must comply with the requirements

15   established under the Navy's Environmental Readiness Program Manual ("Environmental

16   Manual"), OPNAV M-5090.1C (January 10, 2014).  The Navy's Environmental Manual provides

17   Navy policy and assigns responsibility for the planning and implementation of programs to meet

18   Navy environmental objectives.

19   389.    Chapter 1 of the Environmental Manual establishes the organization and

20   coordination of the environmental duties the Navy is required to comply with.  Under Section 1-4,

21   the Environmental Manual delineates the compliance responsibilities for different divisions of the

22   Navy, also referred to as "commands."  Of relevance to HPNS, the NAVFAC is assigned a number

23   of specific duties.  In particular, the Commander of NAVFAC is designated as "the Navy's primary

24   technical authority and primary execution agent in support of Navy installation COs for

25   environmental planning, compliance, restoration, and natural and cultural resources management

26   for Navy shore facilities" like HPNS.

27   390.    Section 1.4-7 of the Environmental Manual establishes the following specific

28   responsibilities applicable to the Commander of NAVFAC: (1) establishing and assuring adherence

to technical standards and policy; (2) ensuring the safety, environmental compliance, and competency of work delivered to Navy; and (3) ensuring consistent application of environmental policy and coordinating all environmental planning and compliance within the appropriate Navy REC and area environmental coordinator.

391.    Section 7-3.4 forbids Navy workers from engaging in any "prohibited practices," which are defined in pertinent part as "fabrication, falsification, or misrepresentation of data."  In a deposition of the United States in the underlying action, Navy witness Lawrence Lansdale testified that no Navy policy grants it discretion to violate this mandate or to let its contractors break those rules.

392.    The Navy failed to adhere to the duties established under the Environmental Manual, as established by the testimony of multiple former workers at HPNS, including the criminal plea agreements of Justin Hubbard and Stephen Rolfe, as well as independent investigations of Tetra Tech's work conducted by other federal agencies.

393.    In particular, the Commander of NAVFAC, as well as Navy personnel operating under their command, failed to "assure adherence to technical standards," "ensure the competency of work delivered to the Navy," and "ensure consistent application of environmental policy."  This failure is evidenced by the numerous deficiencies in work performed by Tetra Tech that was not competent or compliant, and did not adhere to technical standards, including work plans, QAPPS, sampling plans, and MARSSIM, as detailed at length herein.

394.    Moreover, the Navy published several documents that included fabricated, falsified, or misrepresented data, including through publication of Remedial Investigation reports representing the data collected during the time that Stephen Rolfe was ordering employees to falsify data samples.  In doing so, the Navy failed to uphold its duty under Section 7-3.4.

### 16.    Conflicts of Interest

395.    At HPNS, the Navy's RSM was responsible for overseeing the radiological remediation conduct and progress of Tetra Tech.

396.    During the period of time that Tetra Tech was committing widespread fraud at HPNS, the Navy RSMs in charge of reviewing Tetra Tech's work was Laurie Lowman.

397.     Ms. Lowman had authority to make decisions that impact the sampling, testing, and operations and results of Tetra Tech in the nuclear radiological remediation processes at Hunter Point.

398.     However, Ms. Lowman was unable to objectively review and oversee Tetra Tech because her son, Thorpe Miller, though unqualified, was hired as a Radiological Data Analyst responsible for this work.

399.     As a Radiological Data Analyst, Mr. Miller received towed array information that identified the intensity of the radioactivity of the Survey Unit soils.  In his position, Mr. Miller also received the lab analysis of the samples of the Survey Unit soils taken under Tetra Tech supervision. Mr. Miller had responsibility to review the towed array information with the resulting laboratory test results from the Survey Unit soil samples.

400.     Tetra Tech whistleblowers and Mr. Miller's direct supervisors believed that Mr. Miller's previous employment was in retail and that he did not have the requisite experience for work on a radiological remediation site.

401.     The Navy and Ms. Lowman knew that Mr. Miller did not have the training or experience to fulfill his role as Radiological Data Analyst.  Yet, he was granted a significant pay raise within one year of his employment.

402.     Tetra Tech Project Managers specifically directed changes to be made to Mr. Miller's evaluations to support this increase.

403.     Tetra Tech's hiring of Mr. Miller created a conflict of interest and as a result Ms. Lowman, RASO, and the Navy favored Tetra Tech due to the employment of Ms. Lowman's son by Tetra Tech.

404.     Tetra Tech was clearly aware of the conflict of interest and its potential influence on the Navy.

405.     The Navy, including the Navy's Lead RPM, Melanie Kito, were also fully aware of this conflict of interest. In an EPA Criminal Division interview, Ms. Kito stated that "Lowman's son was employed by Tetra Tech" and that "she wanted to make sure that the anomalous soil samples issue was not just the result of a 'personality conflict.'"

406.     Tetra Tech and a Tetra Tech Contractor, IO Environmental, subsequently collaborated to have Mr. Miller formally "resign" from Tetra Tech, be "hired" and paid through IO Environmental as an "employee" but perform the same work for Tetra Tech, at the same Tetra Tech work desk and office at HPNS, to hide the conflict of interest.  The resignation from Tetra Tech and immediate hire of Mr. Miller by IO Environmental was all orchestrated by Tetra Tech to  curry favor with Ms. Lowman, but hide the obvious conflict of interest.

407.     The Navy was also aware of the conflict of interest and investigated but did not remedy the situation. "I was aware that her son was working there or affiliated company, time frame 2013- I don't know.  But I was aware that her son was working in either one capacity or another.  It was either Tetra Tech or a subcontractor at one point."  (Lansdale Depo. at 324.)

408.     On September 2011, Tetra Tech significantly changed and weakened the procedures for use of radiation detection portal monitor and procedures and standards for review of a truck with a load of soil and debris that failed thee portal monitor screening.

409.     As understood by those whistleblowers present at HPNS, Ms. Lowman did not object but rather assisted Tetra Tech in the effort to hide its failures because of her conflict of interest.

410.     Although the Navy, via Ms. Lowman, received inconsistent information between the towed array radiological readings and the lower laboratory results, Ms. Lowman did not contest the accuracy of the soil Survey Unit sampling processes overseen by her son and failed to call into question the testing of the soil samples.

411.     After Mr. Miller was in positions of responsibility over the RSY pad processing, very high percentages of the soil removed from HPNS were deemed "cleared" and used as backfill into trenches at HPNS.  For example, a total of 1,023 cubic yards of soil were processed on the RSY pads from units 190 and 187 from Parcel UC3.  The oversight of Mr. Miller for the RSY pad processing resulted in only 10 remediated cubic yards of RAD contaminated soil, or less than .01% of the soil.  Having such a low level of soil remediated was a substantial cost savings to Tetra Tech under the firm fixed price contracts with the Navy.

412.     Thus, it is clear that Ms. Lowman did not provide adequate oversight to the

1   remediation on the ground, as was required of that role.

2       413.    Ms. Lowman was clearly aware of her failures, which, on information and belief,

3   is why she retired shortly after RASO began looking into the issue of anomalous soil samples.

4       414.    The Navy violated its mandatory duty to fulfill the responsibilities delegated to

5   its RASO.

6       415.    The Navy's inability to effectively oversee Tetra Tech allowed their fraud to

7   continue throughout the site unmitigated and unchecked, including by allowing unapproved

8   procedures for radiation detection.

9       416.    The scope and extent of this fraudulent activity has significantly delayed the

10  transfer of property to Plaintiffs, who have been harmed as a result.

11              **K.    Plaintiffs' Reliance on the Navy's Supervision of Tetra Tech.**

12      417.    Plaintiffs relied on the supervision and oversight of Tetra Tech and the clean up

13  by the United States to ensure that Tetra Tech properly remediated the Shipyard.

14      418.    As discussed herein, the United States is subject to mandatory requirements to

15  ensure a proper investigation and effective remediation of the Shipyard.

16      419.    The United States was obligated to ensure the quality of Tetra Tech's work, and

17  certainly the United States was under an obligation to be truthful with Plaintiffs about the fraud

18  they uncovered and the impact it would have on the transfer schedule; instead, the United States

19  hid the fraud from the public, including Plaintiffs, and instead continued to reassure Plaintiffs that

20  the original transfer schedule would be implemented.

21      420.    As an example, each time Tetra Tech purportedly completed radiological survey

22  or remediation of work in a building or area (such as a segment of the sanitary sewer and storm

23  drain systems), the Unites States directed it to prepare a final radiological report for that building

24  or area, called a final status survey report for buildings and a final survey unit project report for a

25  sewer and storm drain segment.  After all of the final reports are issued for a Shipyard transfer

26  parcel, the United States directed Tetra Tech to prepare a Radiological Removal Action Completion

27  Report ("Rad-RACR") for that parcel.  The purpose of the Rad-RACRs was to "summarize the

28  results of the radiological work activities performed for" each portion of the Shipyard.

421.     Unbeknownst to Plaintiffs, Tetra Tech knew, and purposefully concealed the fact that it had not complied with applicable statutes and regulations concerning environmental investigation and testing of the Shipyard in preparing the final radiological reports and Rad-RACRs.  The extent of this fraud is summarized in Final Fourth Five-Year Review for Hunters Point Naval Shipyard (July 2019), which was not prepared by Tetra Tech but by another environmental contractor, Innovex ERRG.  That report states that "the Navy determined that a significant portion of the radiological survey and remediation work completed to date was not reliable because of manipulation and/or falsification of data by one of its radiological remediation contractors.  Radiological data identified in reports associated with Parcels B-1, B-2, C, D-2, E, G, UC-1, UC-2, and UC-3 were deemed unreliable."  In its September 27, 2019 concurrence letter for this review, the United States concluded that "there was no current health risks on the site, based on current site conditions and current uses," but that all of these parcels would "require further actions to remain protective in the long-term."  This includes Parcels D-2, UC-1 and UC-2, which have received Findings of Suitability for Transfer ("FOST") and been transferred to San Francisco, after which Plaintiffs began to conduct critical preliminary development activities as San Francisco's lessee.

422.     Despite obtaining evidence of such fraud—and even conducting investigations into such fraud through the Department of Justice—the United States allowed Tetra Tech to continue its activities under the Shipyard remediation contracts without informing Plaintiffs of the extent of the fraud.  Because the Rad-RACRs were not properly certified by Tetra Tech under supervision by the United States, the work performed by Tetra Tech will need to be redone.  The significant delay caused by another round of environmental investigation is damaging Plaintiffs, as well as the negative public perception faced by Plaintiffs due to the United States' negligent oversight and failure to ensure the quality of Tetra Tech's work.

423.     Plaintiffs acquired their stake in redevelopment of the Shipyard in reliance on the schedule provided by the United States.  Plaintiffs relied on the fact that Rad-RACRs and FOSTs or Parcels D-2, UC-1 and UC-2—where Plaintiffs planned to conduct critical preliminary

development activities as San Francisco's lessee—had been issued and the property transferred to San Francisco in September 2015, which occurred prior to Plaintiffs' acquisition of a stake in the Shipyard development in May 2016.  Moreover, Plaintiffs relied on the fact that the Rad-RACRs for the first set of parcels it intended to own and develop (Parcels B and G) had already been completed and accepted by the United States prior to Plaintiffs' acquisition of their stake in the Shipyard development in May 2016.  The fact that these milestones had purportedly been achieved demonstrated to Plaintiffs that Tetra Tech was properly investigating and remediating any radiological contamination in a timely manner pursuant to the requirements and schedule provided by the Navy.

424.    Even assuming that no further remediation of the Shipyard property is necessary, the United States (and Plaintiffs and all other interested entities) cannot rely on the environmental investigation as reported by Tetra Tech.  Plaintiffs now face significant delay and negative public perception for their redevelopment of the Shipyard property.

## L.    Plaintiffs' Knowledge of the United States' Negligence

425.    Plaintiffs' causes of action against the United States did not accrue until after the indictments against Hubbard and Rolfe were unsealed by the federal court as part of the sentencing proceedings against Hubbard on or around May 2, 2018.  Until that time, Plaintiffs had no reason to believe that they had suffered any injury on account of Tetra Tech misconduct.

426.    To the contrary, Plaintiffs were in active communications with the Navy and diligently sought out real time information from the Government about the progress of the cleanup efforts, so as to plan for the timely development under the transfer schedule provided by the United States.

427.    Further, Plaintiffs were not aware until on or around May 2, 2018 that the transfer schedule previously announced by the United States would be significantly delayed for years by Tetra Tech's actions.  As part of the indictment proceedings, the United States disclosed for the first time that the transfer schedule would be delayed up to a decade, based on Tetra Tech's conduct.  (Victim Impact Statement at 2 [stating, "[t]he Navy estimates that the fraud committed

by Mr. Hubbard and others has set back the planned transfer of HPNS property to the City by an approximate decade"].)

428.     The United States did not inform Plaintiffs of the significant delay in the transfer schedule of HPNS property until May 2018 despite having knowledge of Tetra Tech's conduct. Prior to that time, the Navy continued to advise Plaintiffs that the existing schedule for property transfer would be met.

429.     The Navy, despite learning of Tetra Tech's fraud in 2012, now contends that it did not know the extent of the issues perpetrated by Tetra Tech until proper investigations were completed much later. "The two employees pled guilty to a number of sample switching -- they are switching the soil samples, but there was a lot of uncertainty as far as the extent of the – extent of the fraud prior to them pleading guilty because, you know, we didn't know—we don't—we didn't know the extent of it." (Lansdale Depo. at 84.)

430.     The United States consistently failed to disclose the extent of Tetra Tech's misconduct, even when responding to specific concerns about the potential for delay.

431.     Prior to and through at least 2014, former Tetra Tech employees and contractors had raised various allegations to the United States and the Nuclear Regulatory Commission that Tetra Tech had engaged in fraudulent investigative practices.  In 2014, Tetra Tech admitted that it had provided false soil samples to the United States, but claimed the misconduct was limited to certain former employees and a small number of samples and required remaining employees to engage in "ethics training."

432.     At that time, the United States accepted Tetra Tech's explanation for Tetra Tech's fraudulent investigative practices, and thereby allowed Tetra Tech to continue its work at HPNS.  The United States did not inform Plaintiffs that Tetra Tech had committed extensive criminal fraud during Tetra Tech's work at HPNS nor that that the transfer schedule would be significantly delayed.  Plaintiffs did not learn that the transfer schedule would be delayed until on or around May 2, 2018, when the indictments against Hubbard and Rolfe were unsealed by the federal court.

433.     As of May 2018, the United States continued to publicly misrepresent that the

bulk of HPNS property would be transferred to Plaintiffs for redevelopment in 2019, when it held a public workshop that included a presentation depicting that schedule. But when the victim impact statements from the United States in the Rolfe and Hubbard cases were also revealed in May 2018, the United States finally admitted under oath that Tetra Tech's fraud would cause substantial schedule delays – by "approximately a decade." The United States deliberately withheld this information from Plaintiffs and overtly misrepresented the transfer dates to Plaintiffs and the public, even though it knew those representations were materially false.

## M.   Injuries Suffered by Plaintiffs

434.   The United States has admitted that the failures at HPNS have led to considerable harm. The Navy, in its Victim Impact Statement stated that: "[t]he fraud and uncertainty surrounding TtEC's work at HPNS has caused a complete loss of trust in the Navy by the local community. The new residents at HPNS are understandably anxious for their safety, and this has required additional effort by the Navy and regulators to address these concerns." (Victim Impact Statement at 1.)

435.   Further, "[t]he fraud has also caused a loss of confidence by the regulatory community (both EPA and California State regulators) regarding the Navy's radiological remediation program and the Navy's competence to implement it….The Navy now faces an uphill struggle to rehabilitate itself from this negative connotation in the regulatory community. It will take years to rebuild this credibility." (Victim Impact Statement at 2.)

436.   The Navy, in its own words, affirmed that the public and overseeing regulators, have lost complete trust in the Navy's remediation.

437.   In addition, the Navy stated that "[t]he fraud committed by Mr. Hubbard and others has also led to negative national media attention. The effort to respond to this negative media attention has required increased staffing to answer questions, prepare for interviews, and conduct risk communication training - all of which pulled Navy staff away from their primary duties and caused collateral impacts to other Navy bases and projects." (Victim Impact Statement at 2.)

438.   Five Point's future development at HPNS suffers from this same harm.

439.   The Navy's failure to properly supervise, oversee, and ensure the quality of Tetra

Tech's work, and failure to detect Tetra Tech's fraud, as alleged herein, means that the fraudulent work performed by Tetra Tech cannot be used to support the unrestricted radiological release for Shipyard parcels.

440.    The Navy is currently working with federal and state regulatory agencies to determine the extent of rework that will be necessary at HPNS in order for the Navy to obtain the required "free release" from the regulatory agencies to turn the property over to the City.  The EPA has indicated that it would require all work to be reperformed as originally contracted.  (Victim Impact Statement at 3.)

441.    The Navy similarly has acknowledged that the vast amount of fraud that occurred throughout the site will cause a *significant* delay in completing appropriate remediation at the site.

442.    The work now required to assure the public and EPA that the Navy's remediation will meet all safety requirements is vastly greater than what would have been necessary if issues of fraud were addressed and remediated under proper oversight in 2012.

443.    The negligence perpetrated by the United States' failure to oversee, supervise, and ensure the quality of the environmental investigation, testing, and remediation of HPNS has injured Plaintiffs.

444.    Plaintiffs have been further injured by the United States' negligent failure discover Tetra Tech's fraud for several years.

445.    Before Plaintiffs can begin redevelopment on any of the remaining parcels of HPNS, the United States must issue a FOST, which it cannot do until an exhaustive, time consuming re-evaluation of Tetra Tech's radiological work at all of the remaining parcels to be transferred is conducted.  This re-evaluation is expected to take several years.  The injuries which Plaintiffs have and continue to experience were not, and could not, be known despite Plaintiffs' reasonable diligence until May 2018 when the indictments were unsealed and Plaintiffs were first advised that significant delays would occur as a result of the fraud that Tetra Tech perpetrated on Plaintiffs.

446.    When Five Point acquired its interest in redevelopment of HPNS in May 2016,

the bulk of the property was scheduled to be transferred by 2019, and the final parcel in 2021.  But now, the transfer of Shipyard property to Plaintiffs cannot occur as scheduled; the investigation, testing, and remediation conducted by Tetra Tech must be reviewed and reexamined in detail by the United States because the United States failed to adequately do so the first time.  According to statements from the United States made public in May 2018, Tetra Tech's fraudulent actions will delay any transfer of HPNS parcels for a decade.  The most recent transfer schedule demonstrates an increasing delay and uncertainty in remediation, with the next parcel not able to transfer before 2024 and in the last land parcel not able for transfer until 2027. Plaintiffs had already started to build out portions of HPNS property leased to Plaintiffs from the City, including a community kitchen and artist colony.  In fact, Plaintiffs who had started the horizontal development of the artist colony were forced to abandon the physical development of that facility in the summer of 2018, after the widespread nature of the fraud became public.

447.   This delay is resulting in substantial economic and reputational harm to Plaintiffs, which cannot generate any revenue from its investment in redeveloping HPNS until after the Shipyard property is properly investigated and remediated, and thereafter transferred to Plaintiffs.  Only then can redevelopment begin.  Like any development company, Plaintiffs can only realize meaningful profits from their redevelopment projects when those projects are completed on time.  That is especially so when plans must be made decades in advance, such as the massive mixed-use redevelopment of the Shipyard property that is contingent upon proper environmental investigation and remediation.

448.   By negligently supervising investigation and remediation of the Shipyard property, the United States directly undermined the very transfer schedule that it communicated to Plaintiffs and upon which Plaintiffs relied.

449.   Plaintiffs have also incurred substantial costs in responding to the harm caused by Tetra Tech while under United States oversight, including costs associated with a host of lawsuits brought against Plaintiff Five Point arising out this matter.  The fraud perpetrated by Tetra Tech under United States supervision has also significantly diminished the value of the Shipyard property to be redeveloped by Plaintiffs, as well as surrounding properties, which are also to be

1  developed by Plaintiffs.

2  ## FIRST CAUSE OF ACTION
3  ## (NEGLIGENCE)

4  450.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if

5  fully set forth herein.

6  451.     The United States owed a duty to Plaintiffs to exercise reasonable and ordinary

7  care to avoid causing economic and other injury to Plaintiffs.  That duty arises from the statutes,

8  regulations, policy manuals, site-specific work plans, and contracts between the Navy and Tetra

9  Tech for the completion of remediation work at HPNS, as well as the nature of the environmental

10  investigation, testing, and remediation work Tetra Tech was performing, which was initiated

11  pursuant to the Navy's decision to close HPNS for redevelopment pursuant to the Defense Base

12  Closure and Realignment Act of 1990.

13  452.     Moreover, the Navy agreed to ensure effective environmental investigation of

14  HPNS and remediation sufficient for redevelopment by companies such as Plaintiffs when it

15  executed a memorandum of understanding with San Francisco and the SFRA to establish the

16  process for conveying HPNS property for redevelopment.  The Navy repeatedly confirmed its

17  obligations through the FOST process, as well as communications to Plaintiffs, the public, and

18  public officials—even though those communications failed to provide notice to Plaintiffs of the

19  extent of the fraud perpetrated by Tetra Tech under United States supervision.

20  453.     The Navy had a duty of care to Plaintiffs as third parties with significant and

21  foreseeable financial interest dependent on the Navy's contractor, Tetra Tech, sufficiently

22  performing its testing and remediation obligations under the Navy's supervision.

23  454.     The environmental investigation, testing, and remediation of HPNS initiated by

24  the United States was intended to, and did, affect Plaintiffs.  The United States was aware that its

25  decision to contract with Tetra Tech was for the express purpose of preparing HPNS for

26  redevelopment.  The United States was aware that Plaintiffs are master developers who would be

27  conducting redevelopment of certain parcels of HPNS that have yet to be transferred.

28  455.     Accordingly, it was foreseeable that the United States' negligent misconduct

would significantly delay and/or hinder redevelopment of HPNS, discourage property buyers, lessees, investors and lenders, and harm Plaintiffs.

456.    The United States negligently, carelessly, tortiously, and wrongfully breached its duty to Plaintiffs through misconduct that included, but is not limited to, negligent supervision and oversight of Tetra Tech and Tetra Tech's employees, negligent enforcement of rules instituted to curb Tetra Tech's fraudulent activities, negligent failure to ensure the quality of Tetra Tech's work, negligent failure to discover the widespread fraud perpetrated by Tetra Tech for several years.

457.    The Navy's negligence was in direct violation of specific and mandatory duties under the Federal Facilities Agreement, Federal Acquisition Regulations, Work Plans, QAPPs, Sampling Plans, contract task orders, the Environmental Readiness Program Manual, CERCLA, the NCP, and the NAVFAC's Construction Manual, which did not afford any discretion in their enforcement and execution, as detailed at length herein.

458.    The Navy failed to comply with these and other duties governing its oversight role at HPNS and responsibility to ensure the quality of Tetra Tech's work, as detailed at length herein.

459.    The Navy's conduct is ethically and morally blameworthy because the Navy failed to adequately supervise Tetra Tech when at stake was the safety of the public and the development of badly needed housing in San Francisco.  The Navy has no reasonable excuse for its failure to supervise Tetra Tech, which has delayed the transfer of Shipyard parcels and harmed Plaintiffs.

460.    The Navy's conduct is contrary to the public policy interests of the State of California because it erodes the public confidence in the reliability of environmental remediation work and deters potential developers from building much-needed housing on former military bases.

461.    The United States (based upon the conduct of the Navy) is liable to Plaintiffs for the damages described herein pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674.

462.    The United States' conduct violated its own authority to ensure proper environmental investigation and remediation and ultimate transfer of the Shipyard property under the Defense Base Closure and Realignment Act of 1990 and related regulations.

463.     Pursuant to California Evidence Code Section 669, the United States' negligence is presumed under the doctrine of negligence per se because it violated these laws and related regulations.

464.     Plaintiffs' harm resulted from conduct that the foregoing statutes and regulations were designed to prevent, and Plaintiffs are within the class of persons those statutes and regulations are intended to protect.

465.     Plaintiffs have been harmed as a direct and proximate result of the United States' negligence.

466.     Plaintiffs relied upon the United States' statements and activities when Plaintiffs acquired exclusive interests to conveyance, management, and redevelopment of the second phase of Shipyard properties (those portions of the Shipyard other than Parcel A) from affiliates of Lennar Corporation in May 2016 at a cost to Plaintiffs of over $1 billion.

467.     As a direct and proximate result of the United States' negligence, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**SECOND CAUSE OF ACTION**

**(NEGLIGENT HIRING)**

468.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

469.     The United States through the Navy owed a duty to Plaintiffs to exercise reasonable care in hiring employees, independent contractors, and other agents, supervising them, and/or retaining them.  That duty arises from the Federal Acquisition Regulations and the Navy's contracts with Tetra Tech, as well as the nature of the environmental investigation, testing, and remediation work Tetra Tech was performing, which was initiated pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to the Defense Base Closure and Realignment Act of 1990.

470.     The United States breached its duty by retaining and continuing to hire and

contract with employees, independent contractors, and other agents that were unfit and incompetent, and did not meet responsibility requirements, including Tetra Tech, Tetra Tech's employees, and individuals associated with Tetra Tech that were investigated by the United States. Under the Federal Acquisition Regulations, the Navy was under a mandatory duty to "award[] [contracts] to [] responsible prospective contractors only." Nevertheless, for at least two years after Tetra Tech admitted to the Navy that it had committed fraud during the HPNS remediation, the Navy continued to award it contracts for that very same work. The Navy also failed to "review all pertinent records" in order to authorize individuals to work at HPNS, as mandated by its Task Orders with Tetra Tech, allowing numerous unqualified individuals to perform environmental remediation work at HPNS for which they lacked adequate training.

471.    The United States knew or should have known that retaining and continuing to hire Tetra Tech  for new contracts at the HPNS—even after evidence of fraud surfaced—violated the Navy's specific and mandatory duties and created a particular risk or hazard of continued misrepresentation and falsification of data at HPNS.

472.    The United States knew or should have known that Tetra Tech was willing to or had a propensity to participate in fraudulent activities, fabricate surveys, and perform improper radiological investigation, including permitting unqualified and unethical workers to perform remediation work at HPNS.

473.    The particular risk or hazard materialized when those employees fabricated surveys and other aspects of the radiological investigation, as alleged herein.

474.    The unfitness and incompetence of Tetra Tech, who was repeatedly hired by the United States and whose contracts were renewed by the United States, was a factor in causing Plaintiffs harm.

475.    The United States (on behalf of the Navy) is liable to Plaintiffs for the damages described herein pursuant to the FTCA, 28 U.S.C. § 2674.

476.    As a direct and proximate result of the United States' negligent hiring, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with

the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**THIRD CAUSE OF ACTION**

**(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)**

477. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

478. Plaintiffs have existing and prospective economic relationships with individuals and entities that are intended to facilitate Plaintiffs' redevelopment of HPNS. These relationships depend upon the timely transfer of the Shipyard properties to Plaintiffs consistent with the schedule disclosed by the Navy prior to May 2018 when significant delays were revealed.

479. These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs through profitable redevelopment of HPNS.

480. The United States knew or should have known of these existing and prospective economic relationships. The United States knew that HPNS was being developed for residential, commercial and other purposes and that, as master developer of parcels of the Shipyard, Plaintiffs intended to develop the land for sale and/or investment.

481. The United States owed a duty of care to Plaintiffs to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs. That duty arises from the statutes, regulations, policy manuals, site-specific work plans, and contracts between the Navy and Tetra Tech for the completion of remediation work at HPNS, as well as the nature of the environmental investigation, testing, and remediation work Tetra Tech was performing, which was initiated pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to the Defense Base Closure and Realignment Act of 1990.

482. The United States breached those duties to Plaintiffs through its misconduct in connection with HPNS.

483. The United States' negligence was in direct violation of specific and mandatory duties that did not afford any discretion in their enforcement, as noted above.

484. The Navy failed to comply with these and other duties governing its oversight

1  role at HPNS, as detailed at length herein.

2  485.    The United States knew or should have known that, if it failed to act with

3  reasonable care, the existing and prospective economic relationships Plaintiffs had with individuals

4  and entities to redevelop HPNS in a timely manner would be interfered with and disrupted.

5  486.    The United States was negligent and failed to act with reasonable care in

6  connection with its oversight of testing and remediation work at HPNS.

7  487.    The United States engaged in wrongful acts and/or omissions in connection with

8  its work.  The United States' interfered with Plaintiffs' existing and prospective economic

9  relationships by, among other things, negligently hiring, supervising, and retaining Tetra Tech.  The

10  United States misconduct constituted an act that was independently wrongful of its interference

11  with Plaintiffs' prospective economic relations.  Among other things, the misconduct of the United

12  States facilitated its contractors' violations of Title 18 U.S.C. § 1519 (destruction, alteration, or

13  falsification of records), 10 C.F.R. 20.1501(a), and 10 C.F.R. 20.2103, and violated the United

14  States' duties of care arising from the statutes, regulations, policy manuals, site-specific work plans,

15  and contracts between the Navy and Tetra Tech for the completion of remediation work at HPNS.

16  488.    As a direct and proximate result of the United States' wrongful acts and/or

17  omissions, Plaintiffs have suffered and will suffer economic harm, injury, and losses, including

18  increased construction costs and delays in the overall development.

19  489.    As a direct and proximate result of the United States' negligent interference with

20  Plaintiffs' prospective economic advantage, Plaintiffs have suffered and will continue to suffer

21  damages in an amount to be proven at trial.

22  **FOURTH CAUSE OF ACTION**

23  **(EQUITABLE INDEMNIFICATION)**

24  490.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if

25  fully set forth herein.

26  491.    Due to the negligent oversight of the United States of Tetra Tech's fraudulent

27  activities, Plaintiffs have become a party to litigation (either individually as Plaintiff Five Point or

28  in combination with Emile Haddad, the Chairman and Chief Executive Officer of Five Point).

1    These lawsuits generally allege that Plaintiff Five Point and Mr. Haddad are responsible to those

2    plaintiffs for injuries resulting from Tetra Tech's failure to properly investigate, test, and remediate

3    HPNS pursuant to Tetra Tech's obligations to the United States.  Several such cases have already

4    been filed naming as defendants Five Point Holdings, LLC and Mr. Haddad, and it is possible that

5    more such cases will be filed in the future, given the gravity of the harm perpetrated by Tetra Tech

6    under United States supervision.

7        492.    Plaintiff Five Point has been named in multiple lawsuits based on the United

8    States' failure to ensure proper investigation, testing, and remediation of HPNS.  To date, Five

9    Point has been named in the following lawsuits:

10       • *Pennington, et al. v. Tetra Tech, Inc., et al.* (N.D. Cal. No. 3:18-cv-05330-JD).

11       • *Bayview Hunters Point Residents, et al. v. Tetra Tech EC, Inc., et al.* (N.D. Cal. No.

12           3:19-cv-01417-JD).

13       493.    Plaintiffs deny any liability as to any claims arising from the United States'

14   failure to ensure proper investigation, testing, and remediation of HPNS.  Five Point is entitled to

15   equitable indemnification and/or contribution from the United States for the costs incurred in

16   responding to claims arising from the United States' failure to ensure proper investigation, testing,

17   and remediation of HPNS.

18       494.    Plaintiff Five Point has sought indemnification for defense costs described

19   above from the United States pursuant to Section 330 of the National Defense Authorization Act

20   of 1993.  According to correspondence from the Deputy General Counsel (Environment, Energy,

21   and Installation), the authority to adjudicate such requests was delegated by the Secretary of

22   Defense to the General Counsel of the Department of Defense, who in turn delegated that authority

23   to the Deputy General Counsel (Environment, Energy, and Installation).  As of the date of this

24   Complaint, the United States has not agreed to indemnify Plaintiff Five Point for the defense costs

25   described above pursuant to Section 330.

26       495.    In the event liability should be established in any action described above

27   involving Plaintiffs or Mr. Haddad, which liability is expressly denied, such liability will arise by

28   reason of the conduct and negligence of the United States.  The United States is therefore bound

and obligated to defend, indemnify, and hold harmless Plaintiffs and Mr. Haddad from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred or to be incurred in response to claims arising from the United States' negligent supervision of the investigation, testing, and remediation of HPNS.

496.    As a further direct and proximate result of the United States' improper conduct, Plaintiffs have incurred, and will continue to incur, liabilities for attorneys' fees and costs in responding to claims arising from the United States' failure to ensure proper investigation, testing, and remediation of HPNS, in an amount to be determined according to proof at trial.

497.    In order to prevent a multiplicity of actions, a determination of the comparative fault, if any, of Plaintiffs and the United States should be made at trial of this action herein.  If any party, in an action arising from the United States' failure to ensure proper investigation, testing, and remediation of HPNS, recovers a judgment against Plaintiffs or Mr. Haddad, then Plaintiffs are entitled to be indemnified by the United States for the amount of any damages awarded in favor of that party and against Plaintiffs or Mr. Haddad, pursuant to and in accordance with the proportion of relative fault or liability attributed to the United States.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Five Point Holdings, LLC and CP Development Company, LLC pray for relief as follows**:**

A.    For compensatory and special damages pursuant to the First through Third Claims alleged above, according to proof at trial;

B.    For equitable indemnification pursuant to the Fourth claim above, according to proof at trial;

C.    For costs of suit and reasonable attorneys' fees incurred herein; and

D.    For an award holding the United States liable for all of Plaintiffs' damages, costs, fees, and interests arising from the United States' tortious conduct;

/ / /

/ / /

/ / /

1      E.      For interest thereon at the maximum legal rate; and

2      F.      For any and all other relief the Court deems just and proper.

3

4    Dated: July 19, 2021                    Respectfully submitted,

5                                       JEFFREY D. DINTZER
                                        MATTHEW C. WICKERSHAM

6                                       ALSTON & BIRD LLP

7

8                                      By: _____
                                               Jeffrey D. Dintzer

9                                       Attorneys for Plaintiffs FIVE POINT
                                      HOLDINGS, LLC and CP DEVELOPMENT

10                                    CO., LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

| | |
|---|---|
| BRAC | Base Realignment and Closure |
| CDPH | California Department of Public Health |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 |
| COC | Chain of Custody |
| CLP | Contract Laboratory Program |
| DDA | Disposition and Development Agreement |
| DERP | Defense Environmental Restoration Program |
| DTSC | California Department of Toxic Substances Control |
| EMAC | Environmental Multiple Award Contract |
| ENA | Exclusive Negotiations and Planning Agreement |
| EPA | Environmental Protection Agency |
| FAR | Federal Acquisition Regulation |
| FFA | Federal Facilities Agreement |
| FOST | Finding of Suitability to Transfer |
| HPNS | Hunters Point Naval Shipyard |
| MARSSIM | Multi-Agency Radiation and Survey Site Investigation Manual |
| NAVFAC | Naval Facilities Engineering Command |
| NCP | National Contingency Plan |
| NRC | Nuclear Regulatory Commission |
| Rad-RACR | Radiological Removal Action Completion Report |
| RASO | Radiological Affairs Support Office |
| ROD | Record of Decision |
| ROICC | Resident Officer in Charge of Construction |
| RPM | Remedial Project Manager |
| RSM | Radiological Site Manager |

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD

RSY             Radiological Screening Yards

TSP             Task Specific Plan

SAP             Sampling and Analysis Plans

SARA            Superfund Amendments and Reauthorization Act

SFRA            San Francisco Redevelopment Agency

TSC             The Shipyard Communities, LLC

FIRST AMENDED COMPLAINT
AGAINST THE UNITED STATES
CASE NO. 3:20-CV-01480-JD