DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
DAVID MARROSO (S.B. #211655)
dmarroso@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

JEFFREY D. DINTZER (S.B. #139056)
jeffrey.dintzer@alston.com
**ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

*Attorneys for Plaintiffs CPHP DEVELOPMENT, LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK 50, LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53, LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC; LENNAR CORPORATION; FIVE POINT HOLDINGS, LLC; and CP DEVELOPMENT CO., LLC*

MAYER BROWN LLP
DAVINA PUJARI, SBN 183407
dpujari@mayerbrown.com
CHRISTOPHER A. RHEINHEIMER, SBN 253890
crheinheimer@mayerbrown.com
575 Market Street, Suite 2500
San Francisco, CA 94105
Telephone: (415) 874-4230
Facsimile: (650)-331-2060

*Attorneys for Defendants Tetra Tech, Inc. And Tetra Tech EC, Inc.*

BRETT A. SHUMATE
Assistant Attorney General
JONATHAN D. GUYNN
Deputy Assistant Attorney General
J. PATRICK GLYNN
Director, Torts Branch
ALBERT K. LAI (DC Bar No. 1007316)
Assistant Director
CAROLINE W. STANTON (DC Bar No. 1010918)
ROSEMARY C. YOGIAVEETIL (NY Bar No. 5296264)
Senior Trial Counsel
Civil Division, Torts Branch
P.O. Box 340
Washington, D.C. 20044
(202) 598-9070

*Attorneys for Defendant United States of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CPHP DEVELOPMENT, LLC, et al.,

Plaintiffs,

v.

TETRA TECH, INC., et al.,

Defendants.

Case No. 3:20-cv-01485-JD

**JOINT PRETRIAL STATEMENT**

Trial Date: January 11, 2027
Courtroom: 11
Judge: Hon. James A. Donato

| | |
|---|---|
| FIVE POINT HOLDINGS, LLC, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA, et al.,<br>Defendants. | Case No. 3:20-cv-01480-JD |
| FIVE POINT HOLDINGS, LLC, et al.,<br>Plaintiffs,<br>v.<br>TETRA TECH, INC., et al.,<br>Defendants. | Case No. 3:20-cv-01481-JD |

# I. SUBSTANCE OF THE ACTION

## A. Parties

The Plaintiffs are: CPHP Development, LLC; HPS Development Co., LP; HPS1 Block 50, LLC; HPS1 Block 51, LLC; HPS1 Block 53, LLC; HPS1 Block 54, LLC; HPS1 Block 55, LLC; HPS1 Block 56/57, LLC; and Lennar Corporation (collectively, "Lennar"); and Five Point Holdings LLC and CP Development Co., LLC (CP Development Co, LLC and Five Point Holdings, LLC are collectively referred to as, "Five Point" and together with Lennar, "Developers" or "Plaintiffs").

The Defendants are: Tetra Tech, Inc. ("TTI") and Tetra Tech EC, Inc. ("TtEC")[1]; and the United States of America ("United States" or the "Navy" and, together with TTI and TtEC, "Defendants").

## B. Plaintiffs' Position

Developers partnered with the City and County of San Francisco to transform the Hunters Point Naval Shipyard ("HPNS")—a former World War II Navy installation—into housing, parks, schools, and businesses for one of San Francisco's most underserved communities. It was the Navy's duty to test and remediate the property, and the Navy hired Tetra Tech as its primary radiological contractor to remediate the radiological contamination the Navy left behind. That remediation had to meet standards set by state and federal regulators, and agreed to by Tetra Tech in multiple contracts. Instead of properly testing and remediating HPNS, Tetra Tech engaged in pervasive remediation fraud directed and tolerated by Tetra Tech managers and supervisors. Tetra Tech intentionally falsified data, misrepresented the results of its radiological investigation and cleanup at HPNS, and knowingly issued false reports stating its radiological work was properly conducted and HPNS was safe for redevelopment. The Navy, charged with overseeing this work, abdicated its nondiscretionary duties and its negligence allowed the fraud to occur unchecked for years. Among other things, the Navy failed to ensure compliance with cleanup standards,

---

[1] TTI and TtEC note that Developers incorrectly refer to TTI and TtEC as "Tetra Tech" which is the subject of TTI and TtEC's Motion *In Limine* No. 1. Developers have referred to the Tetra Tech Defendants as "Tetra Tech" because they seek relief against both Tetra Tech, Inc. and Tetra Tech EC, Inc. As explained in Developers' opposition, and as will be established at trial, both entities are liable for Developers' harm and any distinction between the two entities will be addressed at trial.

CERCLA requirements, and the applicable Federal Facility Agreement, abdicated its responsibility to prepare quality assurance logs, failed to have the required personnel on site during Tetra Tech's work and to conduct on-site quality assurance reviews of all cleanup operations, failed to adequately investigate concerns of misconduct, and failed to determine if Tetra Tech was a responsible contractor under the Federal Acquisition Regulations prior to awarding it more HPNS cleanup contracts.

Tetra Tech covered up its misconduct for years and the United States's negligence allowed it to fester and remain undiscovered for years before it eventually uncovered the extent and magnitude following a confidential criminal investigation—an investigation the Developers were not privy to. When the Court unsealed two Tetra Tech supervisors' guilty pleas in May 2018, the public—and Developers—learned for the first time that Tetra Tech's misconduct was so pervasive and systematic that the Navy concluded that none of Tetra Tech's work could be trusted and all would need to be re-verified and eventually redone. Worse, the Navy announced the additional scheduled property transfers to Five Point would be delayed by at least a decade. Existing home sales halted. Lenders pulled out. All further development work necessarily stopped. Litigation against Developers and Tetra Tech ensued.

Developers have spent eight years and tens of millions of dollars trying to keep the HPNS redevelopment project alive in the face of Defendants' misconduct. Developers bring claims for intentional misrepresentation and intentional interference with prospective economic advantage against Tetra Tech, as well as claims for negligence; negligent hiring, supervision, and retention; negligent interference with prospective economic advantage; and equitable indemnification against both Defendants. Developers' compensatory damages exceed $1 billion; with punitive damages, total exposure is many times that amount.

***Tetra Tech's Fixed-Fee Incentives and the Navy's Absent Oversight.*** Tetra Tech's remediation contracts for work at HPNS began in 2002 as "cost plus" contracts. Around 2008, Tetra Tech's contracts with the Navy shifted from a "cost plus" structure to fixed-fee arrangements, resulting in Tetra Tech cutting corners—i.e., falsifying data, misrepresenting soil samples, and otherwise engaging in a massive fraud—in order to both speed up its work to help

secure additional contracts from the Navy and to protect its profit margins. The misconduct was management-directed and occurred throughout HPNS, as multiple individuals involved in fraud will testify. The Navy was not an innocent bystander. Federal law, a Federal Facilities Agreement between government stakeholders and the Navy, Navy manuals, and approved remedial action plans obligated the Navy to oversee Tetra Tech's work and ensure compliance with scientific and mandatory cleanup protocols. These protocols left no room for discretion. The evidence shows that the Navy breached these mandatory duties, and there was no meaningful oversight of Tetra Tech. Multiple Navy witnesses will testify to noncompliance with nondiscretionary supervisory duties and that the Navy failed to provide adequate oversight. The Navy's negligence enabled and prolonged Tetra Tech's misconduct.

Eventually, in 2012, the Navy's Radiological Affairs Support Office ("RASO") flagged "anomalous" soil sample results showing ambient K-40 (potassium) appearing inconsistently in the samples from the same survey units, suggesting the samples did not in fact come from the same locations and that Tetra Tech might be substituting clean soil for potentially contaminated soil to ensure "clean" test results. RASO recommended that the Navy commission an independent, third-party root-cause investigation. Instead, the Navy invited Tetra Tech to investigate itself. Tetra Tech, with the Navy's blessing, looked only at limited K-40 anomalies and declined to conduct a wholesale analysis of its remediation data for other potential issues. Tetra Tech interviewed its own field personnel using a stilted script that opened with a threat, guaranteeing that none of the perpetrators admitted misconduct. It failed to interview key supervisors, the project manager, assistant project managers, and certain field personnel even though they were all implicated in the soil swapping. Tetra Tech's "April 2014 Anomalous Soil Samples Report"—the culmination of its self-investigation—minimized the issue, framing it as an isolated anomaly, and failed to identify a root cause. Tetra Tech fired no one.

Some RASO personnel internally raised significant concerns about the scope of Tetra Tech's self-investigation, noting that Tetra Tech had neither identified all perpetrators or the "root cause" of the problem and therefore there was no way to determine the scope of the affected data nor prevent it from happening again. But the Navy nonetheless did not push for more answers and

allowed Tetra Tech to continue its remediation work for years. Eventually, the federal government initiated a confidential investigation into Tetra Tech's conduct at HPNS, including gathering evidence of broader fraud implicating multiple personnel, but the scope and implications of the investigation's findings were kept confidential.

Developers did not learn about RASO's concerns with Tetra Tech's self-investigation until years later. In the meantime, a trickle of media reports recounted allegations by whistleblowers related to HPNS. Developers did not sit idly by: their representatives repeatedly asked for and received reassurance from the City and the Navy regarding these allegations. The Navy said that it was looking into the issue and downplayed the anomalous soil sample issue. These repeated assurances were backed up by the transfer schedules provided by the Navy, which remained relatively consistent and showed continued progress towards parcel transfers.

***The Criminal Pleas, Whistleblowers, and the Scope of the Fraud.*** Ultimately, after the federal government's multi-year confidential investigation, in March 2017, Tetra Tech supervisor Steve Rolfe pleaded guilty in a sealed proceeding and admitted that he had tampered with soil samples back in 2011 under pressure from Tetra Tech management. Justin Hubbard, another Tetra Tech supervisor, pleaded guilty later that year to a single day of soil swapping in 2011. Tetra Tech was aware of these criminal convictions and yet publicly denied the whistleblower allegations and aggressively defended its remediation work. In May 2018, the pleas were unsealed, exposing for the first time that the soil swapping issue was gravely serious and had not been resolved and, worse, that the misconduct was directed from above. Unlike what Defendants will argue at trial, the criminal fraud was not the work of two rogue employees, and was significantly broader than a few instances of soil swapping. Rolfe specifically admitted he acted under pressure from Tetra Tech management, and the surrounding evidence that has emerged establishes that the misconduct was not limited to Rolfe and Hubbard's soil swapping. In truth, the misconduct was far broader, systemic, and management-directed. Whistleblowers and other former Tetra Tech employees and subcontractors will testify to a years-long pattern of fraud at HPNS: soil swapping by substituting offsite "clean" dirt for onsite soil samples that went far beyond what Rolfe and Hubbard pled to; falsification of chain-of-custody forms; manipulation of

building scans; significant manipulation and alteration of survey data across different locations; backdated reports; forged signatures; and explicit direction from Tetra Tech supervisors, including Project Manager Bill Dougherty, to falsify results in order to deliver the project on schedule and within the fixed fee. The United States' documents and witnesses will confirm that the government's investigation revealed rampant misconduct that could only have been the result of a concerted, company-driven effort to cheat. Plaintiffs' expert Steve Mattingly will buttress this fact testimony with his analysis showing Tetra Tech's fraud was even more widespread than the Navy reported.

***The Impact on Developers and HPNS.*** The May 2018 unsealing was a public catastrophe for the HPNS redevelopment. Home sales on Parcel A—the sole piece of the HPNS property that Lennar had received and begun developing—ceased. Homebuyers cancelled. Banks restricted lending against Parcel A homes. Project partners pulled out. Buyers and the press began calling the project's homes "cancer condos," even though Parcel A itself was never radiologically contaminated. Lennar's project, its capital commitments, and its reputation as the master developer for one of the country's largest urban redevelopments were severely impaired. Today, more than eight years after the fraud was revealed and eleven years after sales began, Lennar has been unable to sell all of its units on Parcel A and has "mothballed" any further development on Parcel A because it is not economically viable to move forward. The delayed sales, depressed sales prices, and increased costs caused by the Defendants' misconduct has resulted in damages to Lennar exceeding $100 million.

The May 2018 unsealing was even more damaging for Five Point, the master developer of Phase 2 of the Shipyard (everything other than Parcel A) and the adjacent Candlestick Point. Only two years earlier, Five Point had paid $840 million for those development rights. It relied on Navy schedules and assurances providing that most of the Shipyard would be transferred to Five Point by 2019, with the remaining Parcels following soon after. In May 2018, the Navy's unsealed victim impact statement revealed that the Navy believed Tetra Tech's fraud had set back the transfer by about a decade and put the redevelopment "on hold indefinitely." Since then, the Navy's schedule has slipped again and again as a result of the need to re-do Tetra Tech's work.

The remaining HPNS parcels are now not expected to transfer until 2038 or later. To this day, Five Point has been unable to redevelop *any* HPNS parcels. Under its current plans, it will not sell a single HPNS building pad until at least 2040. The delayed land transfers, deferred revenues, and added development and carrying costs caused by the Defendants' misconduct have resulted in damages to Five Point of over $800 million.

In the meantime, Developers had to pay settlements exceeding $17 million to homebuyers whose home values had plummeted and to members of the Bayview Hunters Point community.

***Defendants' Attempts to Avoid Responsibility.*** In response to the mountain of evidence of Defendants' misconduct and the subsequent coverup, Defendants invoke a statute of limitations defense. The United States also asserts sovereign immunity, and Tetra Tech claims preemption under the Price Anderson Act. None of these have merit. Defendants ignore the fact that Developers could not have known they suffered injury (because they had not yet suffered any injury) based solely on early media reports that Defendants dismissed or downplayed, particularly since at no time before May 2018 did transfer schedules hint that a delay of a decade or more was coming. The Court has rejected the United States' sovereign immunity arguments twice, and Navy witnesses have admitted both that their duties were mandatory and they failed to follow them, rebutting the Government's discretionary-function defense. And finally, Tetra Tech's last-minute invocation of the Price-Anderson Act (which it never pleaded nor raised over six years of litigation) misstates the statute and asks this Court to make new law in the Ninth Circuit.

**Claims Against Tetra Tech**

**Fraud.** Tetra Tech intentionally falsified data, misrepresented the results of its radiological investigation and cleanup at HPNS, and knowingly issued false reports stating its radiological work was properly conducted and HPNS was safe for redevelopment. Relying on those misrepresentations, Developers acquired development rights to HPNS and proceeded with plans to redevelop HPNS. Tetra Tech knew Developers would rely on its data and reports, and that its fraud, if discovered, would delay the project, inflate costs, and cause substantial financial harm. Plaintiffs seek compensatory and punitive damages for the losses caused by Tetra Tech.

**Negligence.** Tetra Tech owed Developers a duty to exercise reasonable care in performing its work to ensure that parcels at HPNS were safe for residential and commercial redevelopment. Tetra Tech breached this duty by, among other things, destroying and falsifying samples, data, and records, and hiring and failing to supervise unqualified personnel. As a result, Tetra Tech's misconduct caused significant harm to the redevelopment process, discouraged property buyers and lenders from investing in HPNS, and caused Developers' damages.

**Negligent Hiring.** Tetra Tech failed to exercise reasonable care in selecting and supervising its employees, contractors, and agents responsible for the environmental and radiological work at HPNS. Even after Tetra Tech learned its employees were engaging in sampling fraud and data falsification at the direction of management, Tetra Tech continued to staff these individuals in sensitive radiological investigation roles. This misconduct, coupled with Tetra Tech's failure to supervise, resulted in fabricated data, defective remediation, and foreseeable harm to Developers.

**Negligent and Intentional Interference with Prospective Economic Advantage.** Tetra Tech's misconduct at HPNS, which was knowing and intentional, foreseeably disrupted Developers' ongoing and anticipated economic relationships with investors, buyers, contractors, and other entities involved in the property's redevelopment. Tetra Tech knew its remediation work was being performed to enable residential and commercial redevelopment and that Developers depended on accurate, timely cleanup to maintain their business relationships and development schedules. By intentionally and/or negligently or recklessly performing its environmental work—falsifying or mishandling data, failing to act with reasonable care, and engaging in wrongful acts and omissions—Tetra Tech caused substantial interference with Developers' economic opportunities, leading to significant financial harm.

**Equitable Indemnification.** Developers have been wrongfully drawn into multiple lawsuits alleging harms stemming from Tetra Tech's fraudulent and negligent acts. Developers assert that any liability stems from Tetra Tech's misconduct. Accordingly, Developers seek equitable indemnification and contribution from Tetra Tech for all resulting losses, including defense costs, judgments, and settlement expenses incurred in such related actions. Developers

further request a determination of comparative fault to ensure that any damages or costs arising from Tetra Tech's failures are borne entirely—or proportionately—by Tetra Tech.

**Claims Against the United States**

**Negligence.** The United States breached its duty of reasonable care in overseeing the environmental investigation, testing, and remediation of HPNS. This duty arose from federal statutes, regulations, and contracts governing the Navy's remediation program, which was expressly intended to prepare HPNS for redevelopment. The United States negligently supervised Tetra Tech's work, failed to enforce mandatory rules and oversight obligations, and ignored indications of widespread fraud and data falsification that left the site unsafe. The United States' negligence violated federal regulations and constitutes negligence per se under California law, as it directly delayed property transfer, impeded redevelopment, and caused substantial financial harm in project costs, delays, and litigation expenses.

**Negligent Hiring.** The United States negligently hired, retained, and supervised Tetra Tech and its personnel despite clear evidence of incompetence and fraud at HPNS. The United States had a duty under the Federal Acquisition Regulations and its own mandatory procedures to hire only responsible contractors and qualified personnel; instead, the United States continued to award contracts to Tetra Tech and authorize unqualified individuals from Tetra Tech to perform radiological testing and cleanup, even after learning of Tetra Tech's misconduct. The United States' failure to review records, enforce its oversight obligations, and prevent continued fraud and misrepresentation created foreseeable risks of harm, resulting in construction delays, increased costs, and other financial harm.

**Negligent Interference with Prospective Economic Advantage.** The United States negligently interfered with Developers' existing and prospective economic relationships related to the redevelopment of HPNS. The United States owed a duty to act with reasonable care to avoid conduct that would disrupt those relationships and the timely transfer of HPNS parcels. Despite knowing that Developers were depending on the United States' compliance with statutory and contractual obligations, the United States acted negligently in hiring, supervising, and retaining Tetra Tech, and in overseeing remediation work at HPNS. This negligence—including disregard

of federal regulations, site-wide work plans, and quality assurance requirements—was independently wrongful and foreseeably interfered with Developers' redevelopment efforts, causing substantial harm.

**Equitable Indemnification.** The United States, through its negligent oversight of Tetra Tech, caused Developers to be sued in multiple lawsuits arising from Tetra Tech's misconduct. Developers bear no responsibility for Tetra Tech's failures and are entitled to equitable indemnification or contribution from the United States for all defense costs, settlements, judgments, and liabilities incurred because of the Navy's negligence. Developers seek recovery of all associated costs and a determination apportioning fault between Developers and the United States.

**The United States' Factual Position.** The United States suggests below that Plaintiffs do not contest its account of the facts. That is incorrect.

**C. TTI and TTEC's Position**

Developers bring tort claims against TTI and TtEC to recover alleged economic damages from development delays at the Hunters Point Naval Shipyard ("HPNS"), but the evidence will show that neither TTI nor TtEC is liable for those claims. Developers argue that delays resulted from TtEC's allegedly inadequate radiological remediation of HPNS. But Developers cannot establish the elements of each of their causes of action; they cannot show that TTI or TtEC caused their claimed damages; and their claims are barred by the Price-Anderson Act ("PAA") and by the statute of limitations.

**TTI Was Not Involved At HPNS.** To begin with, Developers seek to hold TTI liable based on TtEC's alleged conduct at HPNS, but TTI is not the same company as TtEC. TTI is TtEC's parent company. TTI and TtEC have separate corporate identities. TtEC is the company that the Navy hired in 2003 to clean up low-level radiological contamination at HPNS. TTI was never involved at HPNS and there is no basis to impute any conduct at HPNS to TTI.

**TTEC Was Not Responsible For Any Misconduct.** Although two TtEC employees—Steve Rolfe and Justin Hubbard—went to prison for falsifying records, TtEC did not know about and could not have foreseen the criminal actions of its employees.

TtEC competently performed the radiological remediation at HPNS, including rework of areas implicated by the Rolfe and Hubbard crimes. TtEC hired qualified workers, provided them with training on soil sampling, and had a quality control program to ensure sampling data were accurate (though such programs are not designed to detect hidden crimes). After sampling irregularities were discovered in 2012, TtEC actively investigated them. TtEC's 2014 report named Rolfe, Hubbard, and other low-level subcontractor workers who were never employed by TtEC (including Anthony Smith) as individuals connected to the suspect samples. TtEC provided that report to the government, which then prosecuted Rolfe and Hubbard. After TtEC's investigation, it took corrective actions—it retrained employees and subcontractors, retested areas where suspect samples were taken, and cleaned up areas at issue in the investigation. TtEC also took disciplinary actions against individuals identified in the investigation, putting them on leave or removing them from the project. TtEC spent millions of dollars on the investigation, cleanup, and corrective actions.

There is no dispute that Rolfe and Hubbard's actions were wrong—in fact, TtEC and TTI fully supported the government's efforts to prosecute them for their crimes—but their actions cannot be imputed to TtEC, let alone TTI. Rolfe and Hubbard falsified the records on their own out of frustration with their work—they were not directed to do so by TtEC. Their conduct was unknown to TtEC and TTI. Rolfe and Hubbard lied to TtEC about their actions when it was investigating them and TtEC would have immediately fired them if they had told the truth. TtEC would never have hired Rolfe and Hubbard—and would never have subcontracted with the companies who employed the other individuals connected to the suspect soil samples—if it knew or could have foreseen that they would engage in misconduct.

The government also investigated the allegations against TtEC. It never prosecuted anyone other than Rolfe and Hubbard. The U.S. Nuclear Regulatory Commission concluded that TtEC's managers were not responsible and never knew about any misconduct.

**Development Delays Were Not Caused By TTEC.** Further, TtEC and TTI did not cause the ongoing delays at HPNS. The primary contamination at HPNS is chemical contamination that TtEC was never responsible for remediating. The chemical cleanup has been slow and

complicated—it will not be complete until 2039 even though the government's radiological rework will be done years earlier. The radiological rework itself—which Developers incorrectly blame for all of the delays—has been driven by EPA's decision to require the Navy to unnecessarily re-excavate HPNS parcels (rather than conducting more reasonable confirmatory sampling) and to meet overly stringent cleanup requirements, even though radiation levels at HPNS already are safe. In addition, the Covid pandemic contributed to the delays, stalling redevelopment work. Economic factors like rising mortgage rates and inflation further slowed redevelopment. TtEC and TTI are not responsible for these causes of the delays and are not liable for Developers' alleged damages.

**Developers Cannot Prove Their Claimed Damages.** Even if TtEC or TTI were liable, Developers have not suffered their claimed damages. Their experts' damages calculations are overblown and riddled with mistakes. They improperly compare Parcel A to the most expensive neighborhoods in San Francisco. They ignore causes of delay unrelated to TtEC. Moreover, Five Point's own expert agrees that Five Point will still make more than $500 million from the HPNS project once the properties are transferred. Further, Five Point is getting the HPNS land *for free* once it is ready to be transferred. Lennar has already developed and made millions in profits from its development of Parcel A. Correcting for such mistakes and omissions, Developers suffered no damages at all.

**Claims Against TTI and TTEC**

Given those facts, Developers cannot meet their burden of proving any of their claims against TtEC and TTI. The evidence will show that Developers cannot prove that TtEC or TTI did anything wrong and cannot prove causation or damages (essential elements of all their claims). The evidence will also show that each of their claims fails for additional reasons as well.

**Intentional Misrepresentation or Fraudulent Deceit.** Developers cannot prove essential elements of their fraud claims. Developers cannot show that TtEC and TTI ever made any false representations to them or even communicated with them at all. Nor can they show that they relied on any representations by TtEC, let alone TTI—instead, Developers' witnesses testified that they read and relied on reports and transfer schedules prepared by the Navy. Developers also

cannot show that TtEC or TTI intentionally deceived them—TtEC and TTI were unaware of any wrongdoing at HPNS while it was occurring, and had no motive to induce Developers to take action in reliance on any representations that TtEC made about HPNS.

**Negligence and Negligent Hiring.** Developers also cannot prove that either TtEC or TTI was negligent. Neither TtEC nor TTI even had any relationship with Developers; TtEC's contracts were with the Navy. TtEC and TTI thus owed Developers no legal duty to prevent their purely economic harms. Nor did TtEC or TTI do anything to breach any duty of care. TtEC performed its work competently, hired qualified employees, and took appropriate corrective and disciplinary actions after misconduct was discovered. Although Rolfe and Hubbard's actions were wrong, TtEC and TTI could not have foreseen them and cannot be held liable for them.

**Negligent and Intentional Interference with Prospective Economic Relations.** Developers also cannot prove essential elements of the economic interference claims. There is no evidence that TtEC or TTI knew or should have known of Developers' economic relationships with third parties. TtEC was focused on the remediation work, not the development project. Nor is there evidence that TtEC or TTI intended to disrupt the Developers' relationships they knew nothing about.

**Equitable Indemnification.** Developers are not entitled to equitable indemnification for payments to the homeowner plaintiffs who sued Developers, TtEC, and TTI in *Bayview* and *Pennington*. This Court's good-faith settlement order in *Bayview* and its order granting summary judgment for TtEC and TTI in *Pennington* together bar Developers from seeking equitable indemnification for payments to plaintiffs in those cases. In any event, Developers cannot prove that TtEC or TTI are at fault for the *Bayview* and *Pennington* plaintiffs' claimed harms.

**TTI and TTEC's Counter-Claim**

**Equitable Indemnification.** TTI and TtEC allege a counter-claim against Developers for equitable indemnification. Developers share in the blame for any liability TTI or TtEC might have to the *Bayview* plaintiffs. As those plaintiffs themselves alleged in suing Developers in those cases, Developers contributed to the homeowners' claimed injuries and property damages—including because they were responsible for earth-moving work at HPNS, knew of contamination

at HPNS, but violated safety regulations on dust emissions during the development work. TTI and TtEC properly may seek equitable indemnification from Developers for any liability they may have to the *Bayview* plaintiffs.

**TTI and TTEC's Jurisdictional/Preemption Defense**

**Price-Anderson Act ("PAA").** Pending with the Court is TTI and TtEC's motion to dismiss for lack of subject matter jurisdiction, or alternatively for summary judgment, under the PAA. As set forth in the motion, the PAA bars Developers' claims as a matter of law and they should not go to trial. Even if the Court denies the motion, the PAA would still apply to bar their claims at trial because Developers will not show that they were exposed to radiation in excess of federal maximum safety limits, and therefore all their claims will fail as a matter of fact.

**TTI and TTEC's Affirmative Defenses**

**Statute of Limitations.** The evidence will show that Developers' claims are barred by the statute of limitations. From the very outset, Developers knew that the redevelopment of HPNS would be complicated because of the chemical and radiological remediation that was necessary, the involvement of federal and local government agencies, and the challenges of developing property in San Francisco. Lennar spun off Five Point in 2016 precisely to manage the risks of redeveloping HPNS.

Even before then, beginning in 2014, Developers were aware of media reports on public "whistleblower" allegations by Anthony Smith and others suggesting that TtEC falsified soil samples at HPNS. In March 2016, Lennar received excerpts from TtEC's report on its investigation of the sampling irregularities (shortly before spinning off Five Point).

In December 2016, San Francisco and the EPA directly told Developers that the government was halting any further HPNS land transfers pending a determination that the properties were safe. Developers were told that the government could not say how long the delay would last or when the transfers would happen. The same month, Five Point told the SEC and its investors about the delays and their impact on the schedule for developing HPNS.

Developers did not do anything to pursue or preserve their claims until they entered a tolling agreement with TTI and TtEC on March 7, 2019. That date is well past the two-year

limitations period on their non-fraud claims—Developers plainly knew of the delays by December 2016 at the very latest. And March 7, 209 is even past the three-year limitations period on their fraud claims—Developers were aware of the allegations against TtEC when they were made public in 2014.

**Comparative Fault/Apportionment of Fault.** Though the evidence will show that TTI and TtEC are not liable, they also assert that any liability should be apportioned among the parties and non-parties. Developers themselves are at fault for dust emissions at HPNS that violated safety standards, resulting in delays and stigma that would contribute to their own claimed damages. Subcontractors are responsible for negligently hiring, supervising, or training non-TtEC employees at HPNS. TTI and TtEC thus seeks to have the jury apportion fault at trial.

**D. United States' Position**

Plaintiffs Five Point and Lennar collectively seek $5.8 billion from the United States on the basis that the Navy was the victim of criminal conduct by two remediation contractor employees at HPNS. They allege that the resulting delays to the transfer of free prime real estate to the City of San Francisco has deferred plaintiffs' anticipated profits from the development of that land. These claims are unsupported by both the facts and the law. Below is a brief summary of the facts of the case, which the United States understand Plaintiffs do not contest—they refuse to stipulate because they believe an organized statement of facts is prejudicial to their case.[2]

In 2004, the Navy entered an agreement with the City of San Francisco to HPNS parcels to the City after regulatory confirmation that environmental remediation of the parcels was complete. The Navy's agreement with the City provided that the Navy would transfer each parcel to the City for the cost of $1.00 for the City to pursue economic redevelopment. That same year, the Navy transferred Parcel A to the City, which in turn transferred the land to Lennar Plaintiffs for development. Neither TtEC nor TTI performed any remediation work on Parcel A. The Navy

[2] *See Inst. For Fisheries Resources v. Bridgestone Am. Tire Op*erators, 3:23-cv-5748, (Donato, J.) Dkt. 281. (**"**If the Court concludes that a party has been uncooperative in stipulating to facts or otherwise streamlining the trial presentation, it will reduce the party's trial time to present its case.)

had no direct contractual relationship with either Five Point or Lennar Plaintiffs, and Plaintiffs never paid the Navy for the land.

The Navy contracted with TtEC to conduct aspects of the environmental cleanup, including radiological remediation, at the remaining HPNS Parcels. Neither TtEC nor TTI had a contractual relationship with Plaintiffs. On or around October 3, 2012, the Navy's Radiological Affairs Support Office (RASO) informed TtEC that some soil samples from Parcel E appeared anomalous. TtEC investigated and identified other anomalous samples from Parcel C. TtEC and the Navy worked together to implement corrective actions under the remediation contract. On November 29, 2012, TtEC prepared a Root Cause Analysis as to the cause of the anomalous soil samples. On September 27, 2013, RASO concluded that the Root Cause Analysis did not provide an adequate explanation for the anomalous samples. On October 21, 2013, TtEC reported the issue to the Nuclear Regulatory Commission (NRC), the agency that issued TtEC's radiological license. The Navy and TtEC then continued to work on further corrective actions. On April 7, 2014, the Navy also informed the U.S. Environmental Protection Agency (EPA)_and state regulators of the anomalous soil samples.

By early 2014 and into 2015, NBC Bay Area news and other news outlets began reporting that soil remediation was being done improperly at HPNS and that the radiological cleanup was "botched." Geosyntec, an environmental services consulting company retained by Plaintiffs, attended meetings with the Navy and the City and received information from the City concerning the issues with the radiological remediation. Plaintiffs also received continual updates on the news reports of the cleanup at HPNS through media monitoring reports from G.F. Bunting, a public relations firm that Plaintiffs retained.

On or around February 11, 2016, the NRC issued an investigation report identifying potential enforcement action. On July 28, 2016, the NRC issued a notice of violation and a $7,000 proposed civil penalty based on the conduct of two TtEC employees after considering that TtEC had taken various corrective actions, including requiring retaining, resampling, and an enhanced quality assurance process.

By September 2016, further transfer of all HPNS parcels was indefinitely delayed. On September 13, 2016, the EPA issued a letter requesting that the Navy confirm that further parcels would not be proposed for transfer without the results of investigations into soil samples taken by TtEC, which the Navy confirmed. On September 19, 2016, the City stated it would not accept transfer of any HPNS parcels until federal and state regulators were satisfied that the land was clean. Throughout September 2016, news reports from NBC, SF Magazine, the San Francisco Chronical, and others reported that all land transfers had halted pending further investigation and that the timeline for completing these investigations was unknown. Plaintiffs received these news reports and updates on transfer from Geosyntec, G.F. Bunting, and the City. Plaintiffs also attended meetings with the EPA and the Navy that repeated the same information. By December 2016, Five Point Plaintiffs identified potential transfer delay as a material risk factor for investment in their SEC filings.

On December 14, 2016, the EPA recommended that the Navy, through a new contractor, review all records of TtEC's radiological work across all sites at HPNS, to identify areas of uncertainty and to resample priority areas of uncertainty. The Navy, through new contractors, continued to re-review TtEC's sampling records throughout 2017. In December 2016, Five Point Plaintiffs potential transfer delay as a material risk factor for investment in their SEC filings.

On March 15, 2017, the Navy submitted a victim impact statement in the criminal case against the two former TtEC employees, Justin Hubbard and Stephen Rolfe, for falsification of records under 18 U.S.C. § 1519 in connection with the submission of false soil samples at HPNS. This statement asked for a substantial sentence because their actions created uncertainty as to the trustworthiness of the cleanup, leading to a delay of approximately a decade to planned transfers. The victim impact statement became public on May 2, 2018.

**Claims Against the United States**

Two threshold sovereign immunity issues bar Plaintiffs' tort claims against the United States. First, Plaintiffs' generic negligent supervision and negligent hiring claims are the types of claims that the Ninth Circuit has routinely held are barred by the FTCA's discretionary function exception. Second, Plaintiffs fail to identify—as required by the FTCA—any applicable state law

duty governing the supervision or retention of a contractor. Setting aside these threshold issues, Plaintiffs will also fail to prove the elements of their claims—duty, breach, causation, and damages—or proceed on theories against the United States that are barred by other doctrines of sovereign immunity under the FTCA.

First, as noted, Plaintiffs fail to identify an applicable state law duty. There is no duty under state law for a party contracting for services to search for fraud by its contractor. There is also no duty under state law for a party contracting for services to immediately terminate a contractor after believing that a contractor provided unsatisfactory services.

Second, even if a state law duty existed, Plaintiffs do not articulate a theory of breach. Plaintiffs do not explain *how* the Government's supervision or retention of TtEC was negligent. Plaintiffs do not contest that it was a Navy RASO employee who identified the anomalous soil samples that led to the discovery of soil sample falsification, belying any claim of negligent oversight. Plaintiffs also do not dispute that the Navy ceased contracting with TtEC for services at HPNS after attempts at corrective action pursuant to the terms of the contract and an investigation. Nor do Plaintiffs seriously contend that the Navy's initial retention of TtEC for remedial services going back to 2003 was negligent. Rather than the breach of a duty, Plaintiffs' claims are premised on strict liability—that the United States is liable simply because falsification occurred. But the FTCA does not waive sovereign immunity for the acts of contractors or for strict liability claims.

Third, even if Plaintiffs identified a state law duty and articulated a theory of breach, their claims fail on causation. Plaintiffs assert the United States was negligent in its supervision and retention of TtEC, but this alleged negligence only caused Plaintiffs' purported injuries because Plaintiffs were unaware of the scale of the data falsification or the impact on transfer schedules. Plaintiffs assert that, had they known prior to the May 2, 2018, unsealing of the Navy's victim impact statement, they would have altered development plans to avoid losses. Such a theory of causation, premised on the United States' failure to communicate information, is barred by the FTCA's misrepresentation exception.

Absent this failure to communicate theory, Plaintiffs can articulate no causal relation between the Navy's purported negligent supervision and retention and their alleged injuries. For example, Plaintiffs cannot show that even more scrutinous supervision would have stopped the intentional soil sample falsification by two former TtEC employees. Nor could Plaintiffs show how earlier termination of contractual relations with TtEC for work at HPNS would have prevented their harm. Once the soil sample falsification occurred, the Navy needed to work with regulators to reassess all data at the site. Earlier termination of contractual relations with TtEC would not have reduced any transfer schedule delays.

Fourth, Plaintiffs fail to identify any damages as a result of the United States' conduct. The Navy is providing prime real estate to Plaintiffs—via the City of San Francisco—for free. What Plaintiffs complain of is the inability to make money off this free land faster. But no one disputes that Plaintiffs will be able to make money off this free land once it is transferred. Moreover, the damages Plaintiffs do articulate arise from interference with contracts—namely, failure to receive land from the City under the Disposition and Development Agreement with the City or the cancellation of homebuyer contracts at Parcel A. The FTCA's interference with contract rights exception bars these theories of damages.

The only other damages Plaintiffs identify are for equitable indemnification for the *Pennington* and *Bayview* claims. In *Pennington et al. v. Tetra Tech EC, Inc. et al.*, the Court held that the Price Anderson Act barred the *Pennington* plaintiffs' claims. 3:18-cv-5330, ECF No. 413. Because the United States may raise all defenses that Plaintiffs could have raised in the underlying action, equitable indemnity is not appropriate for the *Pennington* case. Further, Plaintiffs' equitable indemnity claims are duplicative of their NDAA Section 330 claims pending in the Court of Federal Claims.

Finally, setting aside the jurisdictional issues and Plaintiffs' inability to prove each element of their claim, the affirmative defense of statute of limitations bars the claims. By September 2016, the fact that the transfer of HPNS parcels would be indefinitely delayed was clear. The EPA, California state regulators, and the City all stated that they would not accept transfer of further parcels until the investigation of the radiological data collected by TtEC was

complete. The local press reported on these issues widely, and Plaintiffs learned about the indefinite transfer delays through the City, Geosyntec, and G.F. Bunting. In December 2016, Five Point Plaintiffs included potential transfer schedule delays as a risk factor in their SEC filings. Yet, Plaintiffs did not submit administrative tort claims until June 27, 2019, more than two years after the FTCA's statute of limitations period. 28 U.S.C. § 2401(b).

## II. RELIEF REQUESTED

### A. Plaintiffs' Position

Plaintiffs request from all defendants: (1) judgment on all claims; (2) compensatory and special damages, including monetary damages resulting from delayed transfers, delayed sales, depressed prices, increased costs, out-of-pocket losses, unrecoverable expenses, loss of tax increments, worsened financing terms, costs of investigating Defendants' misconduct, and reputational harm; (3) equitable indemnification; (4) costs of suit and reasonable attorneys' fees incurred; and (5) any further relief that the Court may deem just and fair. Plaintiffs also seek punitive damages and pre-judgement interest at the maximum legal rate against Tetra Tech. Plaintiffs request an award holding Tetra Tech, Inc. and Tetra Tech EC, Inc. jointly and severally liable for all of Plaintiffs' damages, costs, fees, and interest arising from Tetra Tech, Inc.'s, Tetra Tech EC, Inc.'s and the United States' joint tortious conduct. Plaintiffs also request an award holding the United States liable for all of Plaintiffs' damages, costs, fees, and interest arising from the United States' tortious conduct, and jointly and severally liable for all compensatory damages arising from the United States and Tetra Tech's joint tortious conduct.

### B. TTI and TTEC's Position

TTI and TtEC request that under the PAA, the Court dismiss Developers' claims against them for lack of subject matter jurisdiction or, in the alternative, enter summary judgment in favor of TTI and TtEC. To the extent that the Court does not grant TTI and TtEC's pending PAA motion, TTI and TtEC deny that Developers are entitled to any relief from them. In addition, TTI and TtEC seek equitable indemnification from Developers.

### C. United States' Position

The United States requests dismissal of all claims against it for lack of subject-matter jurisdiction or, in the alternative, judgment in its favor on all claims asserted against it. In addition, in the event the jury finds TtEC or TTI are liable, the United States cannot be held jointly and severally liable for certain types of damages, such as punitive damages and damages arising from interference with contract rights.

## III. UNDISPUTED FACTS

Below is a list of facts which are not in dispute.

- The Hunters Point Naval Shipyard (HPNS) is a former Navy facility, parts of which became exposed to radioactive contamination during the operations of the Second World War and the Cold War.
- In 1989, HPNS was placed on the National Priorities List under CERCLA and became a Superfund site.
- In 1991, the Navy identified HPNS for closure as part of the Base Realignment and Closure Program (BRAC).
- In 2003, the Redevelopment Agency of the City and County of San Francisco (the "Redevelopment Agency") entered into the Hunters Point Shipyard Phase 1 Disposition and Development Agreement ("Phase 1 DDA") with Lennar/BVHP Partners for the development of Parcel A on the Shipyard. In 2004, the Navy entered an agreement with the City of San Francisco to transfer HPNS parcels to the City after regulatory confirmation that environmental remediation of the parcels was complete.
- Approximately 496 acres of HPNS were designated for redevelopment.
- The Hunters Point Naval Shipyard was originally divided into Parcels A, B, C, D, and E. At different points over time, the Parcels were further subdivided into Parcels A-1, A-2, B-1, B-2, C, D-1, D-2, E, E-2, F, G, UC-1, UC-2, and UC-3.
- By 1995, Parcel A was reviewed and approved by federal and state regulators for no further action.

- In 2004, the Navy transferred HPNS Parcel A to the City, which in turn transferred the parcel to Lennar for development.
- The Navy has not transferred Parcels B-1, B-2, C, D-1, E, E-2, F, G, or UC-3 at the Hunters Point Naval Shipyard to OCII (or any other entity).
- The Navy contracted with TtEC to conduct radiological remediation at Hunters Point.
- Neither TtEC nor TTI performed any environmental remediation on Parcel A.
- Neither TtEC nor TTI have ever been hired by Lennar, Five Point Holdings, LLC or CP Development Co., LLC, or any related or predecessor entities, to conduct radiological remediation at Hunters Point Naval Shipyard.
- On June 3, 2010, CP Development Co., LP, (a then wholly-owned subsidiary of Lennar) entered into a Disposition and Development Agreement ("DDA") with the Redevelopment Agency.
- The San Francisco Office of Community Investment and Infrastructure ("SF OCII") is the successor agency to the Redevelopment Agency.
- Several state, local, and federal agencies are involved in the cleanup of HPNS, including the United States Environmental Protection Agency ("EPA"), California Department of Toxic Substances Control ("DTSC"), San Francisco Regional Water Quality Control Board ("SF-RWQCB"), and the San Francisco Department of Public Health ("SFDPH").
- On June 27, 2019, the Navy received SF-95 administrative tort claims from Plaintiffs.

## IV. <u>DISPUTED FACTUAL ISSUES</u>

Below is a summary of the key disputed factual issues:

### A. Plaintiffs' Statement of Disputed Factual Issues

- The extent of Tetra Tech's fraud at HPNS and whether Tetra Tech covered up the extent of the fraud.
- Tetra Tech's negligence at HPNS and whether Tetra Tech covered up the extent of the negligence.
- The United States' negligence, including whether the United States breached its mandatory duties.

- Tetra Tech's control over its subcontractors at HPNS.
- Whether Tetra Tech's employees and subcontractors were acting within the scope of their employment in committing misconduct at HPNS.
- The qualifications of Tetra Tech, its employees, agents, and subcontractors to perform the remediation work mandated by the Navy.
- Whether Tetra Tech employees and subcontractors were pressured by Tetra Tech supervisors and managers to commit fraud.
- The extent of Tetra Tech's managers' and corporate officers' involvement in fraud at HPNS and/or its coverup.
- Tetra Tech's financial motives for committing fraud.
- The extent, nature, and results of Tetra Tech's and the Navy's investigations into misconduct in the remediation of HPNS.
- Whether Tetra Tech EC, Inc. acted as Tetra Tech, Inc.'s agent while engaging in misconduct.
- The extent of Tetra Tech, Inc.'s knowledge of the fraud at HPNS, coverup of the fraud, and endorsement of the fraud.
- Whether Plaintiffs' reliance on the Navy's property transfer schedules was reasonable.
- Whether Plaintiffs were aware prior to the unsealing of the guilty pleas of Justin Hubbard and Stephen Rolfe in May 2018 of the widespread cleanup fraud by Tetra Tech that would result in unprecedented property transfer delays and harm to Plaintiffs.
- Whether Plaintiffs were aware prior to the unsealing of the guilty pleas of Justin Hubbard and Stephen Rolfe in May 2018 that the Navy's negligence and Tetra Tech's misconduct had caused them harm.
- Whether Plaintiffs suffered damages by the actions of Tetra Tech and the United States, and, if so, the amount of Plaintiffs' damages.
- Whether the Navy's and Tetra Tech's misconduct was a substantial factor in causing the *Pennington* and *Bayview* plaintiffs' harm, leading them to sue Developers.

**B. Defendants' Statement of Disputed Factual Issues**

- Whether Developers can prove the fraudulent deceit or intentional misrepresentation claim against TTI or TtEC.
- Whether Developers can prove the negligence claim against the United States, TTI, or TtEC.
- Whether Developers can prove the negligent hiring, training, or supervision claim against the United States, TTI, or TtEC.
- Whether Developers can prove the negligent interference with prospective economic relations claim against the United States, TTI or TtEC.
- Whether Developers can prove the intentional interference with prospective economic relations claim against the United States, TTI or TtEC.
- Whether Developers can prove that TTI is responsible for TtEC's conduct.
- Whether Developers can prove that TtEC is responsible for conduct of its employees or subcontractors.
- Whether Developers can prove that they suffered damages as a result of the actions of TTI, TtEC, or the United States, and if so, the amount of Developers' damages.
- Whether Developers can prove the equitable indemnification claim against the United States, TTI, or TtEC, and if so, the amount of the indemnification.
- Whether TTI or TtEC can prove the equitable indemnification counter-claim against Developers, and if so, the amount of the indemnification.
- When Developers' claimed harm occurred.
- When Developers discovered, or a reasonable and diligent investigation would have disclosed, that the alleged conduct of TTI, TtEC, or the United States contributed to Developers' claimed harm.
- Whether Developers suffered physical harm from exposure to radiation in excess of federally-established maximum safety limits.
- Whether applicable mandatory and specific directives exist and, if so, whether the United States complied for purposes of the discretionary function exception.

- Whether Plaintiffs' alleged damages arise from a purported failure by the United States to convey the scope of the investigation into radiological data collected by TtEC's employees or to convey delays to the transfer of HPNS parcels to Plaintiffs.
- Whether Plaintiffs' alleged damages arise from interference with existing, rather than prospective, contracts and economic relationships.
- Whether Plaintiffs' damages were caused by the Navy's continued contracting with TtEC, at HPNS after October 2012, and whether the retention of an alternative contractor could have avoided Plaintiffs' alleged damages.

## V. DISPUTED LEGAL ISSUES

In addition to disputes relating to the jury materials (as outlined in the parties' concurrently-filed proposed jury instructions and verdict form), the admissibility of exhibits (as outlined in the parties' concurrently-filed exhibit list), the legal issues associated with the pending motions *in limine* being filed concurrently, motions to exclude expert testimony (3:20-cv-01485-JD, ECF Nos. 311, 312, and 310; 3:20-CV-01481-JD, ECF No. 326; 3:20-cv-01481-JD, ECF No. 274; 3:20-cv-01481-JD, ECF No. 273; 3:20-cv-01485-JD, ECF No. 318; and 3:20-cv-01481-JD, ECF No. 271; 3:20-cv-01485-JD, ECF No. 316 ), and disputes relating to the legal sufficiency of the evidence to support each element of the claims asserted against Defendants, below is a summary of the key disputed legal issues:

- ***Statute of Limitations.*** Developers and TTI/TtEC dispute the applicable statute of limitations for the claims against TTI and TtEC, the accrual date of Developers' claims, and whether the applicable statute of limitations was tolled against TTI and TtEC. Developers and the United States dispute the accrual date of Developer's claims and whether the applicable statute of limitations on the claims against the United States was tolled.
- ***Equitable Indemnification.*** The parties dispute whether Developers are entitled to equitable indemnification for homeowners' damages claims in *Bayview* and *Pennington*, and whether TTI and TtEC are entitled to equitable indemnification for the claims in *Bayview*.

- ***Price-Anderson Act.*** Developers and TTI/TtEC dispute whether TTI/TtEC have properly invoked the PAA as an affirmative defense, whether the PAA is an affirmative defense, whether the PAA is applicable to Developers' claims, and whether Developers' claims should be dismissed or judgment should be entered in favor of TTI and TtEC under the PAA.
- ***Parent Company's Liability For Subsidiary.*** Developers and TTI/TtEC dispute whether TTI may be held liable for conduct of TtEC, and under what legal standard.
- ***Duty.*** Developers and TTI/TtEC dispute whether TTI or TtEC owed Developers a legal duty of care to prevent their claimed economic damages.
- ***Analogous Private Liability***. Developers and the United States dispute whether the duties Developers identify could apply to the United States "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.
- ***Discretionary Function Exception.*** Developers and the United States dispute whether the FTCA's discretionary function exception applies. 28 U.S.C. § 2680(a).
- ***Misrepresentation Exception.*** Developers and the United States dispute whether the FTCA's misrepresentation exception applies. 28 U.S.C. § 2680(h).
- ***Interference with Contract Rights Exception.*** Developers and the United States dispute whether the FTCA's interference with contract rights exception applies. 28 U.S.C. § 2680(h).
- ***Independent Contractor Exception.*** Developers and the United States dispute whether the United States could be held liable for the actions of contractors, including TtEC.
- ***Duty Under State Law.*** Developers and the United States dispute whether the United States can be liable under the FTCA for the breach of a duty arising under federal, rather than state, law.
- ***Duty to Detect Fraud.*** Whether the United States had a duty to prevent and/or detect fraudulent or intentional misconduct as part of its supervision of TtEC.

- ***Duty to Cease Contractual Relationships.*** Whether the United States had a duty to terminate all further contracts with TtEC after the detection of anomalous soil samples, or the conclusion that the soil samples had been intentionally falsified.
- ***Duty to Communicate.*** The United States asserts that whether the United States had a duty to convey accurate information regarding the investigation into anomalous soil samples and potential soil sample falsification or accurate transfer schedule information to Plaintiffs is in dispute. Plaintiffs assert that none of their causes of action against the United States depends on the existence of a "duty to convey accurate information regarding the investigation into anomalous soil samples and potential soil sample falsification or accurate transfer schedule information to Plaintiffs," as stated by the United States. Furthermore, there are factual disputes related to when Plaintiffs suffered appreciable harm and when they knew certain facts that are relevant to Defendants' statute of limitations defense. Aspects of Plaintiffs' position on this issue is set forth in their opposition to the United States' Motion in Limine No. 3 (transfer schedules).

## VI. STIPULATIONS

The parties stipulate that:

- ***Fact Witnesses.*** Each party may designate a current or former employee to serve as a designated representative for the trial. Except for the designated representative for each party, all fact witnesses will be excluded from the courtroom except when they are called to testify and will be barred from reviewing the testimony of any other witness (via transcript, video, audio, or any other means) before they testify.
- ***FRE 611(b)***. For the convenience of the witnesses, the parties agree that fact witnesses should only be called at trial once (except if called in a party's rebuttal case). If Plaintiffs call a witness who is also on Defendants' witness list, the parties agree that Defendants will not be limited to cross examination, but rather, may conduct direct examination as well. Plaintiffs will be allowed to cross-examine in the same manner following Defendants' direct examination.

- ***Pre-Admitted Exhibits.*** The parties agree that exhibits identified in bold and with an asterisk on the joint exhibit list may be "pre-admitted" into evidence and may be used in openings, closings, and examinations without witness identification or testimony. All parties reserve the right to object to testimony about "pre-admitted" exhibits.
- ***"Admissible" Exhibits.*** For all exhibits which the parties have agreed are "admissible," Plaintiffs do not waive objections to the use of such an exhibit without it first being introduced at trial with an appropriate witness – that is, a witness with some basis to testify about the document. Plaintiffs' position is that only then may the exhibit be formally moved into evidence, without objection. Plaintiffs object to "admissible" exhibits being used in openings, closings, or sent to the jury room without first being sponsored by an appropriate witness. Defendants' position is that "admissible" exhibits may be "pre-admitted" into evidence and may be used in openings, closings, and examinations without witness identification or testimony. All parties reserve the right to object to testimony about "admissible" exhibits.
- ***Disclosure of Demonstratives.*** The parties have agreed to provide final copies of any demonstratives they plan to use during the direct examination of any witness no later than 4 p.m. one calendar day before calling the witness to the stand.
- ***Reduction of Deposition Designations***. A party must disclose any reductions to a witness's deposition designations no later than 12 p.m. two calendar days before calling a witness by deposition. The other party must disclose any reductions to its counter-designations for that witness within 24 hours of receiving the reduced deposition designations from the other party.
- ***Withdrawal of Motion to Exclude Five Point Expert Eric Sussman***: Plaintiffs stipulate that they will not present testimony from Eric Sussman at trial. Accordingly, the United States withdraws its pending Daubert motion, 20-cv-1480-JD, Dkt. No. 215.
- ***Deposition Testimony of Third Party Witnesses***. To alleviate the burden on certain third parties who may reside within 100 miles of the Court, the parties have agreed that the

following witnesses may be presented by deposition designation rather than live testimony: Amy Brownell, Rich Kanaya, Sheetal Singh.

The parties continue to discuss other potential stipulations. The parties have been unable to reach a stipulated proposal, however, on the following issue, and request input from the Court.

- ***Expert Testimony Sequencing.***

**<u>Plaintiffs' Position</u>**

Because of the overlap between affirmative experts who also rebut another party's affirmative experts, it is not feasible to have all experts take the stand only once. This would mean Plaintiffs' affirmative experts who also have rebuttal opinions would be prevented from offering those rebuttal opinions, or be forced to give them before the defense expert gave the affirmative opinions to be rebutted. Accordingly, in an effort to follow the Court's preference for expert sequencing to the extent possible, Plaintiffs propose the following sequencing:

- Defendants' damages experts directly follow Plaintiffs' damages experts.
- Defendant's government contracting expert directly follows testify Plaintiff's government contracting expert.
- Plaintiffs' scheduling expert to directly follow Defendants' scheduling expert.
- All other experts give their affirmative opinions in their respective cases-in-chief.
- Defendants' experts give their rebuttal opinions in Defendants' case-in-chief.
- Plaintiffs' rebuttal experts give their rebuttal opinions in Developers' rebuttal case, even if they have already taken the stand in Plaintiffs' case to give their affirmative opinions.

**<u>The Tetra Tech Defendants' Position</u>**

The Tetra Tech Defendants understand that the Court prefers opposing sides' experts to testify grouped together based upon subject matter. There are numerous overlapping experts in this case, with defendants' experts responding to multiple of Developers' experts, with the complexity particularly acute if Developers put on all 10 of their experts listed on their witness list. The interwoven nature of expert testimony in this case makes following the Court's preferred approach more complicated, but not impossible. The basic structure of the Court's preferred expert sequencing can still be followed: each defense expert testifies after all of Developers'

correspondence experts have testified. For example, the Tetra Tech Defendants' expert Dr. Remy Hennet opines on topics overlapping with Developers' experts Stephen Emsbo-Mattingly and Michael Miller. Thus, Dr. Hennet would testify after both corresponding Developers' experts. The Tetra Tech Defendants are also amenable to using a more "traditional" expert approach, with all of Developers' experts testifying in their case-in-chief, and the Defendants' experts testifying in the defense case. During the meet and confer process, Developers rejected both of these proposed options.

**<u>The United States' Position</u>**

The United States will follow whatever sequencing the Court orders. The United States understands that the Court prefers opposing sides' experts to testify grouped together based upon subject matter.

## VII. <u>BIFURCATION</u>

### A. Plaintiffs' Position

Plaintiffs do not plan to seek bifurcation of any issues at this time.

### B. TTI and TTEC's Position

TTI and TtEC seek bifurcation of the punitive damages phase of the trial from the liability and compensatory damages phase. Under Federal Rule of Civil Procedure 42(b), the Court may bifurcate trial both "to avoid prejudice" and "to expedite and economize." Bifurcation of punitive damages is warranted for both those reasons. Developers intend to seek substantial punitive damages against TTI and TtEC, and their case includes an expert witness on punitive damages who would purportedly testify on the appropriate amount of punitive damages based on "Tetra Tech's" alleged culture and incentives for wrongdoing. TTI and TtEC have moved to exclude this improper punitive damages expert. Developers also intend to present evidence of TTI's and TtEC's financial condition that would be irrelevant to the liability phase of the trial. Introducing fact evidence and (improper) expert testimony on those issues during the trial of liability and compensatory damages would be highly prejudicial to TTI and TtEC. It would also promote judicial economy to allow the evidence only if the jury finds TTI or TtEC liable (and, indeed, Developers already are asking for more trial time than the Court has provided). The Court

therefore should bifurcate the trial into an initial phase on liability and compensatory damages and a subsequent phase on punitive damages, to occur only if the jury finds TTI or TtEC liable. Courts in this District often have bifurcated the punitive damages phase for reasons equally applicable here. *See, e.g.*, *Amezquita v. Garcia-Cortes,* 2026 WL 3036406, at *5 (N.D. Cal. Oct. 9, 2026); *Vieste, LLC v. Hill Redwood Dev.,* 2011 WL 13153235, at *1 (N.D. Cal. Nov. 30, 2011); *Bowoto v. Chevron Corp.,* 2008 WL 2074401, at *1-2 (N.D. Cal. May 15, 2008).

**C. The United States' Position**

The United States does not plan to seek bifurcation of any issues at this time.

## VIII. SETTLEMENT

**A. Plaintiffs' and TTI/TTEC's Position**

The parties previously attempted to settle the case on August 27, 2025 with the assistance of Hon. Dean Pregerson but were unable to reach an agreement. In March 2026, the Court referred the above-captioned cases to Magistrate Judge Laurel Beeler for settlement purposes. On June 25, 2026, Judge Beeler held a settlement conference with the parties, where no settlement was reached. The parties are continuing to engage with Judge Beeler regarding settlement including through a settlement conference on November 4 and 5, 2026.

**B. United States' Position**

The United States participated in all settlement conferences listed above and will consider any new information or settlement demands received, but the United States does not believe settlement as to the claims against it is appropriate at this time due to the strength of multiple, dispositive jurisdictional issues until those issues are resolved by the Ninth Circuit Court of Appeals. The United States' position on jurisdiction, as articulated in its motion for certification of interlocutory appeal under 28 U.S.C. § 1292(b), was approved at the highest level of the Department of Justice.

## IX. ESTIMATE OF TRIAL LENGTH

**A. Plaintiffs' Position**

Plaintiffs continue to believe that 20 hours is not sufficient to present their case and rebut Defendants' defenses. Plaintiffs estimate 35 hours per side (exclusive of openings, closings, and

jury selection) will be necessary given the number of parties and claims, the anticipated length of essential fact and expert witness testimony (both live and by deposition), and the amount and complexity of disputed issues. Plaintiffs are prepared to discuss this issue at the appropriate time.

**B. Defendants' Position**

The Court previously stated that the parties should "estimate presentation times of no more than 20 hours per side, exclusive of openings and closings." 3:20-cv-1480, ECF No. 282. The Defendants will abide by the Court's limitation on time.

**Related Dispute as to Witness List Disclosures**

**A. Plaintiffs' Position**

Plaintiffs' comprehensive witness list and candid time estimates reflect a transparent effort to preserve the testimony they may need at trial to prove their claims— nothing more, and nothing less. Plaintiffs' list also reflects months spent cutting back their case-in-chief and substantially reducing their deposition designation disclosures. Plaintiffs have committed to the live witnesses and specific deposition designations disclosed in this submission. They will be reduced further as the evidence comes in and to meet the Court's time limits, whether the Court allows more time or not. Plaintiffs' disclosure is intended to preserve the right to call to the stand the witnesses and play the deposition testimony necessary to prove their claims as the trial unfolds. Plaintiffs prepared their list with an eye toward transparency and candor to the Court and Defendants. Defendants have taken a different approach.

Defendants' list is neither candid nor transparent. Rather than stake out the deposition testimony they may need for their case, they obscure the amount of time they may reasonably spend on a given witness. Plaintiffs understand that these lists are intended to be good faith estimates, and that things change in the lead up to, and during the course of, trial. But Defendants have ***not*** prepared their estimates or disclosures in good faith. The gamesmanship is inappropriate and should not be allowed. Specifically:

- ***Defendants' Deposition Designation Estimates Do Not Match Their Designations***: The amount of time reserved for a deposition witness is not an estimate; it is simply a number based on the runtime of the designated testimony. Accordingly, Plaintiffs' estimated times for deposition witnesses correspond to their exchanged designations to the minute. Not so for Defendants' deposition witnesses. Tetra Tech designated six hours and 21 minutes of deposition testimony, including 98 minutes for third party witness Amy Brownell. Yet in its list, Tetra Tech "estimates" 70 total minutes of deposition testimony, and only 5 minutes for Ms. Brownell. Similarly, the United States designated over four hours of deposition testimony, including 93 minutes for former Five Point and Lennar employee Mark Luckhardt. Yet in its list, the United States "estimates" 180 minutes for all depositions and only 30 minutes for Mr. Luckhardt. Defendants paint an inaccurate picture for the Court and impose an unwarranted burden on Developers.

- ***Defendants Fail to Provide Estimates for Plaintiffs' Witnesses***: Both Defendants provide "0 min" estimates for multiple witnesses on Plaintiffs' list. These estimates are inappropriate and render the witness list unhelpful to the Court and prejudicial to Plaintiffs.

Defendants are choosing to "hide the ball" so that their case ***appears*** to fit within a 20-hour per side time limit. But for the reasons above, the table included in Defendants' position statement is inaccurate and misleading. Plaintiffs, on the other hand, are disclosing all the witnesses they may call and the deposition testimony they may use because they understand that without robust pretrial disclosures, the right to put on additional testimony is waived. Theirs is a "real" disclosure so that Defendants are not surprised and there are no avoidable disputes about adequate witness disclosures. If Defendants intend to or spend time with a witness, they must disclose that

information now, not later, and not during trial. Defendants' tactics will only waste the Court's and Developers' time. Developers respectfully request that the Court require Defendants to provide a ***genuine*** witness list and disclose the ***actual*** time for their deposition designations, or be bound to their current disclosures free of purported reservations.

**B. Defendants' Position**

As the Court instructed, Defendants are preparing for a trial in which each side is allotted twenty hours or less of trial time. Developers are asking for more time and casting any lack of assent to that request as gamesmanship. Defendants' trial time estimates reflected in the witness list provide as much accuracy as can be known two months before trial. This is particularly true because Plaintiffs have insisted on listing a sprawling parade of witnesses that could never be heard within their allotted twenty hours (or less) of trial time.

Whether and for how long Defendants ultimately decide to cross-examine a witness on either the Developers' witness list or each other's witness lists will depend on whether and what that witness testifies to and in what detail. It is premature and inappropriate to demand the Defendants make concrete decisions about cross examination time in advance of trial. Defendants are reserving rights to cross examine a witness, even if that witness is allotted zero minutes on our witness list, because Defendants do not believe Developers will actually put most of their 62 listed witnesses on the stand. Defendants' representations that they expect to spend zero minutes of examination time on certain witnesses are also good-faith estimates and in no way inappropriate or prejudicial to Plaintiffs. On the contrary, those estimates provide an overview of which witnesses the Defendants plan to prioritize at trial and will allow Developers to prepare accordingly. Defendants made their most accurate estimates of trial time in the face of Developers wholly unrealistic witness list.

Defendants designated deposition testimony that they anticipate may be played at trial. However, the designations are not yet precise for a few reasons. First, some of the designations overlap with other parties' designations; that testimony will not be played more than once. Second, where live witnesses provide testimony that is currently designated, Defendants will not

play the designated testimony. For example, the Tetra Tech Defendants designated Amy Brownell's testimony. The Tetra Tech Defendants hope to elicit much of that testimony from live witnesses. To the extent the Tetra Tech Defendants are unsuccessful, the Tetra Tech Defendants will resort to the deposition designations—the preference is to use as much live testimony as possible, and to minimize deposition designations as much as is possible. Third, the parties have not yet exchanged counter designations so it is impossible for all the parties to perfectly estimate total times for witnesses appearing by designation. Ultimately, Defendants will endeavor to use deposition designations as sparingly as possible, but cannot be certain of the exact testimony that will be played until additional trial preparation occurs, such as reaching agreement on stipulated facts, and until Plaintiffs' put on their case.

The Developers concede that even their own deposition designations will be reduced given some of the above concerns. Yet instead of letting the designations narrow organically as trial approaches and occurs, which is Defendants' approach, Developers are using their 14.5 hours of deposition designations to insist that they need more than twenty hours of trial time. That bid for more time should be denied, just as it has been denied in the past.

For the Court's reference, the parties' estimated trial times are broken out in the chart below:

| **Party** | **Estimated Direct Live Examination Time** | **Estimated Deposition Designation Time** | **Estimated Cross Examination Time** | **Estimated Total Trial Time** |
|---|---|---|---|---|
| **Plaintiffs** | 17 hours, 45 minutes | 14 hours, 30 minutes | 6 hours, 50 minutes | 39 hours, 5 minutes |
| **TTI & TTEC** | 6 hours, 20 minutes | 1 hour, 25 minutes | 2 hours, 15 minutes | 10 hours |
| **United States** | 2 hours, 35 minutes | 2 hours, 50 minutes | 4 hours, 35 minutes | 10 hours |

Dated: November 5, 2026

O'MELVENY & MYERS LLP

By: /s/ David Marroso

DAVID MARROSO
*Attorney for Plaintiffs CPHP DEVELOPMENT, LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK 50, LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53, LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC; LENNAR CORPORATION; FIVE POINT HOLDINGS LLC; and CP DEVELOPMENT CO., LLC*

Dated: November 5, 2026

ALSTON & BIRD LLP

By: /s/ Jeffrey D. Dintzer

JEFFREY D. DINTZER
*Attorney for Plaintiffs CPHP DEVELOPMENT, LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK 50, LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53, LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC; LENNAR CORPORATION; FIVE POINT HOLDINGS LLC; and CP DEVELOPMENT CO., LLC*

Dated: November 5, 2026

UNITED STATES OF AMERICA, CIVIL DIVISION/TORTS BRANCH

By: /s/ Caroline Stanton

CAROLINE STANTON
*Attorney for Defendant UNITED STATES OF AMERICA*

Dated: November 5, 2026

MAYER BROWN LLP

By: /s/ Davina Pujari

DAVINA PUJARI
*Attorney for Defendants TETRA TECH, INC. and TETRA TECH EC, INC.*

**Civil Local Rule 5-1(i)(3) Attestation**

Pursuant to Local Rule 5-1(i)(3), I, David Marroso, the ECF filer of this document, hereby attest that I obtained concurrence in the filing of this document from each of the other signatories.

Date: November 5, 2026 By: */s/ David Marroso*

David Marroso